# In The Matter Of:

*Aaron Petitt, et al. v.*
*City of Cleveland*

---

*Aaron Petitt*
*January 17, 2019*

---

*Fincun-Mancini, Inc.*
*1801 E. Ninth Street*
*Suite 1720*
*Cleveland, Ohio 44114*
*(216) 696-2272*

Min-U-Script® with Word Index

Page 1

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE NORTHERN DISTRICT OF OHIO
    EASTERN DIVISION
3               - - -
4   Aaron Petitt,              )
5       and                    )
6   Cleveland Police           )
    Patrolmen's Association,    )
7           Plaintiffs,        )
8       vs.                    )Case No. 1:18-CV-01678-JG
9   City of Cleveland,         )
10          Defendant.         )
11              - - -
12
13      Videotaped deposition of Aaron Petitt, a
14  plaintiff herein, called on behalf of the defendant
15  for oral examination, pursuant to the Federal Rules
16  of Civil Procedure, taken before Karen A. Toth,
17  Notary Public in and for the State of Ohio, pursuant
18  to notice, at Burke Lakefront Airport, 1501 North
19  Marginal Road, Cleveland, Ohio 44114, on Thursday,
20  January 17, 2019, commencing at 9:54 a.m.
21              - - -
22
23
24
25

Page 2

1   APPEARANCES:
2   On behalf of the Plaintiffs:
3       Jared Klebanow, Esq.
        Klebanow Law LLC
4       701 City Club Building
        850 Euclid Avenue
5       Cleveland, Ohio 44114
6       Avery Friedman, Esq.
        Avery Friedman & Associates
7       701 City Club Building
        850 Euclid Avenue
8       Cleveland, Ohio 44114
9
10  On behalf of the Defendant:
11      Michael J. Pike, Esq.
        Assistant Director of Law
12      City of Cleveland Law Department
        601 Lakeside Avenue, Room 106
13      Cleveland, Ohio 44114
14
15  Also present:
16      Steve Mengelkamp, Video technician
17              - - -
18
19
20
21
22
23
24
25

Page 3

1                   INDEX
2   WITNESS:                        CROSS
3   Aaron Petitt
4       by Mr. Pike                    4
5               - - -
6
7           E X H I B I T S
8   Defendant's:                    Marked
9       A                             20
10      B                             26
11      C                             29
12      D                             31
13      E                             49
14      F                             84
15      G                            129
16              - - -
17
18
19
20
21
22
23
24
25

Page 4

1           PROCEEDINGS
2       VIDEO TECHNICIAN: We're on the record
3   at 9:54.
4           AARON PETITT
5   of lawful age, being first duly sworn, as
6   hereinafter certified, was examined and testified as
7   follows:
8           CROSS-EXAMINATION
9   By Mr. Pike:
10  Q   Sir, my name is Michael Pike.  I'll probably
11      be asking you all the questions today.  Have
12      you ever had your depo taken before?
13  A   Yes.
14  Q   How long ago?
15  A   Around two years.
16  Q   All right.  So a couple of ground rules.  We
17      have to respond verbally to any questions that
18      are asked just like if you're testifying in
19      court.  Try not to cut each other off.  I'll
20      give you the courtesy of letting you finish
21      your answer completely before I go into my
22      next question and just try to let me finish my
23      entire question before I -- before you answer.
24      It helps Karen with putting together a clean
25      record and we won't talk over each other,

Page 5

1     okay?
2 A   Okay.
3 Q   Can you state your name for the record?
4 A   Aaron Petitt.
5 Q   Okay. And, Mr. Petitt, where are you
6     currently employed?
7 A   The City of Cleveland.
8 Q   Okay. And then can you tell me, let's say
9     starting with high school, your background
10    including any college or education that you
11    have attended?
12 A   I went to Fairview High School.
13 A   Uh-huh.
14 A   Before graduating at the age of 17 I enlisted
15    in the U.S. military. My senior year I went
16    to basic training. I came back and I
17    completed my senior year of high school.
18    Directly following high school I joined the
19    U.S. Army and was active duty, First Ranger
20    Battalion, 75th Ranger Regiment where I served
21    four tours in both Iraq and Afghanistan.
22       Following my service in the U.S.
23    military I joined the Cleveland Police
24    Department approximately a year after that and
25    I started going to school at a few different

Page 6

1     places including Tri-C, Cleveland State and
2    then online. And I graduated through
3    University of Phoenix with a Bachelor's of
4    Criminal Justice.
5 Q   Okay. Just to give me an idea, when did you
6    graduate from high school year-wise?
7 A   2003.
8 Q   Okay. And then you served four tours you said
9    in the U.S. Army?
10 A   Yes.
11 Q   When did you get out of there?
12 A   October 14, '06.
13 Q   And around 2007 you joined the Cleveland
14    Division of Police?
15 A   Yes.
16 Q   And what was your initial rank at that point?
17    What was your rank?
18 A   I'm sorry.
19 Q   Patrol officer?
20 A   Yes.
21 Q   You currently are still a patrol officer?
22 A   Yes.
23 Q   2007 moving forward, at some point you left
24    the Cleveland Division of Police, correct?
25 A   Correct.

Page 7

1 Q   Do you recall the year or give me your best
2    estimate?
3 A   2011.
4 Q   Okay. And then what did you leave the
5    Division of Police to do?
6 A   To work as a security contractor for the U.S.
7    Department of State.
8 Q   Did you work for the Department of State or
9    did you work for a contractor who had a
10    contract with the --
11 A   Both.
12 Q   Okay. So you worked for the Department of
13    State in what capacity?
14 A   A security contractor.
15 Q   What did you do?
16 A   I provided close personal security and high
17    threat protection to mid and high level
18    dignitaries.
19 Q   And where was that -- where was that
20    employment?
21 A   Iraq.
22 Q   Okay. And then you said you worked for a
23    contractor as well?
24 A   Correct.
25 Q   That's separate from the Department of State

Page 8

1     work?
2 A   It was contracted to the State Department.
3 Q   All right. So who paid you?
4 A   Triple Canopy.
5 Q   All right. So that was your employer?
6 A   Correct.
7 Q   And how long did that employment for Triple
8    Canopy last?
9 A   Approximately a year and a half.
10 Q   So we're talking about 2013 you're coming back
11    to Cleveland Division of Police?
12 A   I'm not sure exactly on the dates.
13 Q   Okay. Absent -- I mean, putting aside what
14    you did for Triple Canopy, did you have any
15    other for-pay employment up until you returned
16    to Cleveland Division of Police around 2012 or
17    '13?
18 A   No.
19 Q   All right. How much did you get paid by
20    Triple Canopy?
21 A   $500 daily.
22 Q   Okay. And how long was that deployment?
23 A   Generally 90 days on and 30 days off.
24 Q   Why were you -- why did you cease working for
25    Triple Canopy?

Page 9

1 A    Initially I received an injury while I was
2      overseas, and then the contracts through the
3      defense agencies were cut.
4 Q    So Triple Canopy had lost the contract?
5 A    I'm not exactly sure how it happened with the
6      contracts.
7 Q    Okay.  Did you apply to any other government
8      or contractors after you stopped working for
9      Triple Canopy?
10 A   In regards to what time frame?  I'm sorry.
11 Q   Let's start after -- right after you stopped
12     working for Triple Canopy.
13 A   No.
14 Q   Okay.  So your next -- I'm assuming when you
15     returned to the Cleveland Division of Police
16     you had to reapply?
17 A   I had to submit a letter of intent to return.
18 Q   Did you retire when you left --
19 A   No.
20 Q   -- the first time?  What, did you take a leave
21     of absence?
22 A   I resigned.
23 Q   Okay.  When you came back to Cleveland
24     Division of Police in about 2012, 2013 after
25     your work with Triple Canopy you were a patrol

Page 10

1     officer again?
2 A   Yes.
3 Q   What district?
4 A   Third District.
5 Q   What district are you currently in?
6 A   Third District.
7 Q   Did you stay in there since -- you stayed in
8     the Third District since 2013 area?
9 A   No.
10 Q  Okay.  Walk me through where your career has
11    progressed through the Cleveland Division of
12    Police since 2013.
13 A  I don't recall the exact dates but after the
14    large East Cleveland incident there was an
15    issue with manpower in the Second District.  I
16    was sent to the Second District for 90 days
17    where I then returned to the Third District
18    for the remainder of the time.
19 Q  So there has only been a 90 day period where
20    you were out at the Second District?
21 A  Correct.
22 Q  Otherwise you've been in the Third?
23 A  Yes.
24 Q  Okay.  Since we're on employment, have you
25    applied for any other government contractor

Page 11

1     jobs besides -- well, at any time after you
2     returned from Triple Canopy?
3 A   Yes.
4 Q   Who?
5 A   SOC, Aegis.  That's all.
6 Q   Okay.  What were those positions?
7 A   Protective security detail.
8 Q   Okay.  Were those two separate application
9     processes?
10 A  Yes.
11 Q  The same type of work for both?
12 A  Yes.
13 Q  And when did you a apply to SOC?
14 A  Approximately seven months ago.
15 Q  And then how about with respect to Aegis; when
16    did you apply?
17 A  About the same time frame.
18 Q  So that's summer of 2018 give or take?
19 A  Yes.
20 Q  How long have you received -- is that --
21    strike that.
22       Is that a written application process?
23    How did you apply to SOC?
24 A  Online.
25 Q  What does SOC stand for, if you know?  Is that

Page 12

1     just --
2 A   That's just the name of it.  SOC is the name.
3     I don't know.
4 Q   And do you have a copy of the application?
5 A   No.
6 Q   That was submitted online.  You didn't print
7     out a copy or have a copy with you?
8 A   No.
9 Q   Are those positions still open or are they
10    still recruiting for those positions?
11 A  I'm not sure.
12 Q  Did you receive a follow-up letter or response
13    in any way with respect to that application
14    for SOC?
15 A  No.
16 Q  You didn't hear anything?
17 A  No.
18 Q  Do you know, to your knowledge, whether or not
19    that position is still open?
20 A  I don't know.
21 Q  Do you have any knowledge as to why you didn't
22    receive any type of follow-up employment with
23    SOC?
24 A  No.
25 Q  You have no information with regard to that,

Page 13

1    do you?
2  A   No.
3  Q   Okay.  Do you know what the pay rate was
4    suppose -- was going to be for this position?
5  A   500 a day.
6  Q   How about with respect to Aegis; did you make
7    the same type of application online?
8  A   Yes.
9  Q   Do you have a copy of that application?
10  A   No.
11  Q   Do you know if that position is still open?
12  A   I don't know.
13  Q   Did you receive any follow-up information or
14    contact regarding that application?
15  A   No.
16  Q   So do you know any reason why you didn't
17    receive anything since the time -- from Aegis
18    since the time you applied?
19  A   I don't know.
20  Q   Did you have any conversations with anyone
21    regarding your application for SOC or Aegis?
22  A   No.
23  Q   Same type of pay structure?
24  A   Yes.
25  Q   Have you made any other applications to any

Page 14

1    other -- for any other employment outside the
2    Cleveland Division of Police?
3  A   Yes.
4  Q   To whom or what entities?
5  A   Metroparks.
6  Q   What is that application for?
7  A   Patrol officer/park ranger.
8  Q   Okay.  When did you make that ap?
9  A   Approximately seven or eight months ago.
10  Q   So around the same time you made these other
11    applications?
12  A   Yes.
13  Q   Did you hear back from the Metroparks?
14  A   Yes.
15  Q   What did they say?
16  A   I was granted a phone interview.
17  Q   Okay.  Do you have a copy of your application
18    that you submitted to the Metroparks?
19  A   I don't believe so.
20  Q   Was that online or a written ap?
21  A   It was online.
22  Q   With respect to the phone interview, when did
23    that occur?
24  A   November 2018.
25  Q   When did you first hear back from Metroparks?

Page 15

1  A   I immediately received an automated email
2    stating they received the application.
3  Q   Okay.
4  A   Sometime after that that I can't recall I
5    received the email advising me that I'd be
6    receiving a telephone interview.
7  Q   Okay.  What period of time are we talking, a
8    week or two?
9  A   I believe it was a few months.
10  Q   Could you be any more specific?
11  A   No.
12  Q   Is that an email you received?
13  A   Yes.
14  Q   Do you still have the email?
15  A   I'm not sure.
16  Q   So you -- did you have to call or talk -- did
17    that email give you instructions as to how to
18    proceed with respect to the phone interview?
19  A   Yes.
20  Q   Who did you have to call or -- talk to or
21    call, if you recall?
22  A   I don't recall.
23  Q   Do you know who you spoke to at the
24    Metroparks?
25  A   No.

Page 16

1  Q   Do you recall the substance of the
2    conversation you had?
3  A   Yes.
4  Q   How long was the conversation?
5  A   Approximately ten minutes.
6  Q   Okay.  What did you guys -- what was discussed
7    on the phone call?
8  A   My background and my goals for the department.
9  Q   Okay.
10  A   My goals in joining the department.
11  Q   Did you receive an offer from Metroparks?
12  A   No.
13  Q   Do you know why?
14      MR. KLEBANOW: Objection.  You can
15    answer.
16      MR. PIKE: What's the objection?
17      MR. KLEBANOW: Form.  Go ahead and
18    answer.
19  Q   Did anybody express to you the reason why you
20    didn't receive that position?
21  A   No.
22  Q   So you have no idea why you didn't receive the
23    position?
24  A   No.
25  Q   You don't have any facts or evidence to

**Aaron Petitt, et al. v.**
**City of Cleveland**

**Aaron Petitt**
**January 17, 2019**

---

Page 17

1    indicate why you didn't receive that position?

2 A    No.

3 Q    Okay.  Did you receive any type of letter

4    after your phone interview?

5 A    No.

6 Q    Did they tell you you didn't receive the

7    position or is it just --

8 A    No.

9 Q    Never contacted you again?

10 A    No.

11 Q    Bad question.  Double negative.  Did anyone

12    ever contact you again after the phone

13    interview?

14 A    No.

15 Q    Did you contact them?

16 A    No.

17 Q    Okay.  Since that application have you made

18    application anywhere else for employment?

19 A    Yes.

20 Q    Where is that?

21 A    Stark Enterprise.

22 Q    What is Stark Enterprise?

23 A    It's a realtor organization in downtown

24    Cleveland.

25 Q    Realty?

---

Page 18

1 A    Yes.

2 Q    Okay.  What position were you applying for?

3 A    Director of security.

4 Q    When did you make that application?

5 A    Approximately seven to eight months ago.

6 Q    Did you make that application online or --

7 A    Online.

8 Q    Okay.  Do you have a copy of your application?

9 A    No, I don't.

10 Q    Stark Enterprises, are they located in

11    Cleveland?

12 A    Yes.

13 Q    Do you know their address offhand?

14 A    No.

15 Q    Did you receive any follow-up interview or

16    contact from Stark Enterprises after you

17    submitted your application?

18 A    No.

19 Q    Do you know -- have any reason to know why?

20 A    No.

21 Q    Did you ever have any conversation with anyone

22    associated with Stark Enterprises?

23 A    No.

24 Q    Okay.  Besides Stark Enterprises did you make

25    any other application for employment?

---

Page 19

1 A    Owens Corning.

2 Q    Okay.  When did you make that application?

3 A    Along the same time frame.

4 Q    Online I'm assuming?

5 A    Yes.

6 Q    What was that?  What position were you

7    applying for?

8 A    International threat and security advisor.

9 Q    Did you receive a follow-up interview with

10    respect to that application?

11 A    No.

12 Q    Do you know -- have any reason to know why?

13 A    No.

14 Q    Did you have any conversation or receive any

15    written correspondence from anyone at Owens

16    Corning regarding this position?

17 A    I received an email saying that I was not

18    selected.

19 Q    Okay.  When did you receive that?

20 A    I'm not sure on the date.

21 Q    Do you still have the email?

22 A    I believe so.

23 Q    Besides that email indicating that you weren't

24    selected to either an interview or the

25    position did you have any other contact with

---

Page 20

1    Owens Corning regarding that position?

2 A    No.

3 Q    What's your -- did you apply anywhere else?

4 A    No.

5 Q    Okay.  So I have Owens Corning, Stark

6    Enterprises, the Metroparks job, SOC and Aegis

7    for applications since about seven, eight

8    months ago?

9 A    Correct.

10 Q    Are there any other applications for positions

11    that we haven't discussed?

12 A    Not that I recall.

13 Q    Okay.  I didn't tell you at the beginning.  If

14    you need to take a break or get water, just

15    let me know, we'll take a break.  It's not a

16    marathon.

17 A    Okay.

18    (Defendant's Exhibit A

19    marked for identification.)

20 Q    All right.  I'm going to show you what's been

21    marked as Exhibit A.  Do you recognize this

22    document?

23 A    Yes.

24 Q    What is it?

25 A    It's the complaint filed -- filed by my

---

Aaron Petitt, et al. v.
City of Cleveland

Aaron Petitt
January 17, 2019

Page 21

1    attorneys and CPPA.
2  Q    Okay.  I want to run through some of the
3    things that you've alleged in this complaint.
4    I ask you -- I just want to ask you a few
5    things about Paragraph 9 on Page 3.  Talks
6    about your four tours of duty.  How long is a
7    tour of duty?
8  A    It ranges.
9  Q    Ranges from what to what?
10  A    From three weeks to two years.
11  Q    Okay.  So the four tours of duty that you did,
12    how long did each one of those last, if you
13    recall?
14  A    Between three and six months.
15  Q    How about the first tour, how long?
16  A    Approximately three to four months.
17  Q    Okay.  How about the second?
18  A    Approximately four months.
19  Q    Third?
20  A    I believe it was seven months.
21  Q    And then the fourth?
22  A    Four.
23  Q    Those were all consecutive with no breaks?
24  A    No.
25  Q    So you came back and then you had -- you

Page 22

1    stayed here and then re-enlisted?  How does
2    that work between the tours?
3  A    I was still active military in between the
4    tours.
5  Q    So you got redeployed?
6  A    Correct.
7  Q    Okay.  So you did your first tour -- between
8    your first and second tour of duty were you
9    furloughed back here in the states?
10  A    No.
11  Q    Okay.  What happened?  You just stayed there?
12  A    On active duty military the units we were in,
13    being in a special operations unit we were
14    only overseas for three to four months at a
15    time.  We would then return back home and
16    continue to train for the next operational
17    deployment.
18  Q    Okay.  Looking at Page 3 of your complaint, in
19    Paragraph 9 some -- they're referred to here
20    as decorations regarding the United States
21    Army.  I just want to run through them.  With
22    respect to the United States Army Achievement
23    Medal, can you tell me what that is?
24  A    It's a medal that's awarded to someone who was
25    recognized for something that they did.

Page 23

1  Q    Okay.  And in your circumstance who
2    recommended you for the medal?
3  A    I don't recall.
4  Q    Do you know what it was for?
5  A    I don't recall.
6  Q    With respect to the National Defense Service
7    Medal, what is that for, if you recall?
8  A    The National Defense Service Medal is issued
9    for wartime service.
10  Q    Okay.  All members of the armed -- of the Army
11    who perform wartime service receive the medal?
12  A    I'm not sure.
13  Q    Okay.  How about the Afghanistan Campaign
14    Medal, is that similar with respect to the
15    National Defense Service Medal; is it awarded
16    for people that serve in that campaign?
17  A    Yes.
18  Q    How about the Global War on Terrorism
19    Expeditionary Medal, do you know what that's
20    awarded for?
21  A    It's awarded to expeditionary services.
22  Q    What is an expeditionary service?
23  A    I don't have the exact definition.
24  Q    Okay.  Is that another medal that's -- for
25    lack of a better term, it's awarded for

Page 24

1    participation in a particular campaign?
2  A    No.
3  Q    Okay.  Can you tell me what -- anything more
4    specifically about it?
5  A    No.
6  Q    Okay.  How about the United States Army
7    Service Ribbon, do you know what that's
8    awarded for?
9  A    I think that one is just awarded for joining
10    the Army.
11  Q    Okay.  And then the U.S. Army Ranger Tab,
12    that's for becoming a part of the U.S. Army
13    Rangers I'm assuming?
14  A    No.
15  Q    Okay.  What is that for?
16  A    It's for completing the U.S. Army Ranger
17    school.
18  Q    Okay.  Can you complete the school and not
19    become an Army Ranger?
20  A    Yes.
21  Q    And then the Parachutist Badge, what is that
22    for?
23  A    For jumping out of planes.
24  Q    Okay.  All right.  Scrolling through Page 5,
25    there is an allegation in Paragraph 28 that

Page 25

1  you talk about that you had served as a
2  Cleveland Division of Police officer for
3  roughly ten years and you had an excellent
4  professional record. What I want to ask you
5  is with regards to your professional career as
6  a Cleveland Division of Police officer have
7  you received any disciplinary infractions or
8  charges in your career?
9  A  Yes.
10 Q  Can you tell me what those were and when they
11    occurred?
12 A  I don't recall the exact date.
13 Q  Okay. So can you tell me what charges you've
14    been brought up on during your career, if you
15    recall?
16 A  I was charged with failure to obey a direct
17    order.
18 Q  Insubordination; is that what it's called?
19 A  I believe it was insubordination. I'm not
20    sure.
21 Q  Okay. Can you tell me when that occurred?
22 A  I don't recall the exact date.
23 Q  Okay. And my understanding is you were found
24    guilty of that?
25 A  Yes.

Page 26

1  Q  And were you suspended or receive any
2     discipline with regard to that?
3  A  Yes.
4  Q  What was it, if you recall?
5  A  Ten days.
6  Q  Is that the first time that you were brought
7     up on disciplinary charges, to your
8     recollection?
9  A  I don't recall.
10 Q  What's the next time, if you recall, when you
11    were brought up on disciplinary charges?
12 A  I believe it was this.
13 Q  In 2018 is the next time that you believe you
14    were brought up on disciplinary charges?
15 A  I believe.
16 Q  Okay. Tell me a little bit about your
17    recollection of what occurred in 2018.
18 A  Well, I was charged with -- I don't know the
19    exact terms or exactly what the charge paper
20    said for the incident that we're here for. I
21    don't want to speculate.
22 Q  Okay.
23        MR. PIKE: Can you mark that B?
24        (Defendant's Exhibit B
25        marked for identification.)

Page 27

1  Q  Let me know when you've had a chance to take a
2     look at that.
3  A  Okay.
4  Q  Do you recognize that document?
5  A  Yes.
6  Q  What is it that I handed you as Exhibit B?
7  A  This is the charge packet that I received.
8  Q  This is with respect to the charges that you
9     were -- sorry. The specifications you were
10    charged with back in April of 2018?
11 A  Correct.
12 Q  You received this letter, I'm assuming?
13 A  Yes.
14 Q  Did you receive it before you had a
15    predisciplinary hearing?
16 A  Yes.
17 Q  Okay. And does it outline all the
18    specifications and charges that you were
19    charged with as a result of both this incident
20    that occurred in April of 2017 as well as an
21    incident that occurred in October of 2017?
22 A  Yes.
23 Q  It has -- there is actually several charges in
24    here; are there not?
25 A  Yes.

Page 28

1  Q  With regard to the second page of that
2     document, it has three specifications,
3     correct?
4  A  Correct.
5  Q  And those were the three specifications you
6     were charged with, correct?
7  A  Yes.
8  Q  The first specification relates to your
9     lawsuit that we're here about today where it's
10    alleged that you used disparaging remarks when
11    referencing an Arabic male during a potential
12    police action, correct?
13 A  Correct.
14 Q  Specification 2 charges you with failing to
15    use de-escalation techniques and contact and
16    cover when approaching a male as part of a
17    traffic stop, correct?
18 A  Correct.
19 Q  Okay. And then Specification 3 charges you
20    with failing to follow police rules and
21    regulations regarding covering your exposed
22    tattoos, correct?
23 A  Correct.
24 Q  Okay. And you were found guilty of all three
25    of those charges?

Page 29

1       MR. KLEBANOW: Objection. You can
2  answer.
3  A  Yes.
4       MR. PIKE: Let's mark that.
5       (Defendant's Exhibit C
6       marked for identification.)
7  Q  Let me know when you've had a chance to take a
8     look at what we've had marked as Exhibit C.
9  A  Okay.
10 Q  Okay. Can you tell me what Exhibit C is?
11 A  It is the reiteration of the specifications
12    and the findings by Chief Williams.
13 Q  Okay. And he found the findings with respect
14    to what is contained in this letter, you were
15    found guilty of all three specifications,
16    correct?
17 A  Yes, he did.
18 Q  With regard to Exhibit B, Specification 1, are
19    you aware of what group or severity level that
20    specification is?
21 A  No.
22 Q  Are you aware it's a Group II offense?
23 A  No.
24 Q  Do you have any reason to dispute that?
25       MR. KLEBANOW: Objection. You can

Page 30

1  answer.
2  A  I'm not sure. I don't know.
3  Q  Okay. How about with regard to Specification
4     2, do you know what group level defense -- or
5     what group level specification that is?
6  A  No.
7  Q  Would you have any reason to dispute that it's
8     a Group II offense?
9       MR. KLEBANOW: Objection. You can
10    answer.
11 A  I don't know.
12 Q  How about with respect to Specification 3, do
13    you know what group level offense that is?
14 A  No.
15 Q  Okay. All right. Between the time that you
16    received Exhibit B and the time that you
17    received Exhibit C it's my understanding you
18    had a predisciplinary hearing, correct?
19 A  Correct.
20 Q  And what was the purpose of that
21    predisciplinary hearing?
22       MR. KLEBANOW: Objection. You can
23    answer.
24 A  I'm not sure.
25 Q  Aren't you a member of a collective bargaining

Page 31

1  unit?
2       THE NOTARY: Hold on.
3       MR. PIKE: Oh, sorry.
4       (Defendant's Exhibit D
5       marked for identification.)
6  Q  I'm going to show you what's been marked as
7     Exhibit D, if you want to take a look at that.
8  A  Okay.
9  Q  All right. Can you tell me what that is?
10 A  This is a transcript of the hearing.
11 Q  That's your predisciplinary hearing?
12 A  Correct.
13 Q  All right. So when you received Exhibit B is
14    it fair to say that you were put on notice of
15    the charges against you?
16       MR. KLEBANOW: Objection. You can
17    answer.
18 A  Yes.
19 Q  Did you receive notice of the charges before
20    you received this letter, Exhibit B?
21 A  I'm sorry. Give me just a moment.
22 Q  Sure.
23 A  Could you repeat the question?
24 Q  Sure.
25       MR. PIKE: Go ahead and read the

Page 32

1  question back.
2       (Question read.)
3  A  I'm still not sure what you're asking.
4  Q  Sure. Were you put on notice of the charges
5     that you were brought up on with respect to
6     what's contained in Exhibit B before you
7     received Exhibit B?
8       MR. KLEBANOW: Objection. You can
9     answer.
10       Do you understand the question?
11 A  I guess I don't really understand. I'm sorry.
12 Q  Sure. Is Exhibit B the first time you
13    received notice of the charges that were
14    lodged against you by the City of Cleveland
15    that are contained within Exhibit B?
16       MR. KLEBANOW: Objection. You can
17    answer.
18 A  Yes.
19       MR. PIKE: What is the
20    objection?
21       MR. KLEBANOW: Form. Speaking
22    objections. Go ahead and ask your question.
23    I can object to a question. We're not here to
24    argue --
25       MR. PIKE: Well, if I can -- if

Page 33

1    I can correct the form of the question I'm
2    entitled to do so at this time.
3        MR. KLEBANOW: I can object.  We're
4    not here -- it's not speaking objections
5    during a deposition.
6        MR. PIKE: I'm entitled to the
7    basis of the objection here.
8        MR. KLEBANOW: Go ahead.  I don't
9    have to sit here and justify my objections.
10   You can sit here and ask the questions.
11 Q   Okay.  Were you charged with anything other
12   than what was contained in Exhibit B?
13 A   No.
14 Q   Okay.  Was any information or evidence lodged
15   against you at the predisciplinary hearing
16   that was conducted with respect to Exhibit D
17   as the transcript of, was anything else
18   provided against you other than -- any other
19   charges brought against you other than what's
20   in Exhibit B?
21 A   No.
22 Q   Okay.  And at that hearing were you given an
23   opportunity to provide your side of the story?
24 A   Yes.
25 Q   And you were given an opportunity to respond

Page 34

1    to all the charges against you, correct?
2  A   Yes.
3  Q   And through your counsel you chose not to
4    provide any additional information, correct?
5  A   Correct.
6  Q   And nowhere in that transcript did you dispute
7    or contest any of the charges with respect to
8    Specification 2 or Specification 3, did you?
9  A   No.
10 Q   Okay.  And with respect to Specification 1,
11   it's my understanding that you replied upon
12   your Garrity statement?
13       MR. KLEBANOW: Objection.  Go ahead
14   and answer.
15 A   Correct.
16 Q   Do you have a recollection of the testimony
17   you gave in your Garrity statement interview?
18 A   Yes.
19 Q   Okay.  Can you tell me -- well, do you
20   remember word for word what you said?
21 A   No.
22 Q   Going back to some of the allegations in the
23   complaint which we marked as Exhibit A.  Give
24   me a second.  I want to find --
25 A   While you're doing that would it be all right

Page 35

1    if I go use the restroom?
2  Q   Please do.
3        VIDEO TECHNICIAN: We're off the record
4    at 10:31.
5        (Short recess.)
6        VIDEO TECHNICIAN: We're back on the
7    record at 10:37.
8  By Mr. Pike:
9  Q   Okay.  Sir, back to -- back to some of the
10   allegations of the complaint.  I asked you
11   about discipline.  You told me about a 2013
12   approximate case involving insubordination.
13   In 2014 were you brought up on charges for
14   engaging in unauthorized secondary employment
15   as well?
16 A   I don't recall.
17 Q   Okay.  Do you defer to records that are within
18   the purview of the Cleveland Division of
19   Police?
20 A   Yes.
21 Q   Are you saying that it didn't happen or you
22   just have no recollection one way or another?
23 A   I'm saying I don't have any recollection.
24 Q   Okay.  How about in 2009 approximately, were
25   you charged with the improper use of a taser?

Page 36

1  A   Not that I recall.
2  Q   You don't know one way or another or are you
3    saying it didn't happen?
4  A   I don't recall ever being charged with that.
5  Q   Okay.  How about with respect to 2015, were
6    you brought up on charges regarding using
7    unsafe tactics?
8  A   I don't recall that.
9  Q   Do you recall any disciplinary procedures
10   around those relative time frames?  And I'll
11   reread them.  Around 2009?
12 A   No.
13 Q   Okay.  How about with respect to 2015?  I'm
14   sorry.  2014.
15 A   No, I don't recall.
16 Q   Okay.  How about with respect to 2015?
17 A   No.
18 Q   All right.  If there is documented evidence
19   that supports a disciplinary process regarding
20   those in your file, do you have any reason to
21   object to those?
22 A   No.
23 Q   Okay.  All right.  Back to looking at Exhibit
24   A which is the complaint in the case.  I'm
25   going to direct you to Paragraph 32 if you

Page 37

1      could.  It's on Page 6.
2  A   Okay.
3  Q   There is an allegation here that the City of
4      Cleveland should have known that the word that
5      you used was not disparaging.  What evidence
6      do you have to support that allegation?
7           MR. KLEBANOW: Objection.  You can
8      answer.
9  A   Based on my experience and training stemming
10     from my first round of basic training when I
11     was 17 the word haji was commonplace and used
12     on an almost daily basis.  Transferring to
13     active duty the word haji was used again on an
14     almost daily basis referring to a wide range
15     of subjects.
16          Once I joined -- once I was allowed to
17     join and passed the training and I was
18     selected for First Ranger Battalion the
19     training always included the word haji.
20          Overseas the details, which were daily
21     activities, daily training cycles and
22     assignments included everything ranging from
23     haji guard to haji detail to general haji
24     training.  There was haji patrol.  Haji was
25     used on virtually every subject matter of

Page 38

1      every day overseas both between Iraq and
2      Afghanistan.
3  Q   Okay.  My understanding is it's a form of
4      military slang used to refer to middle eastern
5      persons.
6           MR. KLEBANOW: Objection.
7  Q   Is that your understanding?
8  A   No.
9  Q   It has some other meaning, the term haji?
10 A   Yes.
11 Q   What is that meaning as you understand it?
12 A   As I understood haji from my training and
13     experience of actually being overseas was that
14     it was used to describe not only a male who
15     has been to Mecca but the leader of any small
16     tribal group.  The alpha male in any of the
17     groups that would generally speak for the
18     other males or for Muslim males as a group or
19     as a whole.
20 Q   So it's your understanding that the term haji
21     refers to Muslim -- anybody of the Muslim
22     faith who is male?
23          MR. KLEBANOW: Objection.  You can
24     answer if you understand the question.
25 A   Could you rephrase that please?

Page 39

1  Q   Sure.  I'm just trying to get at exactly what
2      the term haji means as you understand it.
3  A   As I understood the term haji it was used to
4      describe groups of males overseas and/or
5      describe the alpha male or the male in charge.
6  Q   The alpha male, what is an alpha male?
7  A   The person in charge.
8  Q   Where does the term alpha male come from?  Is
9      that something you were taught as well?
10 A   It's something that they refer to themselves
11     as, the leader of the group.
12 Q   They refer to -- okay.  That's something that
13     somebody told you overseas while you were
14     deployed?
15 A   Yes.
16 Q   All right.  And your understanding as to what
17     the term haji meant with respect to your
18     deployment came from you're saying U.S.
19     military?
20 A   U.S. military members, local indigenous people
21     that we worked with.
22 Q   Okay.
23 A   Workers on base.
24 Q   So that's based on what somebody told you?
25 A   It was based on my conversations with the

Page 40

1      local indigenous people and the members of the
2      military.
3  Q   You understand that words can have different
4      meanings in different locales, correct?
5           MR. KLEBANOW: Objection.
6  A   I understand what I was taught and what I've
7      been trained.
8  Q   Okay.  Since the time of your incident with
9      regard to your text message in this case have
10     you done any research or investigation into
11     the term haji?
12 A   Not really, no.
13 Q   You haven't looked online or looked it up or
14     tried to find out what it means in other
15     respects?
16 A   With respect to the Internet I know what I was
17     trained with and I don't need the Internet to
18     tell me what I was trained and what I was
19     taught.
20 Q   I understand but that's not my question.  My
21     question was did you go online or do any
22     research whatsoever to determine alternate
23     meanings of the term haji?
24 A   Very little.
25 Q   Okay.  What did that involve?

Page 41

1 A  Talking to friends and Google.

2 Q  Okay.  What did you learn from Google or

3  talking to friends about an alternate meaning

4  of the term haji?

5 A  That the phrasing I used and what I was taught

6  is accurate and truthful.

7 Q  That's not what I -- exactly what I asked you.

8  I asked you about an alternate meaning with

9  respect to, not what -- the way that you

10  believe that you used it.

11       MR. KLEBANOW:  Objection.  You can

12  answer if you understand the question.

13 A  I don't understand the question.

14 Q  Did you learn that the term haji could be used

15  as an ethic slur?  It's an alternate meaning

16  or alternate usage of the term?

17 A  I don't believe that's the meaning of the

18  term.

19 Q  Sir, that's not what I asked you.  I asked you

20  whether or not you learned that, not what you

21  believe.

22 A  It's possible.

23 Q  You're aware that that term has different

24  meanings, correct?

25 A  I'm aware of what I was taught and what I was

Page 42

1  trained.

2 Q  Right.  And you're also aware that the term

3  haji has a derogatory component and

4  understanding as to the meaning, correct?

5       MR. KLEBANOW:  Objection.  You can

6  answer.

7 A  No.

8 Q  So you've never been told or informed that the

9  term haji has a derogatory or demeaning

10  implication or meaning?

11       MR. KLEBANOW:  Objection.  You can

12  answer.

13 A  Not according to the training and experience

14  that I've had.

15 Q  Sir, I'm not asking you with respect to your

16  training and your belief, what I'm asking you

17  is whether or not you've been made aware that

18  the term haji has multiple meanings?

19 A  Can you define the meanings?

20 Q  Sure.  That it can be used as a derogatory

21  term or a slur to refer to certain ethnic

22  persons or persons of the Muslim belief.

23 A  That's not my interpretation of the meaning.

24 Q  I'm not asking your interpretation.  I'm

25  asking you whether or not you've learned that

Page 43

1  that's an alternate meaning?

2 A  Learned by whom?

3 Q  By you.

4 A  I learned myself?

5 Q  Has anybody told you that?

6 A  Outside of the City of Cleveland?

7 Q  Yes.

8 A  No.

9 Q  And when you went on Google to do research of

10  the term haji it never -- nothing came up on

11  Google indicating that that term has a

12  derogatory meaning as well?

13 A  I don't recall.

14 Q  You don't recall doing that?

15 A  Doing what?

16 Q  You don't recall ever -- so it's your belief

17  that that term does not have an ambiguous

18  meaning and could be interpreted in multiple

19  ways?

20 A  I believe that's up to interpretation.

21 Q  Right, because it can have multiple meanings;

22  can it not?

23 A  I don't know.

24 Q  Okay.  Well, your complaint alleges that it is

25  an ambiguous term with multiple meanings.

Page 44

1  That's why I'm asking you.  Do you believe

2  that it has -- it's an ambiguous term with

3  multiple meanings?

4 A  I believe so.

5 Q  Okay.  And what are those multiple meanings?

6 A  Well, I cover the bases of the person in

7  charge of indigenous people, a person who has

8  gone to Mecca, and general usage for terms

9  overseas.

10 Q  Okay.  So despite you filing a lawsuit in this

11  case you don't have any belief or -- strike

12  that.

13       You don't have any understanding of the

14  term haji when used in certain context could

15  be construed to some people as offensive?

16 A  I don't believe it is an offensive term.

17 Q  I'm not asking you -- sir, if you answer the

18  question I ask we'll get through this a lot

19  quicker.  You're not answering the question

20  I'm asking.

21 A  I'm doing my best.

22 Q  You're saying what you believe.  I'm not

23  asking you what you believe.  I'm asking

24  whether or not you have knowledge as to

25  whether or not a term has multiple meanings.

Aaron Petitt, et al. v.
City of Cleveland

Aaron Petitt
January 17, 2019

Page 45

1    We've gone around about this for about five
2    minutes?
3  A    Of a term or what term?
4  Q    The term haji, you're aware it has multiple
5    meanings, correct?
6  A    Yes.
7  Q    And you're aware that some of those meanings
8    are derogatory in nature, correct?
9  A    It's possible.
10 Q    Yeah.  That that's a possible interpretation
11   of that word and meaning, correct?
12       MR. KLEBANOW: Objection.  Go ahead.
13 A    Yes.
14 Q    You're not -- you're not contending that that
15   word has no derogatory implications under any
16   circumstances, do you?
17 A    Can you rephrase that please?
18 Q    Sure.  I'll have the question read back.
19       (Question read.)
20 A    I'm sorry.  I don't understand that.
21 Q    Sure.  Are you claiming that the term haji
22   cannot be used in any manner which could be
23   considered derogatory?
24       MR. KLEBANOW: Objection.  Go ahead.
25 A    No.

Page 46

1  Q    You're not claiming that, right?
2  A    No.
3  Q    You're claiming in certain circumstances that
4    term can be -- can be used in a derogatory
5    manner, correct?
6  A    I'm not claiming what someone else can do.
7  Q    Sir, I'm just asking whether or not it can
8    occur and whether or not you're aware of that?
9        MR. KLEBANOW: Objection.  Go ahead.
10 A    Anything can occur.  I don't know.
11 Q    Right.  It's all based on context, correct?
12       MR. KLEBANOW: Objection.  Go ahead.
13 A    I don't know.
14 Q    The meaning of a word is based on context; is
15   it not?
16       MR. KLEBANOW: Objection.  Go ahead.
17 A    I don't know.
18 Q    Okay.  Now, with respect to the text message
19   exchange, do you have the text message
20   exchange that's the subject of this lawsuit
21   still presently in your possession?
22 A    I don't believe so.
23 Q    You deleted it?
24 A    I have a new phone.
25 Q    So do you still have the old phone?

Page 47

1  A    No.
2  Q    When did you get rid of that phone?
3  A    Approximately a year ago.
4  Q    After you had filed the lawsuit?
5  A    I believe it was beforehand.
6  Q    Where is the -- where is that phone?
7  A    Somewhere with Verizon.
8  Q    You traded it in?
9  A    Yes.
10 Q    Okay.  Was this after you were brought up on
11   charges?
12 A    I don't recall.
13 Q    You don't know if it occurred before or after
14   you were brought up on charges for the use of
15   the term?
16 A    No.
17       MR. KLEBANOW: Objection.  Go ahead.
18 Q    When you got rid of your phone containing the
19   text message are you aware of any
20   documentation of the words -- express words of
21   the text message conversation?
22 A    I'm sorry, can you ask that again?
23 Q    Sure.  Are you aware of any documents or
24   information that contains the content of your
25   text message exchange that's the subject of

Page 48

1    this lawsuit?
2  A    I don't know.
3  Q    Okay.  Well, let's -- let's probe your memory.
4    And please tell me what your recollection is
5    that occurred on or about, what was it, April
6    27th of 2017.  Can you tell me about the text
7    message exchange that you had?
8        MR. KLEBANOW: You're asking who he
9    was talking to?
10       MR. PIKE: I asked what his
11   recollection of the text message exchange is.
12       MR. KLEBANOW: Go ahead, if you
13   know.
14       MR. PIKE: Which we're here
15   about.
16 Q    Sir, you're reading the hearing transcript.
17   I'm asking whether or not you have a
18   recollection of what was discussed on the text
19   message?
20 A    I have a rough recollection, yes.
21 Q    Why don't you let me know what that is.
22 A    It's that I was texted by former Officer Sean
23   Gorman to come to the Hustler Club because
24   there were middle eastern types I think he
25   said causing trouble.

Aaron Petitt, et al. v.
City of Cleveland

Aaron Petitt
January 17, 2019

Page 49

1 Q   Okay.
2 A   I don't recall the exact words.
3        MR. PIKE: Let's mark that.
4        (Defendant's Exhibit E
5        marked for identification.)
6        MR. KLEBANOW: That's E?
7        THE NOTARY: Yes.
8 Q   Let me know when you've had a chance to review
9     Exhibit E.
10 A   Okay.
11 Q   Do you recognize this photograph?
12 A   No.
13 Q   Do you recognize the content of the text
14    messages depicted within the photograph?
15 A   Yes.
16 Q   Is this a true and accurate copy of the text
17    message exchange between you and Officer
18    Gorman on the night in question?
19 A   I believe so.
20        MR. KLEBANOW: I would just object.
21    Objection. Go ahead though. Continuing
22    objection on this line of questioning
23    regarding this exhibit, but go ahead and
24    answer the question.
25        MR. PIKE: What's the objection?

Page 50

1        MR. KLEBANOW: Again, stating
2    objections and justification is not proper
3    during deposition.
4        MR. PIKE: All objections are
5    reserved except as to form and if I fix the
6    format of the question I'm --
7        MR. KLEBANOW: Objection.
8        MR. PIKE: Jared, I'm entitled
9    to do so and ask about it. Otherwise I'm
10    going to consider your objections waived.
11        MR. KLEBANOW: You can consider it
12    whatever you want. It's not waived. I'm
13    objecting to the line of questioning regarding
14    this exhibit. I'm not instructing him not to
15    answer the question. Go ahead and ask your --
16        MR. PIKE: Your objections are
17    preserved with respect to that.
18        MR. KLEBANOW: Go ahead.
19 Q   You can answer. We can have the question read
20    back.
21 A   I'm sorry, could you --
22 Q   Sure. Is this a true and accurate copy or
23    representation of the text message exchange
24    between you and Gorman on the night in
25    question?

Page 51

1 A   Yes.
2 Q   Could you please read it into the record?
3 A   "Stop down to hustler. Apparently there is
4    some middle eastern types given people a hard
5    time. We are in route."
6 Q   And that is from who?
7 A   Sean Gorman.
8 Q   And what is your response?
9 A   "Packing up. Be there soon."
10 Q   And then Officer Gorman responds again?
11 A   "Take your time. Sorry for bothering you,
12    sir."
13 Q   And then your response?
14 A   "Never a bother to tune up some haji haha."
15 Q   Okay. And then Officer Gorman responds with?
16 A   Laugh out loud.
17 Q   Well he says LOL?
18 A   LOL.
19        MR. KLEBANOW: Hold on. Is ours
20    different than the one you have?
21        MR. PIKE: Let me see.
22        THE WITNESS: It is actually.
23        MR. KLEBANOW: Mine doesn't say
24    haha.
25        MR. AVERY: It is different.

Page 52

1        THE WITNESS: Did it get cut off?
2        MR. KLEBANOW: Is there just one
3    more thing?
4        MR. PIKE: I think so.
5        MR. KLEBANOW: All right. I'm fine.
6    I didn't see that. You're okay. Whatever.
7    It's okay. As long as it's just one word.
8 Q   Okay. So it's my understanding that both of
9    you were officers on duty and working at the
10    time of this text message exchange?
11 A   I don't know if he was on duty or not. I
12    don't recall.
13 Q   Okay. You would defer to others on that?
14 A   Yes.
15 Q   Why would he go calling and asking for your
16    assistance if he wasn't on duty?
17        MR. KLEBANOW: Objection. You can
18    answer.
19 A   I don't know.
20 Q   All right. So I want you to assume then
21    Officer Gorman was on duty at that time.
22    Okay. Would you agree with me that this is an
23    official call for police help with regard to a
24    potential police action?
25        MR. KLEBANOW: Objection. You can

FINCUN-MANCINI -- THE COURT REPORTERS
(216) 696-2272

Aaron Petitt, et al. v.
City of Cleveland

Aaron Petitt
January 17, 2019

Page 53

1    answer.
2  A   No.
3  Q   He's asking you to respond in your capacity as
4      a police officer, is he not?
5  A   Yes.
6          MR. KLEBANOW: Objection.
7  Q   So we have a text message asking from one
8      police officer to another police officer
9      requesting assistance with regard to a
10     potential police action, correct?
11         MR. KLEBANOW: Objection.  Go ahead.
12  A   I don't know.
13  Q   Well, he's asking you to come down and help
14     him with respect to some, quote, middle
15     eastern types at the Hustler Club, correct?
16  A   Yes.
17  Q   And you were on duty and working at the time
18     of this text message exchange, correct?
19  A   Yes.
20  Q   What's it mean to tune up someone?
21  A   To fight.
22  Q   Beat him up?
23  A   To fight in general.
24  Q   To fight, to beat somebody up?
25         MR. KLEBANOW: Objection.  Go ahead.

Page 54

1  Q   What do you mean by it's never a bother?  You
2      don't have a problem doing that?
3  A   That I believe my statement to the
4      investigator, which still -- just a moment
5      please.
6  Q   Sir, I'm not asking you about your statement.
7      I asked you whether or not never a bother
8      means you don't have a problem beating someone
9      up.
10  A   What I meant was that if we have to fight then
11     we have to fight.
12  Q   Where does it say if we have to fight in this
13     text message?
14  A   It doesn't.
15  Q   There is no qualifying language regarding
16     that, is there?
17  A   No.
18  Q   And, in fact, when you say never, it indicates
19     under no circumstances is it a problem,
20     correct?
21         MR. KLEBANOW: Objection.  You can
22     go ahead.
23  A   In the context that I was sending it?
24  Q   Yes.
25  A   No.

Page 55

1  Q   Well, somebody else reading this could
2      interpret that to mean that under no
3      circumstances do you have a problem -- a
4      problem beating someone up, correct?
5          MR. KLEBANOW: Objection.  Go ahead.
6  A   I don't know because I didn't send it to
7      someone else.
8  Q   You sent it -- I'm not asking who you sent it
9      to, I'm asking whether or not you think
10     someone could infer from your use of the word
11     never that you didn't have a problem under any
12     circumstances beating someone up; is that
13     fair?
14         MR. KLEBANOW: Objection.
15  A   I'm not sure how somebody would interpret it.
16  Q   Let's talk about the term never.  There is no
17     qualification on the term never, correct?
18  A   What do you mean qualification?
19  Q   There is no limitation, is there?
20  A   I'm sorry, could I finish please?
21  Q   Sure.
22  A   I'm sorry.  I don't know what you mean by
23     qualification of the term never.
24  Q   There is no limitation on the term never.
25     Never means never.

Page 56

1  A   Okay.
2  Q   Correct?
3  A   Yes.
4  Q   So with respect to your statement that it's
5      never a bother to tune up some haji, there is
6      no limitation as to whether or not it comes to
7      that or under certain circumstances, correct?
8  A   If that's -- that is the definition of the
9      word never, yes.
10  Q   You don't know what the definition of the term
11     never is?
12  A   Yes, I do.
13  Q   What does the term never mean to you?
14  A   I don't want to argue a dictionary definition
15     that I don't know off the top of my head.  I
16     don't want to say something wrong.
17  Q   Under all circumstances.  That's a definition
18     of never, isn't it?
19  A   Sure.
20  Q   So you would agree with me that some people
21     could read this text message and indicate that
22     you have, under all circumstances, never had a
23     problem getting into a physical altercation
24     and tuning out some haji, correct?
25         MR. KLEBANOW: Objection.  Go ahead.

Page 57

1  A    I don't agree with you.
2  Q    Okay.  How about with the term haha; is that
3       making a joke of the statement?
4  A    Yes.
5  Q    That you think it's funny that you would get
6       into a fight with some haji?
7  A    No.
8  Q    You can understand where some people might
9       take it that way, correct?
10              MR. KLEBANOW: Objection.  Go ahead.
11 A    I can't understand what other people -- I
12      can't -- I don't know the understanding of
13      other people.
14 Q    But you appreciate the fact that people can
15      take this statement in a negative light,
16      correct?
17              MR. KLEBANOW: Objection.
18 A    I don't know what other people appreciate.
19 Q    I mean, were you being factitious when you
20      made this statement?
21 A    I was joking with a friend, yes.
22 Q    Okay.  In response to a call for official
23      police help?
24              MR. KLEBANOW: Objection.  Go ahead.
25 A    He's not stating anywhere that it's a police

Page 58

1       action or help.
2  Q    So one police officer who is on duty calling
3       another police officer requesting assistance
4       in dealing with a potential -- people having a
5       hard time, giving people a hard time at the
6       Hustler Club, you don't think that's a call
7       for police help?
8              MR. KLEBANOW: Objection.  Go ahead.
9  A    He didn't call.
10 Q    You don't think it's a request?
11 A    I don't know.
12 Q    You don't think he's requesting your
13      assistance at the Hustler Club?
14 A    For a police action, I don't know.
15 Q    You're on duty, correct?
16 A    Correct.
17 Q    Yeah.  With respect to the disciplinary
18      proceeding that occurred with respect to your
19      use of this phrase and text message along with
20      the October 27th use of force incident and
21      this specification regarding your failure to
22      cover your tattoos, are you aware of whether
23      or not anyone in the Cleveland Division of
24      Police did any investigation with respect to
25      the terminology -- this terminology or these

Page 59

1       other specifications?
2  A    I am not, no.
3  Q    So you don't have any knowledge as to what, if
4       anything, the Cleveland Division of Police did
5       to either research or investigation the
6       meaning of this term or any of the other
7       allegations in your charging letter, correct?
8  A    I have the information that was given to me
9       from the transcripts of the hearing, and I
10      believe at the time it was Detective Clark,
11      Officer Clark.  I'm not sure.
12 Q    But my question to you is are you aware of any
13      other investigation that was done either into
14      the meaning of the term or the context in
15      which that text message was given that was
16      done by Cleveland Division of Police in the
17      City of Cleveland before your disciplinary
18      hearing?
19 A    No, I'm not.
20 Q    Okay.  So whether or not any investigation
21      into the meaning of the term haji or that the
22      text message never a bother to tune up some
23      haji, haha, you have no understanding as to
24      whether or not any investigation was done by
25      the City, correct?

Page 60

1  A    Correct.
2  Q    If there was an investigation and the results
3       of that investigation indicated that the term
4       haji, for example, can be used as an ethic
5       slur, you wouldn't dispute that that was the
6       result of their investigation, correct?
7              MR. KLEBANOW: Objection.
8  A    I don't know any results or any investigation.
9  Q    Okay.  I mean, at the hearing and during --
10      well, strike that.
11             At the transcript of the hearing Clark
12      referred to his investigation and his finding
13      with respect to the fact that the term haji
14      can be used as an ethic slur as well, correct?
15      Do you see where that is indicated?
16 A    Just a moment, please.
17 Q    Sure.
18 A    The investigating officer states that on Line
19      24, "Nothing that says that is a good term or
20      is it a bad term.  It's kind of a 50/50 thing.
21      You know, my research of the term says that it
22      is something that's used to described as a
23      status symbol for middle eastern men, but it
24      also can be used as a derogatory term for
25      describing them."  And that's pretty much the

Aaron Petitt, et al. v.
City of Cleveland

Aaron Petitt
January 17, 2019

Page 61

1   gist of the thing.

2 Q   So based upon that it's understandable --

3     well, strike that.

4        Based upon that statement that you

5     just read into the record it's -- would you

6     now have an understanding that there was an

7     investigation done into the meaning of the

8     term haji before your disciplinary hearing?

9 A   Yes.

10 Q   And the results of that investigation

11     indicated that it could be used as a

12     derogatory term, correct?

13 A   To me reading this it says that there is

14     ambiguity, as it states. "There's nothing

15     that says it is a good term or it is a bad

16     term. It is kind of a 50/50 thing. You know,

17     my research of the term says it's something

18     that's used to describe as a status symbol for

19     middle eastern men, that can also be used as a

20     derogatory term for describing them as well."

21        My personal interpretation, if you're

22     asking for that, is that he's stating that

23     there is nothing that says -- nothing that

24     says that it is a good term or it is a bad

25     term.

Page 62

1 Q   Right. But he says it also can be derogatory,

2     correct?

3 A   Correct.

4 Q   It could be either way, correct?

5 A   Correct.

6 Q   Okay. Just so I'm clear, when you received

7     the call for help from Gorman via the text

8     message that we've marked as Exhibit E, did

9     you know whether or not any of the middle

10     eastern types as referenced in the text

11     message had made the hajj?

12        MR. KLEBANOW: Objection. You can

13     answer.

14 A   I never received a call from Officer Gorman.

15 Q   I said in the text message.

16 A   You prefaced that with when I received the

17     call.

18 Q   A request. When you received a request to

19     assist Officer Gorman at the Hustler Club to,

20     quote, deal with some middle eastern types

21     that were giving people a hard time did you

22     know if any of those persons had made the

23     hajj?

24 A   No.

25 Q   Did you know if any of those persons were of

Page 63

1     the Muslim faith?

2 A   No.

3 Q   Did you know if they were even middle

4     easterners?

5 A   No.

6 Q   Did you know if they even followed a religion?

7 A   No.

8 Q   Do you know if they'd even ever been to Saudi

9     Arabia?

10        MR. KLEBANOW: Objection. Go ahead.

11 A   No.

12 Q   Do you know if they've ever been to Mecca?

13 A   No.

14 Q   You knew nothing about them, correct?

15 A   Correct.

16 Q   Did you know if they were the alpha male, as

17     you call it?

18 A   Referring to a group or -- I'm sorry. Can you

19     rephrase that?

20 Q   Sure. You said the term haji can refer to an

21     alpha male in certain circles. Did you know

22     whether or not any of these gentlemen were

23     the, quote, unquote, alpha male?

24 A   No.

25 Q   So when you used the term haji it was an

Page 64

1     assumption on your part that they were middle

2     eastern Muslim and made the hajj or not?

3        MR. KLEBANOW: Objection. Go ahead.

4 A   He stated they were middle eastern, so that

5     wasn't an assumption. Going off his

6     information.

7 Q   All right. Do you refer to all middle eastern

8     persons as haji?

9 A   No.

10 Q   Besides this text message have you used the

11     term haji to refer to anyone else at the

12     Cleveland Division of Police?

13 A   No.

14 Q   Have you used it in any other written

15     correspondence to anyone?

16 A   Not on duty and not on the job, no.

17 Q   So you don't use the term when you're on duty

18     when you come upon a group of people you might

19     believe are of middle eastern descent?

20 A   Not immediately, no.

21 Q   Have you ever used it or referred to it in

22     police records?

23 A   Not in police records, no.

24 Q   Have you ever used it in any other written

25     correspondence, whether it be text message or

Page 65

1 email?
2 A Related to the police?
3 Q At any time.
4 A Yes.
5 Q Okay. When did you do that? Excuse me. When
6 did you do that?
7 A I don't recall.
8 Q Do you have a copy of that text message or
9 email?
10 A No.
11 Q Okay. Your complaint alleges that the
12 defendant arbitrarily and capriciously
13 determined a word used by you to be
14 disparagement without any research or study.
15 Do you see that in Paragraph 36?
16 A Yes.
17 Q Okay. And I think we've gone over this but
18 you have no evidence as to whether or not that
19 allegation is true or false, correct?
20 A Correct.
21 Q And, in fact, the hearing at which you were
22 present for your disciplinary was indicated by
23 Todd Clark that he had done research and
24 investigation into the meaning of the term
25 haji, correct?

Page 66

1 A Yes.
2 Q So that's a false allegation; is it not --
3 MR. KLEBANOW: Objection.
4 Q -- at the time the complaint was filed?
5 A I don't know.
6 Q Well, it's not true, correct?
7 MR. KLEBANOW: Objection. Go ahead.
8 A I don't know.
9 Q You were present at the hearing where it was
10 indicated that he had done investigation and
11 research into the term haji before your
12 disciplinary hearing, correct?
13 MR. KLEBANOW: Objection. Go ahead.
14 A Correct.
15 Q Do you have any reason to dispute that that
16 investigation that Mr. Clark testified about
17 doing wasn't performed by him?
18 A No.
19 Q Next page on Paragraph 37 you make an
20 allegation that the City of Cleveland released
21 a photograph of you along with a photograph of
22 another officer who repeatedly used the,
23 quote, unquote, N-word. Do you see that?
24 A Yes.
25 Q What's the basis of that allegation?

Page 67

1 MR. KLEBANOW: Objection. Go ahead.
2 A That my picture was used with another officer
3 with the headlines officer uses N-word.
4 Q Okay. Where was that published?
5 A Several news media outlets.
6 Q And do you know where the origin of the
7 photograph that was published by -- I'm
8 assuming a newspaper, correct?
9 A I don't recall if it was in the newspaper.
10 Q So you don't know where the alleged
11 publication occurred?
12 A It was on numerous media websites.
13 Q And do you know the source of where any of
14 those unnamed media websites got your
15 photograph?
16 A No.
17 Q So you don't have any evidence that the City
18 of Cleveland released your photo or anyone
19 else's with respect to the allegations in your
20 complaint, correct?
21 A Correct.
22 Q Can you direct me to any of those websites
23 where you claim that your picture was posted
24 alongside another officer?
25 A Not at the moment, no.

Page 68

1 Q Do you have copies of those websites where
2 your photograph allegedly was published next
3 to another officer?
4 A I don't possess those, no.
5 Q Okay. Do you know when that alleged
6 publication occurred?
7 A I don't recall the date, no.
8 Q Okay. And you don't know what media or news
9 outlet that that website was allegedly
10 associated with, do you?
11 A I don't know the exact website, no.
12 Q Well, do you have any information to give me
13 with regard to the website or the news
14 publication that put that out?
15 A No.
16 Q Your next -- so you have no evidence as to
17 whether or not that allegation is true or
18 false with respect to the City of Cleveland,
19 correct?
20 MR. KLEBANOW: Objection. Go ahead.
21 A Which one is that again? I'm sorry.
22 Q When you're alleging that it was the City of
23 Cleveland that released your photograph.
24 A Correct.
25 Q You don't have any information or evidence or

Page 69

1   testimony to offer today as to whether or not
2   that allegation is true or false, correct?
3 A   Correct.
4 Q   Okay.  Next paragraph you allege that the
5   intent in releasing the two photographs
6   together was to diminish your standing as a
7   police officer.  What's your -- what's your
8   evidence or basis for that belief?
9       I mean, do you believe that?  Did you
10   believe that they -- that the City of
11   Cleveland released your photograph with an
12   intent to diminish your standing?
13 A   Unequivocally, yes.
14 Q   But you don't even know if they released the
15   photograph to begin with, right?
16 A   I don't know.
17 Q   All right.  So despite your belief as to that,
18   what is the evidence that you point to to
19   support your belief?
20 A   I don't have anything with me right now.
21 Q   Do you have anything anywhere?
22 A   I don't know.
23 Q   So as you sit here today you are not aware or
24   have knowledge of any evidence of an intent by
25   the City of Cleveland to diminish your

Page 70

1   standing as alleged in Paragraph 38 of your
2   complaint, correct?
3 A   I don't know the City's official intent.
4 Q   That wasn't my question, sir.  My question to
5   you is as you sit here today you don't have
6   any evidence or testimony to offer that would
7   support your allegation in Paragraph 38 of the
8   complaint that it was the intent of the City
9   of Cleveland in allegedly releasing a
10   photograph to diminish your standing as a
11   police officer; is that a true statement?
12 A   Yes.
13 Q   In Paragraph 40 you indicate that the use of
14   the N-word is unambiguously and universally
15   accepted as disparaging.  Is your position
16   then that that word should never be used by an
17   officer?
18 A   Absolutely.
19 Q   And that any use by the officer, whether on or
20   off duty, would be subject to disciplinary
21   proceedings?
22 A   I can't argue for someone's off duty conduct
23   but that absolutely should never be a word
24   used by a police officer on duty.
25 Q   Okay.  So you draw a distinction between

Page 71

1   whether or not someone is on duty or off duty
2   as to whether or not they would be disciplined
3   with respect to using that word, correct?
4 A   I don't know.
5 Q   I think that's what you just testified to,
6   that you don't have an opinion as to whether
7   or not they should be disciplined whether they
8   were off duty, correct; but they should never
9   use it while on duty?
10 A   The word should never be used.
11 Q   My question to you was was it your belief and
12   opinion that they should be disciplined for
13   using the N-word while off duty?
14 A   I don't know.  I don't make the rules.
15 Q   No, I'm asking you whether or not -- what your
16   opinion is on the subject cuz you made an
17   allegation in the complaint regarding it.  I'm
18   just asking what your opinion is.
19 A   I'm sorry, I need you to rephrase the
20   question, exactly what it is.
21 Q   Sure.  If a police officer were to use the
22   N-word off duty under any circumstances is it
23   your understand -- is it your belief that they
24   should be disciplined for that?
25 A   I don't know.

Page 72

1 Q   You don't have an opinion one way or another?
2 A   Just based on that, I don't know.  My opinion
3   is that it's an absolutely terrible word to
4   use that and it should never be used, but as
5   far as the discipline goes I can't argue what
6   discipline the City should be giving to
7   people.
8 Q   Okay.  You've alleged a First Amendment
9   freedom of speech claim in this case saying
10   that you have the right to use a word such as
11   haji and to not be disciplined for doing so in
12   the context of the text message that we've
13   just read, correct?
14 A   Correct.
15 Q   Okay.  So if someone were to have used the
16   word -- the N-word while -- during the -- in
17   the employment of the City of Cleveland as --
18   and on duty as a police officer it's your
19   belief they should be disciplined for that,
20   correct?
21 A   If a police officer uses that word in the
22   course of his duty, absolutely.
23 Q   Okay.  How about if he's off duty, should he
24   be disciplined for that, for the statement,
25   the mere statement of the word -- of the

Page 73

1　　　N-word; should he be disciplined for it?
2　A　I don't know.
3　Q　So you have no objection as to whether or not
4　　　the person is or is not disciplined for using
5　　　the N-word while off duty?
6　　　　　MR. KLEBANOW: Objection. Go ahead.
7　A　I don't know how the discipline and how things
8　　　can affect off duty and on duty so I don't
9　　　know.
10　Q　I'm asking you your opinion, sir. I'm asking
11　　　your opinion as to whether or not someone
12　　　should be disciplined by the City of Cleveland
13　　　for a word or a phrase that is used while they
14　　　are not on duty.
15　A　My opinion is that I don't know.
16　Q　You would defer to the City of Cleveland then
17　　　with respect to that --
18　　　　　MR. KLEBANOW: Objection.
19　Q　-- since you don't have an opinion on it?
20　A　My opinion stands that I don't -- I don't
21　　　
22　　　know.
23　Q　So you have no opinion as to what, if any,
24　　　discipline should be imposed upon an officer
25　　　who uses the N-word while off duty; is that a

Page 74

1　　　fair statement of your position?
2　A　Yes.
3　Q　You don't have a position one way or another,
4　　　right?
5　　　　　MR. KLEBANOW: Objection.
6　A　I believe you're putting words in my mouth
7　　　with that statement so I don't agree with
8　　　that.
9　Q　I'm not. You're not offering an opinion.
10　　　That's what I'm asking you.
11　　　　　MR. KLEBANOW: He's answered the
12　　　question.
13　Q　You have no opinion either way as to whether
14　　　or not an officer who is off duty and uses the
15　　　N-word should be disciplined?
16　A　I don't know because that's -- there is too
17　　　many different situations. I don't know.
18　Q　I'm not asking your opinion, I'm asking
19　　　whether or not I'm stating your position
20　　　correctly. Do you understand that? I'm
21　　　asking whether or not I'm correctly stating
22　　　your opinion on that issue whether or not --
23　　　and correct me if I'm wrong with this
24　　　statement, but it's your opinion that you have
25　　　no position one way or another whether or not

Page 75

1　　　an off-duty officer that uses the N-word
2　　　should be disciplined; is that a true
3　　　statement of your position?
4　A　Yes.
5　Q　Okay. In Paragraph 44 you allege that, "The
6　　　singular use of a word used by Plaintiff Aaron
7　　　Petitt" -- in this case the term haji -- "In
8　　　responding to civil disobedience by apparently
9　　　Arab-American men as the Hustler strip club is
10　　　not disparaging." What do you mean by civil
11　　　disobedience?
12　　　　　MR. KLEBANOW: Objection. Go ahead.
13　　　　　MR. PIKE: It's his complaint.
14　　　I'm just asking.
15　　　　　MR. KLEBANOW: He can answer.
16　A　Possibly a civil issue.
17　Q　What do you mean by civil disobedience? Is
18　　　that something that police could respond to?
19　A　If we're called to.
20　Q　Okay. And in Paragraph 45, the next page, I
21　　　think I've covered this. You have no
22　　　evidence -- well, strike that.
23　　　　　What's your -- what's your evidence or
24　　　belief that the City of Cleveland linked you
25　　　with any other officer with respect to your

Page 76

1　　　conduct?
2　A　I'm sorry, could you repeat that?
3　Q　Sure. In Paragraph 45 you allege that, "In
4　　　order to cause embarrassment and reputational
5　　　damages, City of Cleveland linked plaintiff,
6　　　Aaron Petitt with the other officer." Do you
7　　　see that?
8　A　Yes.
9　Q　Who is the other officer you're talking about?
10　A　Detective Kraynik.
11　Q　What is your evidence that the City of
12　　　Cleveland did anything to link the two of you
13　　　together?
14　A　We were assigned the same classes as
15　　　punishment following -- it was following the
16　　　hearings.
17　Q　Okay.
18　A　We were -- had hearings on the same day, same
19　　　time. We were all linked together by the
20　　　start of the case from Officer Gorman's phone
21　　　itself.
22　Q　Well, that's not -- that's the facts of the
23　　　case that link the two of you, correct?
24　A　Correct.
25　Q　I mean, the three of you text messaged

Page 77

1      together, correct?
2    A   No.
3    Q   Well, you text messaged somebody who was
4      Officer Gorman and then Gorman texted Kraynik
5      on occasion, correct?
6    A   I believe so, yes.
7    Q   So you both had Officer Gorman's cell phone in
8      common, correct?
9    A   Correct.
10   Q   That link is a link that you draw based on the
11     facts of the case, correct?
12   A   Correct.
13   Q   At any time are you aware of any publication
14     that was put out by the City of Cleveland
15     saying that the two of you were linked
16     together for any reason?
17   A   No.
18   Q   And so I'm clear, you don't have any evidence
19     to support the allegation that this link that
20     you claim occurred was to embarrass or damage
21     your reputation; is that true?
22   A   Correct.
23   Q   And just so I'm clear, the only other reasons
24     you think the two of you were linked is
25     because you had disciplinary hearings on the

Page 78

1      same day?
2    A   No.  And we were both sent to the same
3      sensitivity training I believe it was.
4    Q   Are they required to hold separate sensitivity
5      trainings if they impose similar discipline
6      upon numerous officers?
7    A   I don't believe so.
8    Q   Okay.  And that's happened in the past, has it
9      not, where officers get assigned to
10     sensitivity training for unrelated matters,
11     correct?
12   A   I don't know.
13   Q   You would have no reason to dispute that, do
14     you?
15   A   I have never dealt with it before so I don't
16     know.
17   Q   Okay.  You're not alleging that you should
18     have separate sensitivity training for every
19     officer that has to undergo it pursuant to a
20     disciplinary proceeding, correct?
21   A   No.
22   Q   I mean, it's acceptable under the terms of the
23     agreement and the general police orders to
24     have everyone who is ordered to attend
25     sensitivity training to do so together,

Page 79

1      correct?
2          MR. KLEBANOW: Objection.  Go ahead.
3    A   I don't know.
4    Q   All right.  With respect to the disciplinary
5      hearings occurring on the same day, that's
6      commonplace; is it not?
7    A   I'm not sure.
8    Q   Well, you've been through several disciplinary
9      proceedings; have you not?
10   A   Two that I recall.
11   Q   And there were other disciplinary hearings
12     that were conducted on the same day, correct?
13   A   Correct.
14   Q   And in your ten years of being on the
15     Cleveland Division of Police you're aware of
16     other people that have attended disciplinary
17     hearings, correct?
18   A   Correct.
19   Q   And they schedule multiple hearings on those
20     days; do they not?
21   A   I don't know.
22   Q   So there is nothing out of the ordinary as far
23     as you know that the two of you were -- had
24     disciplinary hearings on the same day, right?
25   A   I don't know.

Page 80

1    Q   And then just so I'm clear, was this other
2      officer at your disciplinary hearing?
3    A   Can you rephrase that?
4    Q   Sure.  You had a separate disciplinary
5      hearing, correct?
6    A   Yes.
7    Q   If you look at the hearing transcript nowhere
8      does this Officer Kraynik or Gorman appear as
9      an attendee, correct?
10   A   Correct.
11   Q   In fact, neither one of them were there, were
12     they?
13   A   No.
14   Q   So you had a separate hearing and these other
15     officers had separate hearings, correct?
16   A   Correct.
17   Q   With respect to your -- the October 2017
18     incident that you were found guilty of charges
19     on, do you dispute that you didn't have your
20     tattoos covered pursuant to Cleveland Division
21     of Police policy and orders?
22   A   No.
23   Q   You're supposed to have them covered, right?
24   A   Correct.
25   Q   You had them covered at roll call, correct?

Page 81

1 A   Correct.
2 Q   And then you took them off later that day?
3 A   Yes.
4 Q   Against police orders?
5 A   Yes.
6 Q   So you're not disputing that that's a valid
7     charge and that the finding of guilt against
8     you well founded, correct?
9 A   Correct.
10 Q   With respect to the incident, it's the same
11     day of the incident where you were found
12     guilty of failing to use proper de-escalation
13     techniques.  Do you recall that traffic stop?
14 A   I do.
15 Q   With respect to that traffic stop, as a result
16     of you having to physically restrain the
17     suspect it's my understanding you suffered an
18     injury, correct?
19 A   Correct.
20 Q   Did you miss any work -- time at work because
21     of that injury?
22 A   Yes.
23 Q   How much?
24 A   About 90 days.
25 Q   So you were off work for three months with

Page 82

1     respect to the actions you took on October 27,
2     2017, correct?
3 A   Correct.
4 Q   Okay.  And it was the opinion of the Cleveland
5     Division of Police that that could have been
6     avoided had you followed proper de-escalation
7     techniques, correct?
8 A   Correct.
9 Q   And obviously had you not had to use physical
10     force you would not have been injured with
11     respect to subduing that suspect, correct?
12 A   Correct.
13 Q   What was the injury you suffered?
14 A   It was a small tear above my groin and lower
15     abdomen.
16 Q   Is it like a hernia?
17 A   It mimicked -- I don't want to quote medical
18     that I don't know.
19 Q   I got it.  All right.  Yeah.
20     And you didn't dispute the charges with
21     respect to your failure to use
22     de-escalation -- proper de-escalation
23     techniques at your disciplinary hearing,
24     correct?
25 A   Correct.

Page 83

1 Q   So you offered no evidence in opposition of
2     the allegations and charges against you with
3     respect to that specification, correct?
4 A   Correct.
5 Q   Okay.  All right.  With respect to -- taking a
6     look at Exhibit C, which is the May 10, 2018
7     letter notifying you of your six day
8     suspension.  Take a look at that.
9 A   Just a moment please.
10 Q   Sure.
11 A   Okay.
12 Q   First -- last full paragraph on the second
13     page, it indicates that, "I have accepted the
14     recommendation of the Hearing Officer and I
15     find there is just cause to impose discipline.
16     As such, I find you guilty of the
17     administrative charges and I am issuing you a
18     six work day suspension" -- paren, "Group II
19     offense, first offense, mitigating factors; no
20     active discipline," correct?  Did I read that
21     correctly?
22 A   Correct.
23 Q   Do you know what the minimum disciplinary
24     discipline imposed for a Group II offense is?
25 A   No.

Page 84

1 Q   Do you have any reason to dispute that it's
2     six days?
3 A   No.
4 Q   Are you aware of the general police orders?
5     Do you know what those are?
6 A   Yes.
7 Q   And as a police officer you're required to be
8     both familiar with them and have an
9     understanding of them, correct?
10 A   Correct.
11 Q   And you're expected to follow them as well?
12 A   Correct.
13     MR. PIKE: Mark this please.
14     (Defendant's Exhibit F
15     marked for identification.)
16 Q   I know it's long.  If you want to take a look
17     through it you can, or please do.  The last
18     four pages of it contain a table of
19     discipline.  I'm going to direct your
20     attention to that.
21 A   Okay.
22 Q   Feel free to look through it if you think you
23     need to.  I meant the remainder.  You can look
24     through the remainder if you want to.
25     Have you ever seen this before?

Page 85

1  A    Yes.
2  Q    Okay.  And what's your understanding of what
3       this table of discipline is?
4  A    That it's a discipline matrix for offenses
5       versus the amount of time that they can give
6       you, the amount of time you'd be suspended and
7       the different varying factors that they
8       supposedly weigh into it.
9  Q    All right.  It provides you as a police
10      officer an understanding as to what discipline
11      you would face for a particular group of
12      offenses, correct?
13 A    Correct.
14 Q    There is three group offenses, Group I, Group
15      II and Group III, correct?
16 A    Correct.
17 Q    Group I is the least serious and Group III is
18      the most, right?
19 A    Correct.
20 Q    And based upon the charging -- both the
21      charging letter as well as the May 10th
22      disciplinary letter is it your understanding
23      that you were charged with Group II offenses?
24 A    Yes.
25 Q    And under the matrix of which you were aware

Page 86

1       is it fair to say that now has it refreshed
2       your recollection with regard to the range of
3       discipline that could be imposed for Group II
4       offenses?
5  A    Yes.
6  Q    And what's the -- under the terms of this
7       table of discipline what is the minimum group
8       discipline that can be imposed under a Group
9       II offense?
10 A    It states six to seven day suspension without
11      pay.
12 Q    Okay.  And so I'm clear, you were charged with
13      multiple violations with regard to your
14      disciplinary hearing, correct?
15 A    Correct.
16 Q    At least two Group II offenses?
17 A    Correct.
18 Q    And you were found guilty of both those Group
19      II offenses?
20 A    Correct.
21 Q    Is it fair to say that being found guilty of
22      either one of those Group II offenses would
23      have imposed upon you a minimum of six day
24      suspension without pay?
25 A    Yes.

Page 87

1  Q    So irrespective of whether or not you were
2       found guilty of making disparaging comments
3       you're defining that you failed to use proper
4       de-escalation techniques as a Group II offense
5       would have resulted in you receiving a minimum
6       six day suspension without pay, correct?
7  A    Correct.
8  Q    The allegations in your complaint indicate
9       that -- or I should say allege that you were
10      not given any notice regarding the use of a
11      singular word of ambiguous meaning that would
12      result in punishment, correct?
13 A    Correct.
14 Q    Isn't there a policy, a general police order
15      in place that indicates the use of any
16      disparaging terms can result in discipline?
17 A    I don't recall the exact verbiage of the
18      policy.
19 Q    But you're aware that you can be disciplined
20      if you use language or engage in contact
21      that's disparaging, demeaning, things of that
22      nature?
23 A    Yes.
24 Q    I believe -- with respect to your charging
25      letter that's Exhibit B, if you want to take a

Page 88

1       look at that.  I'll direct your attention to
2       Page 3.  Under the values mission statement of
3       the Cleveland Division of Police.
4  A    Okay.
5  Q    Okay.  Do you see where it says respect?
6  A    Yes.
7  Q    Okay.  And tell me if I read this wrong, but,
8       "We will treat all people with dignity,
9       compassion, courtesy and without prejudice,"
10      correct?
11 A    Correct.
12 Q    Did I read that correctly?
13 A    Yes.
14 Q    Okay.  With respect to your text message that
15      we're here today about, do you think that
16      indicating that you've got no problem tuning
17      up some haji haha is treating those persons or
18      referring to those persons with dignity,
19      compassion, courtesy and respect?
20 A    I never interacted with anybody.
21 Q    Do you think that your comment with respect to
22      those persons was respectful?
23 A    I'm not sure.
24 Q    You don't believe it's somewhat disrespectful
25      to indicate that you have no problem tuning

Page 89

1  them up without even meeting or talking to
2  them?
3 A  In a conversation with my friend the way that
4  we were speaking, it's the same way I would
5  speak to someone else.
6 Q  You wouldn't make that comment to them
7  directly, would you?
8 A  No.
9 Q  Okay.  And it's my understanding during your
10  Garrity interview you felt like -- you stated
11  that you felt like an idiot for making the
12  statement.  Is that a fair representation?
13 A  It is.
14 Q  And you still feel that way today?
15 A  I do.
16 Q  How about with respect to the integrity
17  portion?  "We hold ourselves accountable to
18  the highest standards of moral and ethical
19  conduct, we maintain public trust by being
20  honest, competent and consistent with our
21  values and action."  Do you think that your
22  text message with respect to that encounter is
23  of the highest standards of moral and ethical
24  conduct?
25 A  Yes.

Page 90

1 Q  You don't think that there is anything
2  disparaging or defamatory about the way that
3  you used that term in referring to these
4  middle eastern types?
5  MR. KLEBANOW: Objection.  Go ahead.
6 A  No.
7 Q  Okay.  If for some reason you were a party to
8  a conversation that used disparaging terms and
9  comments would you correct that person?
10 A  I don't know.
11 Q  Would you indicate that that type of language
12  was unacceptable?
13 A  I don't know.
14 Q  Have you been -- strike that.
15  Moving to the next page under
16  procedures, Roman numeral I, do you see where
17  it says, "Not engaging in any conduct, speech
18  or acts while on or off duty, which would
19  reasonably tend to diminish the esteem of the
20  Division of Police or its personnel in the
21  eyes of the public"?  Do you see where I read
22  that?
23 A  I do.
24 Q  Can you appreciate where -- from the content
25  and context of your text message we're here

Page 91

1  today would reasonably diminish the esteem of
2  the police by some persons?
3 A  No.
4 Q  Are you aware of anybody expressing an opinion
5  that -- outside the City of Cleveland that has
6  an issue with the context of your text
7  message?
8  MR. KLEBANOW: Objection.  Go ahead.
9 A  I don't know.
10 Q  No one has expressed to you an opinion that
11  they find your text message to be derogatory
12  or demeaning?
13 A  To me personally, no.
14 Q  Okay.  Do you think that -- go ahead.  I'm
15  sorry.  I didn't mean to cut you off.
16 A  I was actually going to ask do you mind if I
17  grab some more water and use the bathroom
18  again?
19 Q  No.
20  VIDEO TECHNICIAN: We're off the record
21  as 11:37.
22  (Short recess.)
23  VIDEO TECHNICIAN: We're back on the
24  record at 11:50.
25 By Mr. Pike:

Page 92

1 Q  Sir, you've indicated that -- strike that.
2  With respect to the investigation or
3  your disciplinary hearing with respect to the
4  charges we've been talking about, do you think
5  the City of Cleveland should have done
6  something differently than what they did?
7 A  Yes.
8 Q  What?  I realize you don't agree with the
9  outcome and opinion as to the conclusions they
10  made, but with respect to the process they
11  went through before the hearing, do you have
12  anything that you think they should have done
13  differently?
14 A  I believe they should have followed the facts
15  that were discovered by Investigator Clark
16  that determined that, as he stated, it was
17  kind of a 50/50 thing and --
18 Q  It can go either way, right?
19 A  Correct.
20 Q  All right.  So putting aside they decided
21  that -- the City decided to side all on the
22  side that they believed that the term as used
23  in your -- or I should say the phrase as used
24  via your text message was derogatory or
25  demeaning -- sorry, disparaging.  There is a

Aaron Petitt, et al. v.
City of Cleveland

Aaron Petitt
January 17, 2019

Page 93

1  lot of D's.  So it was disparaging.  Putting
2  aside their opinion that they fell on the
3  other side of what your opinion was on how
4  that term was used, is there anything about
5  the way they conducted the process beforehand
6  that you think should have been done
7  differently?
8 A  I'm sorry.  Not that I know of.
9 Q  I mean, they did -- we've talked about it a
10  little today, and Mr. Clark indicates in the
11  hearing that he did do an investigation and
12  the results were -- according to him it can go
13  either way, depending on, you know, how you
14  see the text message, correct?  I'm
15  paraphrasing, sir.  I don't mean to say word
16  for word.  It's 50/50, right?
17 A  Correct.
18 Q  All right.  I mean, they did put you on notice
19  as to what they were charging.  They did put
20  you on notice as to what they were charging
21  you with, right?
22 A  Yes.
23 Q  All right.  And they -- they did give you an
24  opportunity to respond to those charges,
25  right?

Page 94

1 A  Yes.
2 Q  The provisions and the rules by which they
3  were going to impose discipline were spelled
4  out for you in the charging letter, right?
5 A  Yes.
6 Q  And you had prior notice of those rules and
7  regulations, right?
8 A  Yes.
9 Q  You were aware that, you know, using, you
10  know, disparaging terms and under the rules
11  that are cited in your charging letter could
12  result in discipline against you, correct?
13 A  Yes.
14 Q  You weren't surprised about that, were you?
15 A  Yes.
16 Q  I mean, not with respect to how the discipline
17  was imposed but you -- I mean, you had prior
18  understanding that in the event the Division
19  of Police found the terms or words or phrases
20  that an officer used while on duty were
21  disparaging that discipline could be imposed,
22  correct?
23      MR. KLEBANOW: Objection.  Go ahead.
24 A  Yes.
25 Q  I mean, that's in the rules.  It's in black

Page 95

1  and white, correct?
2 A  Correct.
3 Q  All right.  Is there anything about the
4  wording or terminology used in the rules
5  themselves that you take issue with?  You can
6  take a look at your Exhibit C.  And that's the
7  charging -- I'm sorry.  Exhibit B is the
8  charging letter.
9 A  Not that I recall off the top of my head.
10 Q  Okay.  As far as you know they followed the
11  rule -- the City of Cleveland followed the
12  rules and the process and procedure of which
13  you were aware with regard to the discipline
14  imposed, correct?
15 A  Correct.
16 Q  Is there anything about the process by which
17  the disciplinary hearings and the discipline
18  was imposed that you feel is either arbitrary
19  or capricious?
20 A  Can you define capricious please?
21 Q  Well, I don't know that I can do that for you.
22  What's your understanding of capricious?
23 A  None.
24 Q  All right.  How about arbitrary?
25 A  I understand the definition of arbitrary.

Page 96

1 Q  How about capricious having like no basis?
2 A  Okay.
3 Q  Okay.  You understand the basis for the
4  charges that were lodged again you, correct?
5 A  Yes.
6 Q  You don't agree with the outcome but you can
7  appreciate that the basis for which they
8  imposed discipline was spelled out to you well
9  in advance of your hearing, correct?
10 A  I understand what is being stated and I
11  understand the charges.  I don't agree with
12  them but I understand what they say and what
13  they are.
14 Q  Okay.  How about with respect to -- there is
15  an allegation that you were treated more
16  harshly or severely than others.  Do you have
17  any evidence or testimony to offer with
18  respect to those allegations?
19 A  Not at the moment, no.
20 Q  Okay.  So you don't -- with respect to this
21  other officer who may have used the N-word
22  while off duty, you don't know any of the
23  particular facts or circumstances surrounding
24  any of the discipline imposed upon him,
25  correct?

Page 97

1 A   Not right now, no.
2 Q   And do you have any opinion one way or another
3     whether or not he should have received
4     discipline?
5 A   No.
6 Q   Have you ever had any conversations outside
7     the presence of counsel with any member of the
8     CPPA?
9 A   Yes.
10 Q   How about have you ever had any of those
11     conversations -- again, this is always going
12     to be without counsel present, okay?  I don't
13     want you to testify about anything that you
14     may have discussed with counsel present, okay?
15 A   Okay.
16 Q   You understand.  So I don't have to keep
17     giving you that qualifier, okay?
18        MR. KLEBANOW: Do you understand
19     that, Aaron?  If anything has to do with
20     conversations you've had with your attorneys,
21     that's not what he's asking you. This does not
22     include --
23 A   Can I ask a question?  Does this include if
24     the union's attorney was in the room as well?
25        MR. KLEBANOW: That would be

Page 98

1     counsel, yes.
2 A   Yes, so --
3        MR. PIKE: That raises an
4     interesting point.  Are you both representing
5     CPPA in this lawsuit?
6        MR. KLEBANOW: Yes.
7        MR. AVERY: Yes.
8 Q   Okay.  So yeah.
9        MR. KLEBANOW: I answered yes.  If
10     your attorneys were present -- your attorneys
11     representing you in any capacity were present,
12     that's not what he's asking.  He's asking for
13     -- I mean, correct me if I'm wrong.
14        MR. PIKE: No.
15        MR. KLEBANOW: He's asking for
16     questions --
17        MR. PIKE: I don't want to run
18     afoul.
19        MR. KLEBANOW: -- if the attorneys
20     were not present.  So if you had a
21     conversation with another member of CPPA that
22     was not an attorney and no attorneys were
23     present representing you.
24        MR. AVERY: Joe was present.
25        MR. KLEBANOW: Right, if your

Page 99

1     attorney for  CPPA.
2        THE WITNESS: That was my question.
3        MR. KLEBANOW: Those don't count.
4     He's asking you outside of that.  Unless I'm
5     wrong.
6 Q   Let me ask it this way.
7        MR. KLEBANOW: Go ahead.  Yeah.
8 Q   I'll try to walk through it so that we're
9     clear on it.
10        Did you have any meetings regarding
11     your discipline and the text message that your
12     lawsuit is pertaining to with anyone from
13     CPPA?
14 A   Not without counsel.  I don't recall --
15 Q   Okay.
16 A   -- every meeting.
17 Q   All right.  Did you have any discussions with
18     any member of the CPPA outside the presence of
19     counsel where the text message or the
20     allegations in your complaint or your
21     disciplinary proceedings were discussed?
22 A   Yes.
23 Q   Okay.  When did that discussion occur?
24 A   Shortly after I received the charge back or
25     the list of information, whatever you call it.

Page 100

1 Q   Who did you have -- was it a meeting or a
2     conversation?
3 A   A conversation.
4 Q   Over the phone?
5 A   Yes.
6 Q   Okay.  Who did you have a conversation with?
7 A   I believe it was Officer Medina, a member of
8     the CPPA.
9 Q   What is his position, if you know, with the
10     CPPA?
11 A   I don't recall his exact position with the
12     CPPA.
13 Q   Okay.  What was the content of the discussion,
14     if you recall?
15 A   He's an instructor for use of force and a
16     subject matter expert and the conversation was
17     related to Specification 2.
18 Q   Okay.
19 A   Which relates to the de-escalation.
20 Q   Okay.  Any other discussions with anyone from
21     CPPA regarding either, you know, this lawsuit
22     or the allegations in your complaint or the
23     text message exchange --
24 A   I've spoken --
25 Q   -- outside of counsel?

Page 101

1 A    When I initially received the charge packet I
2      know for a fact I called Jeff Follmer, our
3      union president.
4 Q    Okay.  All right.  Do you remember what you
5      discussed with Mr. Follmer?
6 A    Not exactly.
7 Q    Did you express -- did you tell him what the
8      context of the text message was?
9 A    Yes.
10 Q   Did he express his displeasure with the
11     context of the text message?
12 A   I don't recall the conversation.
13 Q   Did you condone the use of the phraseology in
14     your text message?
15         MR. KLEBANOW: Objection.  Go ahead.
16 A   I don't recall the conversation.
17 Q   Did you have any other conversations besides
18     the one with Officer Medina and Mr. Follmer?
19 A   Not that I recall.
20 Q   Okay.  It's my understanding that you -- you
21     appealed the decision regarding your
22     discipline to -- with respect to -- pursuant
23     to the terms of the CBA, correct?
24 A   Correct.
25 Q   And that process has yet to be concluded,

Page 102

1      correct?
2 A    Correct.
3 Q    It's still in process?
4 A    Yes.
5 Q    Okay.  What phase are you at now, if you know?
6 A    I don't know.
7 Q    Okay.  You filed an appeal, correct?
8 A    Yes.
9 Q    Did you receive the results of that appeal?
10 A   Pardon?
11 Q   Did you receive the results of your appeal?
12 A   No.
13 Q   Are you aware whether or not your appeal was
14     -- was denied?
15 A   I believe we're currently waiting on
16     arbitration.
17 Q   Are you aware that it's a several step process
18     before you get to arbitration?
19 A   I'm not familiar with the process.
20 Q   Fair enough.  Did you attend any hearings or
21     meetings regarding the appellate process
22     regarding the disciplinary proceedings?
23 A   No.
24         MR. KLEBANOW: Objection.  Go ahead.
25         THE WITNESS: Sorry.

Page 103

1 Q    In this case there is an allegation that you
2      lost wages or that you're going to lose future
3      lost wages somehow.  Can you explain the basis
4      for that allegation or why you believe that to
5      be the case?
6 A    From the moment that the charges were put on
7      the news and my face was all over with officer
8      using an N-word.  My partner and I oftentimes
9      patrol on foot in the east bank and around the
10     downtown area, engage with community members,
11     and while just walking around talking to
12     people I had members of the community come up
13     to me and recognize me from the news as the
14     officer and the N-word.  I've had numerous
15     people say oh, that's the police officer that
16     used the N-word.  That's the racist.
17         I've been at a family party at my
18     parents' house where family members, you know,
19     had to come to my family and say hey, you
20     know, I saw Aaron on TV.  I can't believe he'd
21     say these things, the N-word.  He's racist.
22     And my own father and family members have to
23     defend me against my family.
24         I've had people that I worked with from
25     all over when I was looking into other jobs

Page 104

1      say just Google and you're everywhere with
2      officer uses N-word.  It's racist police
3      officer Aaron Petitt.  And the Internet is
4      forever.  And everywhere I turn, every time I
5      try to look for something on myself, any
6      search engine, any search results shows
7      something that I'm not and that I had nothing
8      to do with.  And I feel like that has done
9      more damage to me than the six day suspension,
10     than any suspension ever could; that for the
11     rest of my life that's me associated with the
12     racism and the N-word, and that no matter how
13     hard I try, no matter where I go or try to go
14     that's just always there.
15 Q   Has anyone associated with the City of
16     Cleveland ever accused you of using the
17     N-word?
18 A   No.
19 Q   In fact, has any of the media articles that
20     you refer to, they don't allege that you used
21     the N-word, do they?
22 A   Before the other parts of the case were
23     released, some of them did, yes.
24 Q   That's a mistaken statement, isn't it?
25 A   Yes.

Page 105

1 Q   Have you ever sought a retraction or redaction
2     by those particular agencies for making that
3     mistake?
4 A   No.
5 Q   Do you think that the City of Cleveland had
6     anything to do with those agencies making that
7     mistake?
8 A   Yes.
9 Q   What do you think the City did that caused
10    them to make that mistake?
11 A  Well, one specific incident would be when I
12    left the hearing with Officer Follmer present,
13    and media outlets had already had the
14    information of exactly what happened in the
15    hearing, and it was only myself, the union
16    members and other members of the City inside
17    the hearing and news media outlets were
18    already calling the president of CPPA, and I
19    had been in company with my representation
20    since the hearing, in a matter of three to
21    five minutes since the hearing concluded.
22 Q   Okay.  So there is -- do you know where the
23    source of that information came from that
24    these -- well, let's start with this:  Do you
25    know who made those phone calls?

Page 106

1 A   I do not.
2 Q   Do you know what was said on those phone
3     calls?
4 A   I do not.
5 Q   Is there anything else besides these phone
6     calls from people who you don't know who made
7     the calls, you weren't a party to, that you
8     believe that the City of Cleveland had
9     anything to do with the mistaken allegation
10    and news publications that associated you with
11    the N-word?
12 A  No.
13 Q   Do you know which news publications made those
14    false statements?
15 A  I don't recall off the top of my head.
16 Q   Do you have copies of any of those false
17    statements or allegations?
18 A  No.
19 Q   Do you know what websites they were from?
20 A  Not directly off the top of my head, no.
21 Q   Are you aware of any of those news
22    publications who you don't know the identity
23    of, whether or not they ever filed a
24    retraction?
25 A  I don't know.

Page 107

1 Q   You don't know what the source of the
2     information for the -- actually the source of
3     the misinformation with respect to your
4     association with the N-word?
5 A   No.
6 Q   So your concern is your association --
7     improper association with the N-word; is
8     that -- is that a fair characterization?
9 A   It's a partial characterization, yes.
10 Q   Well, I haven't heard anything else besides
11    issues you believe you had to deal with as a
12    result of news outlets mistakenly associating
13    you with the N-word.  Is there anything else
14    that I'm missing?
15 A  In regard to what?  I'm sorry.
16 Q   In regards to how you feel that, you know,
17    your either reputation or your future job
18    opportunities have been affected?
19 A  It's -- it's hard to quantify or describe how
20    people looked at you -- how people looked at
21    me differently at work.  It's hard to -- it's
22    hard to give a description or an attribute to
23    how people -- certain people, especially other
24    officers, other maybe African American or
25    officers of other race simply see that an

Page 108

1     officer was charged with disparaging or
2     demeaning or various other D words all regard
3     -- all relating to race.
4 Q   Okay.
5 A   And you walk down the halls and officers that
6     used to say hello to you, ask you how you were
7     just don't anymore.  They just don't make eye
8     contact.  That people you've known for years
9     just all of a sudden one day decide that
10    nothing more than a nod instead of a
11    conversation.  It's not -- it's not something
12    to -- I don't know how to properly quantify I
13    guess.
14 Q   Have -- as far as who are these officers
15    you're claiming that treat you differently?
16 A  People around the city.  People around the
17    district.
18 Q   Who?
19 A  I don't know names directly.
20 Q   So you don't know the names of any of these
21    people that you claim are now treating you
22    differently after these allegations of the
23    disciplinary process surfaced?
24 A  I wouldn't argue so much that I'm receiving
25    poor treatment or anything like that from

Page 109

1  them, just it feels different to me being
2  around them.
3  Q  Who?  Who makes you feel that way?
4  A  After the case, everyone.
5  Q  Every member of the Cleveland Division of
6  Police makes you feel that way?
7  A  To me it felt different walking around the
8  city and walking around my own police
9  department.
10  Q  Has there been any overt acts by specific
11  individuals that you believe support your
12  claim that you were treated differently after
13  this?
14  A  No.
15  Q  Okay.  Isn't it possible that they read and
16  know the contents of your text message and
17  disagree with you as to whether or not that
18  term was disparaging or demeaning?
19     MR. KLEBANOW: Objection.  Go ahead.
20  Q  Isn't that a possible reason why if these
21  people are treating you differently?
22  A  It's possible.
23  Q  That they don't agree with your -- the context
24  and the use of the term haji, right?
25  A  It's possible.

Page 110

1  Q  And it's also possible that they have a
2  problem with a Cleveland police officer
3  indicating that he doesn't have any
4  reservations about engaging in physical
5  violence with a citizen?
6     MR. KLEBANOW: Objection.  Go ahead.
7  Q  Right?
8  A  It's possible.
9  Q  And you have no idea as to whether or not they
10  are treating -- these specific people you
11  can't identify are treating you differently,
12  right?
13  A  Correct.
14  Q  And you don't know why perhaps, right?
15  A  Because of this.
16  Q  Isn't it possible they think that your use of
17  the term haji was disrespectful to the people
18  that have actually made the hajj?
19     MR. KLEBANOW: Objection.  Go ahead.
20  A  I don't know what they are thinking.
21  Q  Okay.  But that's a possible rationale; is it
22  not?
23  A  Anything is possible.
24  Q  Okay.  How about anything else?  I think we --
25  what I -- do you think that any of your

Page 111

1  perceived being treated differently is in
2  relation to your term -- use of the term --
3  I'm sorry, use of the phrase never a problem
4  to tune up some haji haha versus the N-word?
5  A  I'm sorry.  Can you repeat that one more time?
6  Q  Sure.  My understanding from your testimony
7  that you gave is that you feel like your
8  family and you and your friends are having to
9  defend you because people think that you used
10  the N-word; is that fair?
11  A  That's part of it, yes.
12  Q  Is there -- has there been any conduct or
13  conversations that you're aware of amongst
14  yourself, your friends or your family where
15  they have to defend your use of the phrase
16  never a problem to tune up some haji haha?
17  Has that ever come up?
18  A  I don't know what conversations they've had.
19  Q  Well, you said that they've had to defend you,
20  or people associated you with the N-word.
21  Have they ever done that with respect -- made
22  that association with respect to the -- to
23  your text message or the term haji?
24  A  They've had -- they've had to defend me for
25  what everyone perceived as racist because

Page 112

1  that's what was alleged.
2  Q  What do you mean by racist is what I'm getting
3  at?  Are you saying that you're being branded
4  a racist because you used the term -- the
5  phrase never a bother to tune up some haji
6  haha, or do you think you're being branded a
7  racist because you're being -- it was alleged
8  that you used the N-word?
9  A  Both.
10  Q  Okay.  Who has made the claim with respect to
11  your text message and use of the term haji?
12  A  I know for a fact a family member has.
13  Q  Which family member of yours has had to defend
14  your use of the term haji?
15  A  My father.
16  Q  Tell me about that.  Who made -- I don't
17  know -- an allegation to your father about --
18  A  His brother.  My uncle.
19  Q  Who is your uncle?
20  A  Carl Petitt.
21  Q  So your uncle Carl Petitt expressed a concern
22  about your use of the term haji?
23  A  About racism in general.  I don't know the
24  details.
25  Q  Well, that's what I'm getting at.  Did your

Aaron Petitt, et al. v.
City of Cleveland

Aaron Petitt
January 17, 2019

Page 113

1    own uncle talk to your father about the belief
2    that the term haji implicated that you were a
3    racist?
4  A    I don't know the details.
5  Q    Well, you're saying he had to defend you so
6    please tell me what your father expressed to
7    you as to having to defend your use of the
8    term haji or the phrase never a bother to tune
9    up some haji haha.
10 A    I just told you.
11 Q    What, that he had to defend your use of the
12    term?
13 A    That he had to defend me being called a
14    racist.
15 Q    So your uncle called you a racist for using
16    the term haji?
17 A    I don't know.
18 Q    Well, what did your father tell you that your
19    uncle said that he had to defend you?
20 A    That my uncle believed I was a racist because
21    of what he saw on TV, and that my dad had to
22    defend him -- or defend me.
23 Q    What did he see on TV, the term that you used
24    haji or your association with the N-word?
25 A    I don't know.

Page 114

1  Q    All right.  So as you sit here today has your
2    father or anyone else had to ever defend you
3    or your reputation based on your use of the
4    phrase in your text message or the term haji?
5  A    I don't know.
6  Q    So the answer to my question would be you have
7    no knowledge, evidence or recollection of
8    anyone attacking your reputation for your use
9    of the term haji or the text message we've
10    been discussing; is that true?
11 A    I don't know.
12 Q    No, is that true or not?
13 A    That I don't know.
14 Q    Do you have any knowledge of anyone ever
15    making those allegations against you, that
16    you're a racist or demeaning your reputation
17    based on the term haji or your text message?
18 A    No.
19 Q    What is your father's name?
20 A    Alan Petitt.
21 Q    Is he still with us?
22 A    He is.
23 Q    And what's his address?
24 A    19656 Henry Road.
25 Q    Where is that, Cleveland?

Page 115

1  A    Fairview Park.  I'm sorry, I was waiting until
2    you were finished.
3  Q    I'm sorry.  She takes it all down.  I don't
4    have to write it.
5        How about with respect to your uncle
6    Carl Petitt, what is his address?
7  A    I don't know.
8  Q    Do you know where he lives?  I mean city.
9  A    I think he lives in Cleveland still.
10 Q    Was either your father or your uncle a member
11    of the Cleveland Division of Police?
12 A    No.
13 Q    Do you have any other relatives that were
14    members of the Division of Police?
15 A    No.
16 Q    Do you have any relatives that were in with
17    the fire department?
18 A    Yes.
19 Q    Who?
20 A    My brother.
21 Q    Anyone else?
22 A    I'm sorry, did you -- I apologize.  Did you
23    mean Cleveland Fire or just a fireman?
24 Q    I think we're fixing that.  Where did your
25    brother work?

Page 116

1  A    Rocky River.
2  Q    That's fine.  Are you -- are you aware of you
3    not getting any -- strike that.
4        Are you aware of you not being hired
5    for any position with respect to the
6    discipline -- as a result of the discipline
7    you received in this case?
8  A    Hired, no.  Positions within the department,
9    yes.
10 Q    What positions are you talking about?
11 A    The availability for the NICE Unit.  I was
12    informed that I was not able to go because I
13    had active discipline.
14 Q    And that's a standard thing, correct?
15 A    Correct.
16 Q    Anyone that has disciplinary in the last two
17    years is not going to be selected for a
18    specialized unit, correct?
19 A    Correct.
20 Q    What's the NICE Unit?
21 A    Neighborhood Impact Community Engagement.
22 Q    Okay.  Is that different from Community
23    Control?
24 A    Yes.
25 Q    All right.  Any other positions or employment

Page 117

1  that you claim you didn't receive as a result
2  of the disciplinary process we're here about
3  today?
4  A   No.
5  Q   Would the NICE Unit have resulted in any
6  change in pay?
7  A   Base pay, no.
8  Q   By your answer do you allege that there is any
9  other degree of compensation that would have
10  changed had you been appointed to the NICE
11  Unit?
12  A   Overtime and experience and education
13  opportunities.
14  Q   Overtime it's my understanding is never
15  guaranteed to a member of the Division of
16  Police, correct?
17  A   Rarely is it guaranteed.
18  Q   I'm sorry?
19  A   It's rarely guaranteed.
20  Q   There is a provision where you're guaranteed
21  to receive overtime in the Division of Police?
22  A   Some units have set scheduled overtime.  Not
23  many.  But there is no overall guarantee for
24  any one person.
25  Q   But don't you need to apply for and receive

Page 118

1  approval to work overtime?
2  A   No.
3  Q   You don't have to put in for overtime?
4  A   It's -- for the set ones there is.  It's not
5  approval, it's usually a sign-off, just a
6  roster.  You don't have to receive prior
7  permission.
8  Q   What -- in your belief what are those units or
9  positions?
10  A   Sometimes traffic and the Downtown Services
11  Unit, including my unit.
12  Q   But not the NICE Unit, correct?
13  A   Correct.
14  Q   All right.  So had you transferred to the NICE
15  Unit you would have essentially been forgoing
16  the overtime you would have received under
17  your current unit, correct?
18  A   No.
19  Q   You can do both?
20  A   You can sign up for other units, yes.
21  Q   What would you be doing for the NICE Unit had
22  you been selected?
23  A   The description that was given out by the
24  Chief, they position themselves around the
25  City for high crime areas and focus on quality

Page 119

1  of life issues and go to areas that may be
2  current hot spots with violence or drug
3  activity and try to deal with community issues
4  and enforcement from there.
5  Q   Okay.  But just so I'm clear, that wouldn't
6  have resulted in any difference in base pay or
7  overtime, would it?
8  A   No.
9  Q   Are there any other monetary damages you're
10  claiming as a result of the discipline that
11  was imposed?
12  A   No.
13  Q   When you -- who presided over your
14  disciplinary hearing; do you know?
15  A   I'd have to review the transcript.
16  Q   Go ahead, take a look.
17  A   Deputy Chief Wayne Drummond.
18  Q   Okay.  And who was it that imposed your six
19  day suspension as a result of the three
20  specifications that you were found guilty of?
21  A   I believe it's the Chief of Police that makes
22  the ultimate -- let me check.
23  Q   Go ahead and check the letter.
24  A   I'm sorry.
25  Q   That's fine.

Page 120

1  A   Chief Calvin Williams.
2  Q   Okay.  As a result of this disciplinary
3  process and the imposition of your suspension
4  have you ever suffered from any mental
5  conditions that you claim are causally
6  related?
7  A   No.
8  Q   So there is no sort of mental issues or
9  treatment that you've been seen by any medical
10  professional with regard to the allegations in
11  your complaint; is that true?
12  A   Correct.
13  Q   Okay.  Do you believe that the City of
14  Cleveland's policies and orders under which
15  you were found guilty of should be amended or
16  changed in any manner?
17  A   Yes.
18  Q   In what way?
19  A   To be more specific.
20  Q   In what way?
21  A   For them to state and identify words that they
22  feel are inappropriate.
23  Q   Okay.  Anything else?
24  A   Not at the moment, no.
25  Q   What words would you include on that list?

Page 121

1 A    If the City deems that a word is appropriate
2      they should add that.  If the City of
3      Cleveland believes that the word haji is
4      inappropriate and offensive then I believe
5      there should be notice that that word is
6      inappropriate and offensive, or believed to
7      be.
8 Q    Any other words that you believe should be on
9      the list?
10 A    Not as it relates to this case.
11 Q    Well, I mean, any other words?  Are there any
12      words that you believe that should be on the
13      list that the City of Cleveland should specify
14      that are unacceptable for use by officers?
15 A    I don't feel comfortable speculating that or
16      saying those words.
17 Q    So you have no input or opinion as to whether
18      any particular word should appear on this list
19      that you think should be just added to the
20      orders and policies; is that true?
21 A    I only feel comfortable addressing the word
22      and issue at hand.  I don't feel comfortable
23      issuing.
24 Q    Do you think haji should be on that list?
25 A    If the City of Cleveland deems that it is

Page 122

1      offensive then I believe it should be.
2 Q    Well, are you saying that haji is per se in
3      all circumstances an offensive word?
4          MR. KLEBANOW: Objection.
5 A    What do you mean per se?
6 Q    Well, what is the criteria by which you would
7      put a word on this list that you're talking
8      about?
9 A    That would be up to the City of Cleveland to
10      decide.
11 Q    What if there is a word that doesn't appear on
12      that list, because as you know word meanings
13      and vocabulary is changing all the time,
14      correct?
15 A    Correct.
16 Q    So what if a word comes up that's not on the
17      list, what should the City do in that
18      circumstance?
19 A    What if it doesn't come up?
20 Q    No, I'm saying what if a word like haji is not
21      on the list?
22 A    Uh-huh.
23 Q    Does that mean that you believe that under no
24      circumstances should a person be disciplined
25      for the use of a word that's not on that list?

Page 123

1 A    You're asking me a two-part hypothetical
2      what-if question.  I don't feel comfortable
3      answering what ifs with what ifs.
4 Q    If a word doesn't appear on the list is it
5      your position that a police officer should not
6      be disciplined for using it under any -- under
7      any circumstances?
8 A    But there is no list, correct?
9 Q    Right.  But I'm saying if we were to create a
10      list that you're talking about creating and a
11      word comes up through an investigation that --
12      that people would -- that would be ambiguous
13      or people might consider to be demeaning or
14      derogatory or -- is it your position that that
15      word, because it's not on the list there
16      should be no discipline imposed?
17 A    It would be my position that it should be
18      examined, it should be discussed and it should
19      be addressed from there.
20 Q    But my question is if the City makes a
21      determination that they find that that word
22      that was used, whatever it is that doesn't
23      appear on this list you're talking about, was
24      offensive or demeaning or derogatory, is it
25      your position that the City still should not

Page 124

1      be able to discipline its officers for that
2      use of that word?
3 A    It would be my position that there needs to be
4      guidelines.  If there -- if in this what-if
5      situation that if I'm making a list that if
6      exists and if someone was disciplined for
7      using it because it wasn't on the if list, it
8      would be my position that if that word came up
9      then there should be some sort of sit down,
10      some sort of saying hey, this is a new word
11      that surfaced in our language, because that
12      happens all time.  It should be addressed.
13      And from that point forward it should be known
14      that this is not acceptable.
15 Q    So it's kind of like the dog's one bite rule.
16      You should be able to use a word that's
17      considered offensive at least one time because
18      it's not on the list?
19          MR. KLEBANOW: Objection.
20 Q    Right?
21 A    I'm not sure how this relates to a dog bite.
22      I'm not --
23 Q    The one bite rule?
24 A    I honestly have never heard that phrase.
25 Q    All right.  So in the event that a word comes

Aaron Petitt, et al. v.
City of Cleveland

Aaron Petitt
January 17, 2019

Page 125

1    up that is deemed by the City to be offensive
2    or subject to discipline but it's not on the
3    list, is it your position the City shouldn't
4    be able to discipline the person for that?
5    I'm just --
6  A   My position is exactly as I just stated.
7  Q   Which is what with respect to that question?
8          THE WITNESS: Can you reread that
9    please, ma'am?
10 Q   You sit down --  I'll tell you what.
11 A   Okay.
12 Q   You sit down, you have a discussion about it
13   but at the end of the day if the City still
14   feels that the context in which the term was
15   used was offensive, is it your position that
16   they still shouldn't be able to discipline
17   their employee -- their officer for it?
18 A   Yes.
19 Q   So then if a word doesn't appear on this list
20   and it's determined that it's -- it was used,
21   it was an offensive word that was used in a
22   police action, it's your position that you
23   cannot discipline someone for that?
24 A   So this is the if list, if it's a police
25   action, if it's not a word on the if list that

Page 126

1    I've created?
2  Q   It's not an if list, it's a list, but yeah.
3  A   But it's a list that doesn't exist so it's an
4    if list.
5  Q   No.  If we create your list that you say, the
6    word is not on there --
7  A   There is a lot of theoretical lists floating
8    around there.  I'm sorry.
9  Q   If the word -- that's fine.  If the word is
10   not on there, it's your position that you
11   shouldn't be able to discipline someone for
12   using it?
13 A   It's my position that there should be
14   guidelines.  It's my position that
15   administrators in the City and anyone using
16   that word or someone says I'm offended by it,
17   there should be a conversation about it and it
18   should be addressed.
19 Q   But my point is --
20 A   How is it addressed --
21 Q   My point is the word is not on the list.
22 A   I don't -- I'm sorry but I don't know your
23   point.  I don't know the list and I don't
24   know --
25 Q   It's fine.  It's fine.  All right.

Page 127

1          Well, with respect to the discipline
2    and the process and the investigation with
3    respect to your text message and the other
4    charges, didn't the City do what you say they
5    should have done except for with respect to
6    imposing discipline on you?  I mean, they
7    investigated what the word meant, right?
8  A   Yes.
9  Q   They heard your side of the story and
10   collected, you know, the information that you
11   believe supported your actions and decisions,
12   right?
13 A   Yes.
14 Q   They presented it to -- both sides of the
15   story to at that point the deputy chief,
16   right?
17 A   Correct.
18 Q   And it was left for him to make a
19   determination, or I should say a
20   recommendation to the Chief, correct?
21 A   Correct.
22 Q   And you -- so there is nothing -- there is
23   nothing about the way it was handled, you just
24   have an issue with the fact that you were
25   disciplined for it, right?

Page 128

1  A   No.
2  Q   All right.  What about the process do you
3    think should have been different?
4  A   You previously -- you previously asked me and
5    I said that there should be some sort of
6    guideline set forth if that word is found to
7    be offensive, if they believed it to be
8    offensive.  A standard should be set forth
9    from that period on.
10 Q   Well, all right.  Have you ever been a party
11   to a lawsuit in the past?
12 A   Yes.
13 Q   How many times?
14 A   For any lawsuit ever?
15 Q   Uh-huh.
16 A   Three or four maybe.
17 Q   Okay.  And outside of your employment with the
18   City of Cleveland have you been a party to a
19   lawsuit?
20 A   Yes.
21 Q   How many times?
22 A   One.
23 Q   What was that in regards to?
24 A   Traffic accident.
25 Q   Anything else that you can recall?  Any

Page 129

1    lawsuits you filed?
2  A   When I was in high school.
3  Q   Uh-huh.  What was that lawsuit about?
4  A   It was a freedom of speech case.
5  Q   Okay.  What did it pertain to?
6  A   Against hanging pictures, posters on my locker
7    at school.
8  Q   What was the content of the posters?
9  A   They were U.S. military planes flying over
10   Afghanistan.
11  Q   What else was going on?
12       MR. KLEBANOW: Objection.
13  A   I was suspended for -- I don't remember the
14   exact verbiage but I was suspended with a
15   recommendation for expulsion for hanging
16   posters that could be considered offensive.
17  Q   Okay.  They were flying over Afghanistan.
18   What were the planes doing?
19  A   They were dropping bombs.
20       MR. PIKE: Okay.  Let's mark
21   this.
22       (Defendant's Exhibit G
23   marked for identification.)
24  Q   Take a look at what I've given you as Exhibit
25   B -- I mean G.  I'm sorry.  Five posters I've

Page 130

1    attached here.  Are these posters that you
2    were referring to?
3  A   Yes, they are.
4  Q   All right.  And in each one of these five
5    posters it depicts military planes over
6    Afghanistan dropping bombs?
7  A   Yes.
8  Q   What's the -- under the first page what's the
9    language there that's written?
10  A   "Good morning Afgan."
11  Q   Okay.  And then the second one, what's written
12   there?
13  A   "May God have mercy because we will not."
14  Q   And the third one?
15  A   "Nonstop flights soon to" -- I can't make out
16   the last word.
17  Q   "Soon to be commenced"?
18  A   I don't know.
19  Q   All right.  Fourth one?
20  A   "It's a bird.  It's superman.  No.  It's what
21   dreams are made of" I think.  "Dreams do come
22   true."
23  Q   Again, depicting bombs falling all over
24   Afghanistan?
25  A   Yes.

Page 131

1  Q   And then the final one?
2  A   "American Airlines delivering a special
3    message."
4  Q   Okay.  Okay.  And these are posters that you
5    posted around your school indicating what?
6    Why did you do it?
7  A   This was immediately following 9/11.  These
8    were pictures from the Internet and these were
9    slogans taken off there.  And the front one
10   being a play off the Robin Williams good
11   morning Viet Nam.  The following posters, the
12   following were all from military members that
13   I saw on TV when I was a sophomore in high
14   school.
15  Q   Okay.  Is there any limitation on where or how
16   Afghans should be bombed in any of those
17   photographs?
18  A   That would be up to the commanding general.
19  Q   Well, I'm -- does your writing indicate
20   anything about it or just that the entire
21   Afghan should be bombed?
22       MR. KLEBANOW: Objection.  Go ahead.
23  A   I was a sophomore in high school so I wasn't a
24   member of special operations command at the
25   time so I didn't have any deployable knowledge

Page 132

1    on how the Air Force imposed --
2  Q   I'm asking what you mean by good morning
3    Afghan.  The picture seems to indicate that
4    it's target bombing the country.
5  A   I'm not sure what the bombers on Afghanistan
6    after we started invasion were doing besides
7    bombing.
8   (Jeffrey Follmer entered to conference room.)
9  Q   All right.  Is there any other reason you
10   posted these photos?
11  A   To show support for my country after we were
12   attacked.
13  Q   Okay.  That's the 9/11 attack, Twin Towers?
14  A   Yes, it was.
15  Q   Was your sister injured in that attack?
16  A   Yes, she was.
17  Q   What injuries did she suffer?
18  A   Cuts to the face from glass, partial burns
19   from the debris.  Not -- that's all I really
20   recall.
21  Q   How about with respect to your brother who is
22   a firefighter, I'm sure it impacted him, the
23   9/11 attack?
24  A   He volunteered to go up to Ground Zero to dig
25   out remains and rubble.

Page 133

1 Q    Right.  I'm assuming it made you mad?
2          MR. KLEBANOW: Objection.  Go ahead.
3 A    It made me very mad.
4 Q    And in response to that you posted these type
5      of photos?
6 A    To show support for my country, yes.
7 Q    Okay.  Is it your belief that using the term
8      haji is acceptable, to use that to refer to
9      all middle easterners?
10 A   It depends.
11 Q   Depends on what, context?
12 A   Depends on who you're saying it to, how you're
13     speaking to them.
14 Q   Okay.  Well, what circumstances would it be
15     appropriate or would it not be appropriate to
16     use the term?
17 A   At work.  The same reason I don't use the
18     terms bro or dude or guy when I'm speaking to
19     somebody.
20 Q   How about the term nukka, n-u-k-k-a; do you
21     use that term?
22 A   Joking around with friends I know I have.
23 Q   What does that term mean?
24 A   We -- a lot of times like nukka or ninja.
25 Q   Okay.  Is there another -- is there another

Page 134

1      connotation of the word nukka?  Is it slang
2      for anything?
3 A    Not that I've used it in.
4 Q    You're not aware of any alternate meanings of
5      the term nukka?
6 A    Not that I've used it in, no.
7 Q    How about the term homo; have you ever been
8      involved in a conversation involving the term
9      homo?
10 A   Yes.
11 Q   Have you used the term yourself?
12 A   I'm sure I have.
13 Q   Do you think that's an appropriate term to use
14     when referring to people?
15 A   At work, no.
16 Q   But you agree that you've used that term,
17     right?
18 A   I have.
19 Q   How about the term fag, have you used that
20     term?
21 A   I'm sure I have before.
22 Q   Is there any ambiguity to that term?
23 A   No.
24 Q   Have you ever used that term while on duty?
25 A   I don't believe so.

Page 135

1 Q    Have you ever used that term in respect to
2      text messages?
3 A    I don't know.
4 Q    Is it fair to say that haji is not the only
5      ambiguous term you've used to refer to people
6      of other ethnicities?
7 A    Can you repeat that? I'm sorry.
8 Q    Sure.  Is it fair to say that haji is not the
9      only term you've used to refer to -- ambiguous
10     term that you've used to refer to other
11     people -- people of other ethnicities?
12 A   No.
13 Q   Okay.  Were you a party or involved in any way
14     with respect to a lawsuit to keep the terms of
15     your text message out of the public eye?
16 A   Yes.
17 Q   In what regard?
18 A   Myself and on behalf of the Union initially
19     filed an injunction to stop it from coming
20     out.
21 Q   You didn't want the particulars of the text
22     message that you had used to go public,
23     correct?
24 A   Correct.
25 Q   You filed -- were part of a federal lawsuit

Page 136

1      seeking to prevent that from occurring,
2      correct?
3 A    Correct.
4 Q    Okay.  And just so I'm clear, you were
5      successful in that, right?
6 A    No.
7 Q    Okay.  Well, if the term is so appropriate to
8      use why would you go to great lengths as to
9      file a federal lawsuit to prevent its
10     disclosure to the public?
11        MR. KLEBANOW: Objection.  Go ahead.
12 A   Because everyone has a different opinion and
13     the media can turn anything they want to into
14     anything.
15 Q   Right.  Everybody has a different opinion as
16     to the term haji and the way that you used it
17     in that text message, right?
18 A   Correct.
19 Q   Some people would find it very offensive,
20     correct?
21 A   It's possible.
22 Q   All right.  And isn't it really more important
23     when you're creating a policy for which police
24     officers are to follow that you take into
25     account everyone's ethnic background and

Aaron Petitt, et al. v.
City of Cleveland

Aaron Petitt
January 17, 2019

Page 137

1     opinions on a particular word or phrase?
2  A   Yes.
3  Q   So if some person or persons found your
4     terminology, your text message or the term
5     haji offensive you would agree that -- that
6     that word should not be used by a police
7     officer, correct?
8  A   Yes.
9  Q   Okay.  Even though you may have been using it
10    innocently it's what the public or someone
11    else would perceive the meaning of that word
12    that's important; is it not?
13 A   Yes.
14 Q   As the City of Cleveland or the Cleveland
15    Division of Police, it has a vested interest
16    in holding its officers to the highest
17    standards, correct?
18 A   Correct.
19 Q   Because if you don't do that they lose faith
20    in the police, correct?
21 A   Correct.
22 Q   So with respect to the City's determination as
23    to whether or not a word or a phrase comports
24    with your personal belief as to the meaning of
25    that word, that's really not relevant to a

Page 138

1     disciplinary process, correct?
2         MR. KLEBANOW: Objection.  Go ahead.
3  A   I would disagree with that.
4  Q   Okay.  And can you give me any documents or
5     notices or any paperwork where the U.S.
6     military, as you claim, instructed you in the
7     use of the term haji?
8  A   Not at the moment, no.
9  Q   Can you name any person or commander who told
10    you to use those terms -- that term?
11 A   All of those people are long since gone if I
12    could remember the names.
13 Q   You don't know any of those people who I could
14    ask about this, do you?
15 A   I could try to get information.  No.
16 Q   Well, I'm asking as you sit here do you have
17    any knowledge as to who the person or persons
18    were within the U.S. military that told you it
19    was okay to use those terms?
20 A   Not at the moment, no.
21 Q   You would agree that the culture in society in
22    the middle eastern states is dramatically
23    different than what it is here in Cleveland,
24    Ohio, correct?
25 A   In an unimaginable and unfathomable way, yes.

Page 139

1  Q   It's about as far away from the City of
2     Cleveland as you could possibly be, right?
3  A   Yes.
4  Q   So the terms and phrases that are -- or
5     customs that are used in the middle east are
6     far different from those that are present here
7     in the City of Cleveland, correct?
8  A   No.
9  Q   No?
10 A   No.
11 Q   Okay.  But you can appreciate that the word's
12    usage and context and meaning can mean two
13    different things in two different parts of the
14    world, right?
15 A   Yes.
16 Q   And there is certain gestures and actions that
17    are commonplace here in the United States that
18    would probably get you, you know, into a fight
19    in other parts of the world, right?
20 A   Absolutely.
21 Q   And that was part of your military training,
22    correct?
23 A   Some of it, yes.
24 Q   So what's acceptable in one part of the world
25    is not necessarily acceptable in civilian life

Page 140

1     here in the City of Cleveland, right?
2  A   Sometimes, yes.
3  Q   All right.  You're not disputing that, right?
4  A   No.
5         MR. PIKE: All right.  We can
6     take a break if you want.
7         MR. KLEBANOW: All right.  That's
8     fine.
9         MR. PIKE: I don't want to hold
10    him here.
11        VIDEO TECHNICIAN: We're off the record
12    at 12:48.
13        (Short recess.)
14        VIDEO TECHNICIAN: We're back on the
15    record at 12:55.
16        MR. PIKE: Sir, I looked over my
17    notes.  I think I'm done today.  I appreciate
18    your time and honesty.
19        MR. KLEBANOW: And we'll read.
20        VIDEO TECHNICIAN: We're off the record
21    at 12:55.
22        (Deposition concluded at 12:55 p.m.)
23        (Signature not waived.)
24             - - -
25

Page 141

1                    SIGNATURE PAGE
2
3  In Re:      Aaron Petitt, et al., v. City of Cleveland
4  Case Number: 1:18-CV-01678-JG
5  Deponent:    Aaron Petitt
6  Date:        Thursday, January 17, 2019
7
8  To the Reporter:
9       I have read the entire transcript of my
10 Deposition taken in the captioned matter or the same
11 has been read to me.  I request that the following
12 changes be entered upon the record for the reasons
13 indicated.
14      I have signed my name to the Errata Sheet and the
15 appropriate Certificate and authorize you to attach
16 both to the original transcript.
17
18
19                              _____
20                                   Aaron Petitt
21      Subscribed and sworn to before me this
22 _____day of _____, 2019.
23
24                              _____
25      My commission expires:_____.

Page 142

1       I have read the foregoing transcript from page 1
2  through page 140 and note the following corrections:
3  PAGE-LINE    REQUESTED CHANGE         REASON FOR CHANGE
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25 _____      _____
   Aaron Petitt                 Date

Page 143

1  State of Ohio,          )
2  County of Cuyahoga,     )  SS:  CERTIFICATE
3       I, Karen A. Toth, Notary Public in and for the
4  State of Ohio, duly commissioned and qualified, do
5  hereby certify that the within named witness,
6  Aaron Petitt, was by me first duly sworn to
7  testify the truth, the whole truth, and nothing but
8  the truth in the cause aforesaid; that the testimony
9  then given by him was by me reduced to
10 stenotypy/computer in the presence of said witness,
11 afterward transcribed, and that the foregoing is a
12 true and correct transcript of the testimony so
13 given by him as aforesaid.
14      I do further certify that the testimony given
15 by the witness was video/audio recorded and that the
16 video recording hereto attached is a true and
17 correct visual and audio reproduction of the
18 testimony given by him.
19      I do further certify that this deposition was
20 taken at Burke Lakefront Airport, 1501 North
21 Marginal Road, Cleveland, Ohio 44114, on Thursday,
22 January 17, 2019, commencing at 9:54 a.m. and was
23 completed without adjournment.
24
25

Page 144

1       I do further certify that I am not a relative,
2  counsel, or attorney of either party, or otherwise
3  interested in the event of this action.
4       IN WITNESS WHEREOF, I have hereunto set my
5  hand and affixed my seal of office at Cleveland,
6  Ohio on this 21st day of January, 2019.
7
8               _____
                Karen A. Toth, Notary Public in
                and for the State of Ohio.
9               My Commission expires May 6, 2023.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**$**

**$500 (1)**
8:21

**A**

**AARON (7)**
4:4;5:4;75:6;76:6;
97:19;103:20;104:3
**abdomen (1)**
82:15
**able (6)**
116:12;124:1,16;
125:4,16;126:11
**above (1)**
82:14
**absence (1)**
9:21
**Absent (1)**
8:13
**Absolutely (5)**
70:18,23;72:3,22;
139:20
**acceptable (5)**
78:22;124:14;133:8;
139:24,25
**accepted (2)**
70:15;83:13
**accident (1)**
128:24
**according (2)**
42:13;93:12
**account (1)**
136:25
**accountable (1)**
89:17
**accurate (3)**
41:6;49:16;50:22
**accused (1)**
104:16
**Achievement (1)**
22:22
**action (8)**
28:12;52:24;53:10;
58:1,14;89:21;125:22,
25
**actions (2)**
82:1;127:11;139:16
**active (6)**
5:19;22:3,12;37:13;
83:20;116:13
**activities (1)**
37:21
**activity (1)**
119:3
**acts (2)**
90:18;109:10
**actually (6)**
27:23;38:13;51:22;
91:16;107:2;110:18
**add (1)**

121:2
**added (1)**
121:19
**additional (1)**
34:4
**address (3)**
18:13;114:23;115:6
**addressed (4)**
123:19;124:12;
126:18,20
**addressing (1)**
121:21
**administrative (1)**
83:17
**administrators (1)**
126:15
**advance (1)**
96:9
**advising (1)**
15:5
**advisor (1)**
19:8
**Aegis (6)**
11:5,15;13:6,17,21;
20:6
**affect (1)**
73:8
**affected (1)**
107:18
**Afgan (1)**
130:10
**Afghan (2)**
131:21;132:3
**Afghanistan (8)**
5:21;23:13;38:2;
129:10,17;130:6,24;
132:5
**Afghans (1)**
131:16
**afoul (1)**
98:18
**African (1)**
107:24
**again (12)**
10:1;17:9,12;37:13;
47:22;50:1;51:10;
68:21;91:18;96:4;
97:11;130:23
**against (13)**
31:15;32:14;33:15,
18,19;34:1;81:4,7;
83:2;94:12;103:23;
114:15;129:6
**age (2)**
4:5;5:14
**agencies (3)**
9:3;105:2,6
**ago (6)**
4:14;11:14;14:9;
18:5;20:8;47:3
**agree (11)**
52:22;56:20;57:1;
74:7;92:8;96:6,11;

109:23;134:16;137:5;
138:21
**agreement (1)**
78:23
**ahead (49)**
16:17;31:25;32:22;
33:8;34:13;45:12,24;
46:9,12,16;47:17;
48:12;49:21,23;50:15,
18;53:11,25;54:22;
55:5;56:25;57:10,24;
58:8;63:10;64:3;66:7,
13;67:1;68:20;73:6;
75:12;79:2;90:5;91:8,
14;94:23;99:7;101:15;
102:24;109:19;110:6,
19;119:16,23;131:22;
133:2;136:11;138:2
**Air (1)**
132:1
**Airlines (1)**
131:2
**Alan (1)**
114:20
**allegation (17)**
24:25;37:3,6;65:19;
66:2,20,25;68:17;69:2;
70:7;71:17;77:19;
96:15;103:1,4;106:9;
112:17
**allegations (13)**
34:22;35:10;59:7;
67:19;83:2;87:8;96:18;
99:20;100:22;106:17;
108:22;114:15;120:10
**allege (6)**
69:4;75:5;76:3;87:9;
104:20;117:8
**alleged (8)**
21:3;28:10;67:10;
68:5;70:1;72:8;112:1,7
**allegedly (3)**
68:2,9;70:9
**alleges (2)**
43:24;65:11
**alleging (2)**
68:22;78:17
**allowed (1)**
37:16
**almost (2)**
37:12,14
**Along (3)**
19:3;58:19;66:21
**alongside (1)**
67:24
**alpha (8)**
38:16;39:5,6,6,8;
63:16,21,23
**altercation (1)**
56:23
**alternate (7)**
40:22;41:3,8,15,16;
43:1;134:4

**always (3)**
37:19;97:11;104:14
**ambiguity (2)**
61:14;134:22
**ambiguous (7)**
43:17,25;44:2;87:11;
123:12;135:5,9
**amended (1)**
120:15
**Amendment (1)**
72:8
**American (2)**
107:24;131:2
**amongst (1)**
111:13
**amount (2)**
85:5,6
**and/or (1)**
39:4
**answered (2)**
74:11;98:9
**anymore (1)**
108:7
**ap (2)**
14:8,20
**apologize (1)**
115:22
**Apparently (2)**
51:3;75:8
**appeal (4)**
102:7,9,11,13
**appealed (1)**
101:21
**appear (6)**
80:8;121:18;122:11;
123:4,23;125:19
**appellate (1)**
102:21
**application (20)**
11:8,22;12:4,13;
13:7,9,14,21;14:6,17;
15:2;17:17,18;18:4,6,8,
17,25;19:2,10
**applications (4)**
13:25;14:11;20:7,10
**applied (2)**
10:25;13:18
**apply (6)**
9:7;11:13,16,23;
20:3;117:25
**applying (2)**
18:2;19:7
**appointed (1)**
117:10
**appreciate (6)**
57:14,18;90:24;96:7;
139:11;140:17
**approaching (1)**
28:16
**appropriate (5)**
121:1;133:15,15;
134:13;136:7
**approval (2)**

118:1,5
**approximate (1)**
35:12
**approximately (10)**
5:24;8:9;11:14;14:9;
16:5;18:5;21:16,18;
35:24;47:3
**April (3)**
27:10,20;48:5
**Arab-American (1)**
75:9
**Arabia (1)**
63:9
**Arabic (1)**
28:11
**arbitrarily (1)**
65:12
**arbitrary (3)**
95:18,24,25
**arbitration (2)**
102:16,18
**area (2)**
10:8;103:10
**areas (2)**
118:25;119:1
**argue (5)**
32:24;56:14;70:22;
72:5;108:24
**armed (1)**
23:10
**Army (11)**
5:19;6:9;22:21,22;
23:10;24:6,10,11,12,
16,19
**Around (18)**
4:15;6:13;8:16;
14:10;36:10,11;45:1;
103:9,11;108:16,16;
109:2,7,8;111:24;
126:2,7,8;131:5;133:22
**articles (1)**
104:19
**aside (3)**
8:13;92:20;93:2
**assigned (2)**
76:14;78:9
**assignments (1)**
37:22
**assist (1)**
62:19
**assistance (4)**
52:16;53:9;58:3,13
**associated (6)**
18:22;68:10;104:11,
15;106:10;111:20
**associating (1)**
107:12
**association (5)**
107:4,6,7;111:22;
113:24
**assume (1)**
52:20
**assuming (6)**

Aaron Petitt, et al. v.
City of Cleveland

Aaron Petitt
January 17, 2019

9:14;19:4;24:13;
27:12;67:8;133:1
**assumption (2)**
64:1,5
**attached (1)**
130:1
**attack (3)**
132:13,15,23
**attacked (1)**
132:12
**attacking (1)**
114:8
**attend (2)**
78:24;102:20
**attended (2)**
5:11;79:16
**attendee (1)**
80:9
**attention (2)**
84:20;88:1
**attorney (3)**
97:24;98:22;99:1
**attorneys (6)**
21:1;97:20;98:10,10,
19,22
**attribute (1)**
107:22
**automated (1)**
15:1
**availability (1)**
116:11
**AVERY (3)**
51:25;98:7,24
**avoided (1)**
82:6
**awarded (7)**
22:24;23:15,20,21,
25;24:8,9
**aware (29)**
29:19,22;41:23,25;
42:2,17;45:4,7;46:8;
47:19,23;58:22;59:12;
69:23;77:13;79:15;
84:4;85:25;87:19;91:4;
94:9;95:13;102:13,17;
106:21;111:13;116:2,
4;134:4
**away (1)**
139:1

**B**

**Bachelor's (1)**
6:3
**back (20)**
5:16;8:10;9:23;
14:13,25;21:25;22:9,
15;27:10;32:1;34:22;
35:6,9,9;36:23;45:18;
50:20;91:23;99:24;
140:14
**background (3)**
5:9;16:8;136:25

**Bad (4)**
17:11;60:20;61:15,
24
**Badge (1)**
24:21
**bank (1)**
103:9
**bargaining (1)**
30:25
**base (3)**
39:23;117:7;119:6
**Based (12)**
37:9;39:24,25;46:11,
14;61:2,4;72:2;77:10;
85:20;114:3,17
**bases (1)**
44:6
**basic (2)**
5:16;37:10
**basis (9)**
33:7;37:12,14;66:25;
69:8;96:1,3,7;103:3
**bathroom (1)**
91:17
**Battalion (2)**
5:20;37:18
**Beat (2)**
53:22,24
**beating (3)**
54:8;55:4,12
**become (1)**
24:19
**becoming (1)**
24:12
**beforehand (2)**
47:5;93:5
**begin (1)**
69:15
**beginning (1)**
20:13
**behalf (1)**
135:18
**belief (15)**
42:16,22;43:16;
44:11;69:8,17,19;
71:11,23;72:19;75:24;
113:1;118:8;133:7;
137:24
**believes (1)**
121:3
**besides (8)**
11:1;18:24;19:23;
64:10;101:17;106:5;
107:10;132:6
**best (2)**
7:1;44:21
**better (1)**
23:25
**bird (1)**
130:20
**bit (1)**
26:16
**bite (3)**

124:15,21,23
**black (1)**
94:25
**bombed (2)**
131:16,21
**bombers (1)**
132:5
**bombing (2)**
132:4,7
**bombs (3)**
129:19;130:6,23
**both (15)**
5:21;7:11;11:11;
27:19;38:1;52:8;77:7;
78:2;84:8;85:20;86:18;
98:4;112:9;118:19;
127:14
**bother (7)**
51:14;54:1,7;56:5;
59:22;112:5;113:8
**bothering (1)**
51:11
**branded (2)**
112:3,6
**break (3)**
20:14,15;140:6
**breaks (1)**
21:23
**bro (1)**
133:18
**brother (4)**
112:18;115:20,25;
132:21
**brought (10)**
25:14;26:6,11,14;
32:5;33:19;35:13;36:6;
47:10,14
**burns (1)**
132:18

**C**

**call (14)**
15:16,20,21;16:7;
52:23;57:22;58:6,9;
62:7,14,17;63:17;
80:25;99:25
**called (5)**
25:18;75:19;101:2;
113:13,15
**calling (3)**
52:15;58:2;105:18
**calls (4)**
105:25;106:3,6,7
**Calvin (1)**
120:1
**came (7)**
5:16;9:23;21:25;
39:18;43:10;105:23;
124:8
**Campaign (3)**
23:13,16;24:1
**Can (90)**

5:3,8;16:14;22:23;
24:3,18;25:10,13,21;
26:23;29:1,10,25;30:9,
22;31:9,16;32:8,16,23,
25;33:1,3,10;34:19;
37:7;38:23;40:3;41:11;
42:5,11,19,20;43:21,
22;45:17;46:4,4,6,7,10;
47:22;48:6;50:11,19,
19;52:17,25;54:21;
57:8,14;60:4,14,24;
61:19;62:1,12;63:18,
20;67:22;73:8;75:15;
80:3;84:17,23;85:5;
86:8;87:16,19;90:24;
92:18;93:12;95:5,20,
21;96:6;97:23;103:3;
111:5;118:19,20;
125:8;128:25;135:7;
136:13;138:4,9;
139:11,12;140:5
**Canopy (10)**
8:4,8,14,20,25;9:4,9,
12,25;11:2
**capacity (3)**
7:13;53:3;98:11
**capricious (4)**
95:19,20,22;96:1
**capriciously (1)**
65:12
**career (3)**
10:10;25:5,8,14
**Carl (3)**
112:20,21;115:6
**case (16)**
35:12;36:24;40:9;
44:11;72:9;75:7;76:20,
23;77:11;103:1,5;
104:22;109:4;116:7;
121:10;129:4
**causally (1)**
120:5
**cause (2)**
76:4;83:15
**caused (1)**
105:9
**causing (1)**
48:25
**CBA (1)**
101:23
**cease (1)**
8:24
**cell (1)**
77:7
**certain (7)**
42:21;44:14;46:3;
56:7;63:21;107:23;
139:16
**certified (1)**
4:6
**chance (3)**
27:1;29:7;49:8
**change (1)**

117:6
**changed (2)**
117:10;120:16
**changing (1)**
122:13
**characterization (2)**
107:8,9
**charge (8)**
26:19;27:7;39:5,7;
44:7;81:7;99:24;101:1
**charged (11)**
25:16;26:18;27:10,
19;28:6;33:11;35:25;
36:4;85:23;86:12;
108:1
**charges (32)**
25:8,13;26:7,11,14;
27:8,18,23;28:14,19,
25;31:15,19;32:4,13;
33:19;34:1,7;35:13;
36:6;47:11,14;80:18;
82:20;83:2,17;92:4;
93:24;96:4,11;103:6;
127:4
**charging (10)**
59:7;85:20,21;87:24;
93:19,20;94:4,11;95:7,
8
**check (2)**
119:22,23
**Chief (7)**
29:12;118:24;
119:17,21;120:1;
127:15,20
**chose (1)**
34:3
**circles (1)**
63:21
**circumstance (2)**
23:1;122:18
**circumstances (14)**
45:16;46:3;54:19;
55:3,12;56:7,17,22;
71:22;96:23;122:3,24;
123:7;133:14
**cited (1)**
94:11
**citizen (1)**
110:5
**City (53)**
5:7;32:14;37:3;43:6;
59:17,25;66:20;67:17;
68:18,22;69:10,25;
70:8;72:6,17;73:12,16;
75:24;76:5,11;77:14;
91:5;92:5,21;95:11;
104:15;105:5,9,16;
106:8;108:16;109:8;
115:8;118:25;120:13;
121:1,2,13,25;122:9,
17;123:20,25;125:1,3,
13;126:15;127:4;
128:18;137:14;139:1,

7;140:1

**City's (2)**
70:3;137:22

**civil (4)**
75:8,10,16,17

**civilian (1)**
139:25

**claim (9)**
67:23;72:9;77:20;
108:21;109:12;112:10;
117:1;120:5;138:6

**claiming (6)**
45:21;46:1,3,6;
108:15;119:10

**Clark (7)**
59:10,11;60:11;
65:23;66:16;92:15;
93:10

**classes (1)**
76:14

**clean (1)**
4:24

**clear (8)**
62:6;77:18,23;80:1;
86:12;99:9;119:5;
136:4

**Cleveland (66)**
5:7,23;6:1,13,24;
8:11,16;9:15,23;10:11,
14;14:2;17:24;18:11;
25:2,6;32:14;35:18;
37:4;43:6;58:23;59:4,
16,17;64:12;66:20;
67:18;68:18,23;69:11,
25;70:9;72:17;73:12,
16;75:24;76:5,12;
77:14;79:15;80:20;
82:4;88:3;91:5;92:5;
95:11;104:16;105:5;
106:8;109:5;110:2;
114:25;115:9,11,23;
121:3,13,25;122:9;
128:18;137:14,14;
138:23;139:2,7;140:1

**Cleveland's (1)**
120:14

**close (1)**
7:16

**Club (6)**
48:23;53:15;58:6,13;
62:19;75:9

**collected (1)**
127:10

**collective (1)**
30:25

**college (1)**
5:10

**comfortable (4)**
121:15,21,22;123:2

**coming (2)**
8:10;135:19

**command (1)**
131:24

**commander (1)**
138:9

**commanding (1)**
131:18

**commenced (1)**
130:17

**comment (2)**
88:21;89:6

**comments (2)**
87:2;90:9

**common (1)**
77:8

**commonplace (3)**
37:11;79:6;139:17

**community (5)**
103:10,12;116:21,
22;119:3

**company (1)**
105:19

**compassion (2)**
88:9,19

**compensation (1)**
117:9

**competent (1)**
89:20

**complaint (18)**
20:25;21:3;22:18;
34:23;35:10;36:24;
43:24;65:11;66:4;
67:20;70:2,8;71:17;
75:13;87:8;99:20;
100:22;120:11

**complete (1)**
24:18

**completed (1)**
5:17

**completely (1)**
4:21

**completing (1)**
24:16

**component (1)**
42:3

**comports (1)**
137:23

**concern (2)**
107:6;112:21

**concluded (3)**
101:25;105:21;
140:22

**conclusions (1)**
92:9

**conditions (1)**
120:5

**condone (1)**
101:13

**conduct (6)**
70:22;76:1;89:19,24;
90:17;111:12

**conducted (3)**
33:16;79:12;93:5

**conference (1)**
132:8

**connotation (1)**

134:1

**consecutive (1)**
21:23

**consider (3)**
50:10,11;123:13

**considered (3)**
45:23;124:17;129:16

**consistent (1)**
89:20

**construed (1)**
44:15

**contact (8)**
13:14;17:12,15;
18:16;19:25;28:15;
87:20;108:8

**contacted (1)**
17:9

**contain (1)**
84:18

**contained (4)**
29:14;32:6,15;33:12

**containing (1)**
47:18

**contains (1)**
47:24

**contending (1)**
45:14

**content (5)**
47:24;49:13;90:24;
100:13;129:8

**contents (1)**
109:16

**contest (1)**
34:7

**context (14)**
44:14;46:11,14;
54:23;59:14;72:12;
90:25;91:6;101:8,11;
109:23;125:14;133:11;
139:12

**continue (1)**
22:16

**Continuing (1)**
49:21

**contract (2)**
7:10;9:4

**contracted (1)**
8:2

**contractor (5)**
7:6,9,14,23;10:25

**contractors (1)**
9:8

**contracts (2)**
9:2,6

**Control (1)**
116:23

**conversation (17)**
16:2,4;18:21;19:14;
47:21;89:3;90:8;98:21;
100:2,3,6,16;101:12,
16;108:11;126:17;
134:8

**conversations (8)**

13:20;39:25;97:6,11,
20;101:17;111:13,18

**copies (2)**
68:1;106:16

**copy (9)**
12:4,7,7;13:9;14:17;
18:8;49:16;50:22;65:8

**Corning (3)**
19:1,16;20:1,5

**correctly (4)**
74:20,21;83:21;
88:12

**correspondence (3)**
19:15;64:15,25

**counsel (8)**
34:3;97:7,12,14;
98:1;99:14,19;100:25

**count (1)**
99:3

**country (3)**
132:4,11;133:6

**couple (1)**
4:16

**course (1)**
72:22

**court (1)**
4:19

**courtesy (3)**
4:20;88:9,19

**cover (3)**
28:16;44:6;58:22

**covered (4)**
75:21;80:20,23,25

**covering (1)**
28:21

**CPPA (12)**
21:1;97:8;98:5,21;
99:1,13,18;100:8,10,
12,21;105:18

**create (2)**
123:9;126:5

**created (1)**
126:1

**creating (2)**
123:10;136:23

**crime (1)**
118:25

**Criminal (1)**
6:4

**criteria (1)**
122:6

**CROSS-EXAMINATION (1)**
4:8

**culture (1)**
138:21

**current (2)**
118:17;119:2

**currently (4)**
5:6;6:21;10:5;
102:15

**customs (1)**
139:5

**cut (4)**

4:19;9:3;52:1;91:15

**Cuts (1)**
132:18

**cuz (1)**
71:16

**cycles (1)**
37:21

---

**D**

---

**dad (1)**
113:21

**daily (5)**
8:21;37:12,14,20,21

**damage (2)**
77:20;104:9

**damages (2)**
76:5;119:9

**date (4)**
19:20;25:12,22;68:7

**dates (2)**
8:12;10:13

**day (19)**
10:19;13:5;38:1;
76:18;78:1;79:5,12,24;
81:2,11;83:7,18;86:10,
23;87:6;104:9;108:9;
119:19;125:13

**days (7)**
8:23,23;10:16;26:5;
79:20;81:24;84:2

**deal (3)**
62:20;107:11;119:3

**dealing (1)**
58:4

**dealt (1)**
78:15

**debris (1)**
132:19

**decide (2)**
108:9;122:10

**decided (2)**
92:20,21

**decision (1)**
101:21

**decisions (1)**
127:11

**decorations (1)**
22:20

**deemed (1)**
125:1

**deems (2)**
121:1,25

**de-escalation (7)**
28:15;81:12;82:6,22,
22;87:4;100:19

**defamatory (1)**
90:2

**defend (14)**
103:23;111:9,15,19,
24;112:13;113:5,7,11,
13,19,22,22;114:2

**defendant (1)**

65:12
**Defendant's (7)**
20:18;26:24;29:5;
31:4;49:4;84:14;
129:22
**defense (5)**
9:3;23:6,8,15;30:4
**defer (3)**
35:17;52:13;73:16
**define (2)**
42:19;95:20
**defining (1)**
87:3
**definition (6)**
23:23;56:8,10,14,17;
95:25
**degree (1)**
117:9
**deleted (1)**
46:23
**delivering (1)**
131:2
**demeaning (9)**
42:9;87:21;91:12;
92:25;108:2;109:18;
114:16;123:13,24
**denied (1)**
102:14
**Department (11)**
5:24;7:7,8,12,25;8:2;
16:8,10;109:9;115:17;
116:8
**depending (1)**
93:13
**depends (3)**
133:10,11,12
**depicted (1)**
49:14
**depicting (1)**
130:23
**depicts (1)**
130:5
**deployable (1)**
131:25
**deployed (1)**
39:14
**deployment (3)**
8:22;22:17;39:18
**depo (1)**
4:12
**deposition (3)**
33:5;50:3;140:22
**Deputy (2)**
119:17;127:15
**derogatory (16)**
42:3,9,20;43:12;
45:8,15,23;46:4;60:24;
61:12,20;62:1;91:11;
92:24;123:14,24
**descent (1)**
64:19
**describe (5)**
38:14;39:4,5;61:18;

107:19
**described (1)**
60:22
**describing (2)**
60:25;61:20
**description (2)**
107:22;118:23
**despite (2)**
44:10;69:17
**detail (2)**
11:7;37:23
**details (3)**
37:20;112:24;113:4
**Detective (2)**
59:10;76:10
**determination (3)**
123:21;127:19;
137:22
**determine (1)**
40:22
**determined (3)**
65:13;92:16;125:20
**dictionary (1)**
56:14
**difference (1)**
119:6
**different (18)**
5:25;40:3,4;41:23;
51:20,25;74:17;85:7;
109:1,7;116:22;128:3;
136:12,15;138:23;
139:6,13,13
**differently (10)**
92:6,13;93:7;107:21;
108:15,22;109:12,21;
110:11;111:1
**dig (1)**
132:24
**dignitaries (1)**
7:18
**dignity (2)**
88:8,18
**diminish (4)**
69:6,12,25;70:10;
90:19;91:1
**direct (5)**
25:16;36:25;67:22;
84:19;88:1
**Directly (4)**
5:18;89:7;106:20;
108:19
**Director (1)**
18:3
**disagree (2)**
109:17;138:3
**disciplinary (35)**
25:7;26:7,11,14;
36:9,19;58:17;59:17;
61:8;65:22;66:12;
70:20;77:25;78:20;
79:4,8,11,16,24;80:2,4;
82:23;83:23;85:22;
86:14;92:3;95:17;

99:21;102:22;108:23;
116:16;117:2;119:14;
120:2;138:1
**discipline (42)**
26:2;35:11;72:5,6;
73:7,24;78:5;83:15,20,
24;84:19;85:3,4,10;
86:3,7,8;87:16;94:3,12,
16,21;95:13,17;96:8,
24;97:4;99:11;101:22;
116:6,6,13;119:10;
123:16;124:1;125:2,4,
16,23;126:11;127:1,6
**disciplined (17)**
71:2,7,12,24;72:11,
19,24;73:1,4,12;74:15;
75:2;87:19;122:24;
123:6;124:6;127:25
**disclosure (1)**
136:10
**discovered (1)**
92:15
**discussed (7)**
16:6;20:11;48:18;
97:14;99:21;101:5;
123:18
**discussing (1)**
114:10
**discussion (3)**
99:23;100:13;125:12
**discussions (2)**
99:17;100:20
**disobedience (3)**
75:8,11,17
**disparagement (1)**
65:14
**disparaging (15)**
28:10;37:5;70:15;
75:10;87:2,16,21;90:2,
8;92:25;93:1;94:10,21;
108:1;109:18
**displeasure (1)**
101:10
**dispute (9)**
29:24;30:7;34:6;
60:5;66:15;78:13;
80:19;82:20;84:1
**disputing (2)**
81:6;140:3
**disrespectful (2)**
88:24;110:17
**distinction (1)**
70:25
**district (10)**
10:3,4,5,6,8,15,16,
17,20;108:17
**Division (28)**
6:14,24;7:5;8:11,16;
9:15,24;10:11;14:2;
25:2,6;35:18;58:23;
59:4,16;64:12;79:15;
80:20;82:5;88:3;90:20;
94:18;109:5;115:11,

14;117:15,21;137:15
**document (3)**
20:22;27:4;28:2
**documentation (1)**
47:20
**documented (1)**
36:18
**documents (2)**
47:23;138:4
**dog (1)**
124:21
**dog's (1)**
124:15
**done (14)**
40:10;59:13,16,24;
61:7;65:23;66:10;92:5,
12;93:6;104:8;111:21;
127:5;140:17
**Double (1)**
17:11
**down (7)**
51:3;53:13;108:5;
115:3;124:9;125:10,12
**downtown (3)**
17:23;103:10;118:10
**dramatically (1)**
138:22
**draw (2)**
70:25;77:10
**Dreams (2)**
130:21,21
**dropping (2)**
129:19;130:6
**drug (1)**
119:2
**Drummond (1)**
119:17
**D's (1)**
93:1
**dude (1)**
133:18
**duly (1)**
4:5
**during (7)**
25:14;28:11;33:5;
50:3;60:9;72:16;89:9
**duty (38)**
5:19;21:6,7,11;22:8,
12;37:13;52:9,11,16,
21;53:17;58:2,15;
64:16,17;70:20,22,24;
71:1,1,8,9,13,22;72:18,
22,23;73:5,8,8,14,25;
74:14;90:18;94:20;
96:22;134:24

───────────

**E**

**East (3)**
10:14;103:9;139:5
**eastern (14)**
38:4;48:24;51:4;
53:15;60:23;61:19;

14;117:15,21;137:15
62:10,20;64:2,4,7,19;
90:4;138:22
**easterners (2)**
63:4;133:9
**education (2)**
5:10;117:12
**eight (3)**
14:9;18:5;20:7
**either (12)**
19:24;59:5,13;62:4;
74:13;86:22;87:8;
93:13;95:18;100:21;
107:17;115:10
**else (18)**
17:18;20:3;33:17;
46:6;55:1,7;64:11;
89:5;106:5;107:10,13;
110:24;114:2;115:21;
120:23;128:25;129:11;
137:11
**else's (1)**
67:19
**email (15)**
15:1,5,12,14,17;
19:17,21,23;65:1,9
**embarrass (1)**
77:20
**embarrassment (1)**
76:4
**employed (1)**
5:6
**employee (1)**
125:17
**employer (1)**
8:5
**employment (12)**
7:20;8:7,15;10:24;
12:22;14:1;17:18;
18:25;35:14;72:17;
116:25;128:17
**encounter (1)**
89:22
**end (1)**
125:13
**enforcement (1)**
119:4
**engage (2)**
87:20;103:10
**Engagement (1)**
116:21
**engaging (3)**
35:14;90:17;110:4
**engine (1)**
104:6
**enlisted (1)**
5:14
**enough (1)**
102:20
**entered (1)**
132:8
**Enterprise (2)**
17:21,22
**Enterprises (5)**

Aaron Petitt, et al. v.
City of Cleveland

Aaron Petitt
January 17, 2019

18:10,16,22,24;20:6
**entire (2)**
4:23;131:20
**entities (1)**
14:4
**entitled (3)**
33:2,6;50:8
**especially (1)**
107:23
**essentially (1)**
118:15
**esteem (2)**
90:19;91:1
**estimate (1)**
7:2
**ethic (3)**
41:15;60:4,14
**ethical (2)**
89:18,23
**ethnic (3)**
42:21;135:6;136:25
**ethnicities (2)**
135:6,11
**even (6)**
63:3,6,8;69:14;89:1;
137:9
**event (2)**
94:18;124:25
**Everybody (1)**
136:15
**everyone (4)**
78:24;109:4;111:25;
136:12
**everyone's (1)**
136:25
**everywhere (2)**
104:1,4
**evidence (19)**
16:25;33:14;36:18;
37:5;65:18;67:17;
68:16,25;69:8,18,24;
70:6;75:22,23;76:11;
77:18;83:1;96:17;
114:7
**exact (10)**
10:13;23:23;25:12,
22;26:19;49:2;68:11;
87:17;100:11;129:14
**exactly (9)**
8:12;9:5;26:19;39:1;
41:7;71:20;101:6;
105:14;125:6
**examined (2)**
4:6;123:18
**example (1)**
60:4
**excellent (1)**
25:3
**except (2)**
50:5;127:5
**exchange (10)**
46:19,20;47:25;48:7,
11;49:17;50:23;52:10;

53:18;100:23
**Excuse (1)**
65:5
**Exhibit (35)**
20:18,21;26:24;27:6;
29:5,8,10,18;30:16,17;
31:4,7,13,20;32:6,7,12,
15;33:12,16,20;34:23;
36:23;49:4,9,23;50:14;
62:8;83:6;84:14;87:25;
95:6,7;129:22,24
**exist (1)**
126:3
**exists (1)**
124:6
**expected (1)**
84:11
**Expeditionary (3)**
23:19,21,22
**experience (4)**
37:9;38:13;42:13;
117:12
**expert (1)**
100:16
**explain (1)**
103:3
**exposed (1)**
28:21
**express (4)**
16:19;47:20;101:7,
10
**expressed (3)**
91:10;112:21;113:6
**expressing (1)**
91:4
**expulsion (1)**
129:15
**eye (2)**
108:7;135:15
**eyes (1)**
90:21

**F**

**face (3)**
85:11;103:7;132:18
**fact (9)**
54:18;57:14;60:13;
65:21;80:11;101:2;
104:19;112:12;127:24
**factitious (1)**
57:19
**factors (2)**
83:19;85:7
**facts (5)**
16:25;76:22;77:11;
92:14;96:23
**fag (1)**
134:19
**failed (1)**
87:3
**failing (3)**
28:14,20;81:12

**failure (3)**
25:16;58:21;82:21
**fair (11)**
31:14;55:13;74:1;
86:1,21;89:12;102:20;
107:8;111:10;135:4,8
**Fairview (2)**
5:12;115:1
**faith (3)**
38:22;63:1;137:19
**falling (1)**
130:23
**false (6)**
65:19;66:2;68:18;
69:2;106:14,16
**familiar (2)**
84:8;102:19
**family (5)**
103:17,18,19,22,23;
111:8,14;112:12,13
**far (9)**
72:5;79:22;95:10;
108:14;139:1,6
**father (8)**
103:22;112:15,17;
113:1,6,18;114:2;
115:10
**father's (1)**
114:19
**federal (2)**
135:25;136:9
**Feel (13)**
84:22;89:14;95:18;
104:8;107:16;109:3,6;
111:7;120:22;121:15,
21,22;123:2
**feels (2)**
109:1;125:14
**fell (1)**
93:2
**felt (3)**
89:10,11;109:7
**few (3)**
5:25;15:9;21:4
**fight (8)**
53:21,23,24;54:10,
11,12;57:6;139:18
**file (2)**
36:20;136:9
**filed (9)**
20:25,25;47:4;66:4;
102:7;106:23;129:1;
135:19,25
**filing (1)**
44:10
**final (1)**
131:1
**find (7)**
34:24;40:14;83:15,
16;91:11;123:21;
136:19
**finding (2)**
60:12;81:7

**findings (2)**
29:12,13
**fine (7)**
52:5;116:2;119:25;
126:9,25,25;140:8
**finish (3)**
4:20,22;55:20
**finished (1)**
115:2
**fire (2)**
115:17,23
**firefighter (1)**
132:22
**fireman (1)**
115:23
**first (16)**
4:5;5:19;9:20;14:25;
21:15;22:7,8;26:6;
28:8;32:12;37:10,18;
72:8;83:12,19;130:8
**five (4)**
45:1;105:21;129:25;
130:4
**fix (1)**
50:5
**fixing (1)**
115:24
**flights (1)**
130:15
**floating (1)**
126:7
**flying (2)**
129:9,17
**focus (1)**
118:25
**Follmer (5)**
101:2,5,18;105:12;
132:8
**follow (3)**
28:20;84:11;136:24
**followed (5)**
63:6;82:6;92:14;
95:10,11
**following (7)**
5:18,22;76:15,15;
131:7,11,12
**follows (1)**
4:7
**follow-up (5)**
12:12,22;13:13;
18:15;19:9
**foot (1)**
103:9
**force (4)**
58:20;82:10;100:15;
132:1
**forever (1)**
104:4
**forgoing (1)**
118:15
**Form (5)**
16:17;32:21;33:1;
38:3;50:5

**format (1)**
50:6
**former (1)**
48:22
**for-pay (1)**
8:15
**forth (2)**
128:6,8
**forward (2)**
6:23;124:13
**found (14)**
25:23;28:24;29:13,
15;80:18;81:11;86:18,
21;87:2;94:19;119:20;
120:15;128:6;137:3
**founded (1)**
81:8
**four (10)**
5:21;6:8;21:6,11,16,
18,22;22:14;84:18;
128:16
**fourth (2)**
21:21;130:19
**frame (3)**
9:10;11:17;19:3
**frames (1)**
36:10
**free (1)**
84:22
**freedom (2)**
72:9;129:4
**friend (2)**
57:21;89:3
**friends (5)**
41:1,3;111:8,14;
133:22
**front (1)**
131:9
**full (1)**
83:12
**funny (1)**
57:5
**furloughed (1)**
22:9
**future (2)**
103:2;107:17

**G**

**Garrity (3)**
34:12,17;89:10
**gave (2)**
34:17;111:7
**general (8)**
37:23;44:8;53:23;
78:23;84:4;87:14;
112:23;131:18
**Generally (2)**
8:23;38:17
**gentlemen (1)**
63:22
**gestures (1)**
139:16

gist (1)
    61:1
given (4)
    33:22,25;51:4;59:8,
    15;87:10;118:23;
    129:24
giving (4)
    58:5;62:21;72:6;
    97:17
glass (1)
    132:18
Global (1)
    23:18
goals (2)
    16:8,10
God (1)
    130:13
goes (1)
    72:5
good (6)
    60:19;61:15,24;
    130:10;131:10;132:2
Google (5)
    41:1,2;43:9,11;104:1
Gorman (13)
    48:23;49:18;50:24;
    51:7,10,15;52:21;62:7,
    14,19;77:4,4;80:8
Gorman's (2)
    76:20;77:7
government (2)
    9:7;10:25
grab (1)
    91:17
graduate (1)
    6:6
graduated (1)
    6:2
graduating (1)
    5:14
granted (1)
    14:16
great (1)
    136:8
groin (1)
    82:14
ground (2)
    4:16;132:24
group (28)
    29:19,22;30:4,5,8,
    13;38:16,18;39:11;
    63:18;64:18;83:18,24;
    85:11,14,14,14,15,17,
    17,23;86:3,7,8,16,18,
    22;87:4
groups (2)
    38:17;39:4
guarantee (1)
    117:23
guaranteed (4)
    117:15,17,19,20
guard (1)
    37:23

guess (2)
    32:11;108:13
guideline (1)
    128:6
guidelines (2)
    124:4;126:14
guilt (1)
    81:7
guilty (11)
    25:24;28:24;29:15;
    80:18;81:12;83:16;
    86:18,21;87:2;119:20;
    120:15
guy (1)
    133:18
guys (1)
    16:6

H

haha (9)
    51:14,24;57:2;59:23;
    88:17;111:4,16;112:6;
    113:9
haji (70)
    37:11,13,19,23,23,
    23,24,24;38:9,12,20;
    39:2,3,17;40:11,23;
    41:4,14;42:3,9,18;
    43:10;44:14;45:4,21;
    51:14;56:5,24;57:6;
    59:21,23;60:4,13;61:8;
    63:20,25;64:8,11;
    65:25;66:11;72:11;
    75:7;88:17;109:24;
    110:17;111:4,16,23;
    112:5,11,14,22;113:2,
    8,9,16,24;114:4,9,17;
    121:3,24;122:2,20;
    133:8;135:4,8;136:16;
    137:5;138:7
hajj (4)
    62:11,23;64:2;
    110:18
half (1)
    8:9
halls (1)
    108:5
hand (1)
    121:22
handed (1)
    27:6
handled (1)
    127:23
hanging (2)
    129:6,15
happen (2)
    35:21;36:3
happened (4)
    9:5;22:11;78:8;
    105:14
happens (1)
    124:12

hard (8)
    51:4;58:5,5;62:21;
    104:13;107:19,21,22
harshly (1)
    96:16
head (4)
    56:15;95:9;106:15,
    20
headlines (1)
    67:3
hear (3)
    12:16;14:13,25
heard (3)
    107:10;124:24;127:9
hearing (33)
    27:15;30:18,21;
    31:10,11;33:15,22;
    48:16;59:9,18;60:9,11;
    61:8;65:21;66:9,12;
    80:2,5,7,14;82:23;
    83:14;86:14;92:3,11;
    93:11;96:9;105:12,15,
    17,20,21;119:14
hearings (11)
    76:16,18;77:25;79:5,
    11,17,19,24;80:15;
    95:17;102:20
hello (1)
    108:6
help (6)
    52:23;53:13;57:23;
    58:1,7;62:7
helps (1)
    4:24
Henry (1)
    114:24
hereinafter (1)
    4:6
hernia (1)
    82:16
hey (2)
    103:19;124:10
high (11)
    5:9,12,17,18;6:6;
    7:16,17;118:25;129:2;
    131:13,23
highest (3)
    89:18,23;137:16
hired (2)
    116:4,8
Hold (5)
    31:2;51:19;78:4;
    89:17;140:9
holding (1)
    137:16
home (1)
    22:15
homo (2)
    134:7,9
honest (1)
    89:20
honestly (1)
    124:24

honesty (1)
    140:18
hot (1)
    119:2
house (1)
    103:18
Hustler (7)
    48:23;51:3;53:15;
    58:6,13;62:19;75:9
hypothetical (1)
    123:1

I

idea (3)
    6:5;16:22;110:9
identification (7)
    20:19;26:25;29:6;
    31:5;49:5;84:15;
    129:23
identify (2)
    110:11;120:21
identity (1)
    106:22
idiot (1)
    89:11
ifs (2)
    123:3,3
II (12)
    29:22;30:8;83:18,24;
    85:15,23;86:3,9,16,19,
    22;87:4
III (2)
    85:15,17
immediately (3)
    15:1;64:20;131:7
Impact (1)
    116:21
impacted (1)
    132:22
implicated (1)
    113:2
implication (1)
    42:10
implications (1)
    45:15
important (2)
    136:22;137:12
impose (3)
    78:5;83:15;94:3
imposed (15)
    73:24;83:24;86:3,8,
    23;94:17,21;95:14,18;
    96:8,24;119:11,18;
    123:16;132:1
imposing (1)
    127:6
imposition (1)
    120:3
improper (2)
    35:25;107:7
inappropriate (3)
    120:22;121:4,6

incident (20)
    10:14;26:20;27:19,
    21;40:8;58:20;80:18;
    81:10,11;105:11
include (3)
    97:22,23;120:25
included (2)
    37:19,22
including (3)
    5:10;6:1;118:11
indicate (8)
    17:1;56:21;70:13;
    87:8;88:25;90:11;
    131:19;132:3
indicated (6)
    60:3,15;61:11;65:22;
    66:10;92:1
indicates (4)
    54:18;83:13;87:15;
    93:10
indicating (5)
    19:23;43:11;88:16;
    110:3;131:5
indigenous (1)
    39:20;40:1;44:7
individuals (1)
    109:11
infer (1)
    55:10
information (15)
    12:25;13:13;33:14;
    34:4;47:24;59:8;64:6;
    68:12,25;99:25;
    105:14,23;107:2;
    127:10;138:15
informed (2)
    42:8;116:12
infractions (1)
    25:7
initial (1)
    6:16
Initially (3)
    9:1;101:1;135:18
injunction (1)
    135:19
injured (2)
    82:10;132:15
injuries (1)
    132:17
injury (4)
    9:1;81:18,21;82:13
innocently (1)
    137:10
input (1)
    121:17
inside (1)
    105:14
instead (1)
    108:10
instructed (1)
    138:6
instructing (1)
    50:14

**Aaron Petitt, et al. v.**
**City of Cleveland**

**Aaron Petitt**
**January 17, 2019**

**instructions (1)**
15:17
**instructor (1)**
100:15
**Insubordination (3)**
25:18,19;35:12
**integrity (1)**
89:16
**intent (6)**
9:17;69:5,12,24;
70:3,8
**interacted (1)**
88:20
**interest (1)**
137:15
**interesting (1)**
98:4
**International (1)**
19:8
**Internet (4)**
40:16,17;104:3;
131:8
**interpret (2)**
55:2,15
**interpretation (5)**
42:23,24;43:20;
45:10;61:21
**interpreted (1)**
43:18
**interview (11)**
14:16,22;15:6,18;
17:4,13;18:15;19:9,24;
34:17;89:10
**into (16)**
4:21;40:10;51:2;
56:23;57:6;59:13,21;
61:5,7;65:24;66:11;
85:8;103:25;136:13,
24;139:18
**invasion (1)**
132:6
**investigated (1)**
127:7
**investigating (1)**
60:18
**investigation (20)**
40:10;58:24;59:5,13,
20,24;60:2,3,6,8,12;
61:7,10;65:24;66:10,
16;92:2;93:11;123:11;
127:2
**investigator (2)**
54:4;92:15
**involve (1)**
40:25
**involved (2)**
134:8;135:13
**involving (2)**
35:12;134:8
**Iraq (3)**
5:21;7:21;38:1
**irrespective (1)**
87:1

**issue (7)**
10:15;74:22;75:16;
91:6;95:5;121:22;
127:24
**issued (1)**
23:8
**issues (4)**
107:11;119:1,3;
120:8
**issuing (2)**
83:17;121:23

**J**

**Jared (1)**
50:8
**Jeff (1)**
101:2
**Jeffrey (1)**
132:8
**job (3)**
20:6;64:16;107:17
**jobs (2)**
11:1;103:25
**Joe (1)**
98:24
**join (1)**
37:17
**joined (4)**
5:18,23;6:13;37:16
**joining (2)**
16:10;24:9
**joke (1)**
57:3
**joking (2)**
57:21;133:22
**jumping (1)**
24:23
**Justice (1)**
6:4
**justification (1)**
50:2
**justify (1)**
33:9

**K**

**Karen (1)**
4:24
**keep (2)**
97:16;135:14
**kind (4)**
60:20;61:16;92:17;
124:15
**KLEBANOW (94)**
16:14,17;29:1,25;
30:9,22;31:16;32:8,16,
21;33:3,8;34:13;37:7;
38:6,23;40:5;41:11;
42:5,11;45:12,24;46:9,
12,16;47:17;48:8,12;
49:6,20;50:1,7,11,18;
51:19,23;52:2,5,17,25;

53:6,11,25;54:21;55:5,
14;56:25;57:10,17,24;
58:8;60:7;62:12;63:10;
64:3;66:3,7,13;67:1;
68:20;73:6,18,20;74:5,
11;75:12,15;79:2;90:5;
91:8;94:23;97:18,25;
98:6,9,15,19,25;99:3,7;
101:15;102:24;109:19;
110:6,19;122:4;
124:19;129:12;131:22;
133:2;136:11;138:2;
140:7,19
**knew (1)**
63:14
**knowledge (9)**
12:18,21;44:24;59:3;
69:24;114:7,14;
131:25;138:17
**known (3)**
37:4;108:8;124:13
**Kraynik (3)**
76:10;77:4;80:8

**L**

**lack (1)**
23:25
**language (5)**
54:15;87:20;90:11;
124:11;130:9
**large (1)**
10:14
**last (6)**
8:8;21:12;83:12;
84:17;116:16;130:16
**later (1)**
81:2
**Laugh (1)**
51:16
**lawful (1)**
4:5
**lawsuit (15)**
28:9;44:10;46:20;
47:4;48:1;98:5;99:12;
100:21;128:11,14,19;
129:3;135:14,25;136:9
**lawsuits (1)**
129:1
**leader (2)**
38:15;39:11
**learn (2)**
41:2,14
**learned (4)**
41:20;42:25;43:2,4
**least (3)**
85:17;86:16;124:17
**leave (2)**
7:4;9:20
**left (4)**
6:23;9:18;105:12;
127:18
**lengths (1)**

136:8
**letter (15)**
9:17;12:12;17:3;
27:12;29:14;31:20;
59:7;83:7;85:21,22;
87:25;94:4,11;95:8;
119:23
**letting (1)**
4:20
**level (5)**
7:17;29:19;30:4,5,13
**life (3)**
104:11;119:1;139:25
**light (1)**
57:15
**limitation (4)**
55:19,24;56:6;
131:15
**line (3)**
49:22;50:13;60:18
**link (5)**
76:12,23;77:10,10,
19
**linked (5)**
75:24;76:5,19;77:15,
24
**list (30)**
99:25;120:25;121:9,
13,18,24;122:7,12,17,
21,25;123:4,8,10,15,
23;124:5,7,18;125:3,
19,24,25;126:2,2,3,4,5,
21,23
**lists (1)**
126:7
**little (3)**
26:16;40:24;93:10
**lives (2)**
115:8,9
**local (2)**
39:20;40:1
**locales (1)**
40:4
**located (1)**
18:10
**locker (1)**
129:6
**lodged (3)**
32:14;33:14;96:4
**LOL (2)**
51:17,18
**long (11)**
4:14;8:7,22;11:20;
16:4;21:6,12,15;52:7;
84:16;138:11
**look (14)**
27:2;29:8;31:7;80:7;
83:6,8;84:16,22,23;
88:1;95:6;104:5;
119:16;129:24
**looked (5)**
40:13,13;107:20,20;
140:16

**Looking (1)**
22:18;36:23;103:25
**lose (2)**
103:2;137:19
**lost (3)**
9:4;103:2,3
**lot (4)**
44:18;93:1;126:7;
133:24
**loud (1)**
51:16
**lower (1)**
82:14

**M**

**ma'am (1)**
125:9
**mad (2)**
133:1,3
**maintain (1)**
89:19
**makes (2)**
109:3,6;119:21;
123:20
**making (7)**
57:3;87:2;89:11;
105:2,6;114:15;124:5
**male (13)**
28:11,16;38:14,16,
22;39:5,5,6,6,8;63:16,
21,23
**males (3)**
38:18,18;39:4
**manner (3)**
45:22;46:5;120:16
**manpower (1)**
10:15
**many (4)**
74:17;117:23;
128:13,21
**marathon (1)**
20:16
**mark (5)**
26:23;29:4;49:3;
84:13;129:20
**marked (12)**
20:19,21;26:25;29:6,
8;31:5,6;34:23;49:5;
62:8;84:15;129:23
**matrix (2)**
85:4,25
**matter (5)**
37:25;100:16;
104:12,13;105:20
**matters (1)**
78:10
**May (7)**
83:6;85:21;96:21;
97:14;119:1;130:13;
137:9
**maybe (2)**
107:24;128:16

Aaron Petitt, et al. v.
City of Cleveland

Aaron Petitt
January 17, 2019

**mean (33)**
8:13;53:20;54:1;
55:2,18,22;56:13;
57:19;60:9;69:9;75:10,
17;76:25;78:22;91:15;
93:9,15,18;94:16,17,
25;98:13;112:2;115:8,
23;121:11;122:5,23;
127:6;129:25;132:2;
133:23;139:12
**meaning (23)**
38:9,11;41:3,8,15,
17;42:4,10,23;43:1,12,
18;45:11;46:14;59:6,
14,21;61:7;65:24;
87:11;137:11,24;
139:12
**meanings (14)**
40:4,23;41:24;42:18,
19;43:21,25;44:3,5,25;
45:5,7;122:12;134:4
**means (4)**
39:2;40:14;54:8;
55:25
**meant (4)**
39:17;54:10;84:23;
127:7
**Mecca (3)**
38:15;44:8;63:12
**Medal (10)**
22:23,24;23:2,7,8,11,
14,15,19,24
**media (4)**
67:5,12,14;68:8;
104:19;105:13,17;
136:13
**medical (2)**
82:17;120:9
**Medina (2)**
100:7;101:18
**meeting (3)**
89:1;99:16;100:1
**meetings (2)**
99:10;102:21
**member (11)**
30:25;97:7;98:21;
99:18;100:7;109:5;
112:12,13;115:10;
117:15;131:24
**members (11)**
23:10;39:20;40:1;
103:10,12,18,22;
105:16,16;115:14;
131:12
**memory (1)**
48:3
**men (3)**
60:23;61:19;75:9
**mental (2)**
120:4,8
**mercy (1)**
130:13
**mere (1)**

72:25
**message (51)**
40:9;46:18,19;47:19,
21,25;48:7,11,19;
49:17;50:23;52:10;
53:7,18;54:13;56:21;
58:19;59:15,22;62:8,
11,15;64:10,25;65:8;
72:12;88:14;89:22;
90:25;91:7,11;92:24;
93:14;99:11,19;
100:23;101:8,11,14;
109:16;111:23;112:11;
114:4,9,17;127:3;
131:3;135:15,22;
136:17;137:4
**messaged (2)**
76:25;77:3
**messages (2)**
49:14;135:2
**Metroparks (7)**
14:5,13,18,25;15:24;
16:11;20:6
**Michael (1)**
4:10
**mid (1)**
7:17
**middle (17)**
38:4;48:24;51:4;
53:14;60:23;61:19;
62:9,20;63:3;64:1,4,7,
19;90:4;133:9;138:22;
139:5
**might (3)**
57:8;64:18;123:13
**military (14)**
5:15,23;22:3,12;
38:4;39:19,20;40:2;
129:9;130:5;131:12;
138:6,18;139:21
**mimicked (1)**
82:17
**mind (1)**
91:16
**Mine (1)**
51:23
**minimum (4)**
83:23;86:7,23;87:5
**minutes (3)**
16:5;45:2;105:21
**misinformation (1)**
107:3
**miss (1)**
81:20
**missing (1)**
107:14
**mission (1)**
88:2
**mistake (3)**
105:3,7,10
**mistaken (2)**
104:24;106:9
**mistakenly (1)**

107:12
**mitigating (1)**
83:19
**moment (10)**
31:21;54:4;60:16;
67:25;83:9;96:19;
103:6;120:24;138:8,20
**monetary (1)**
119:9
**months (11)**
11:14;14:9;15:9;
18:5;20:8;21:14,16,18,
20;22:14;81:25
**moral (2)**
89:18,23
**more (10)**
15:10;24:3;52:3;
91:17;96:15;104:9;
108:10;111:5;120:19;
136:22
**morning (3)**
130:10;131:11;132:2
**most (1)**
85:18
**mouth (1)**
74:6
**moving (2)**
6:23;90:15
**much (4)**
8:19;60:25;81:23;
108:24
**multiple (10)**
42:18;43:18,21,25;
44:3,5,25;45:4;79:19;
86:13
**Muslim (6)**
38:18,21,21;42:22;
63:1;64:2
**myself (1)**
43:4;104:5;105:15;
135:18

## N

**Nam (1)**
131:11
**name (6)**
4:10;5:3;12:2,2;
114:19;138:9
**names (3)**
108:19,20;138:12
**National (3)**
23:6,8,15
**nature (2)**
45:8;87:22
**necessarily (1)**
139:25
**need (5)**
20:14;40:17;71:19;
84:23;117:25
**needs (1)**
124:3
**negative (2)**

17:11;57:15
**Neighborhood (1)**
116:21
**neither (1)**
80:11
**new (2)**
46:24;124:10
**news (10)**
67:5;68:8,13;103:7,
13;105:17;106:10,13,
21;107:12
**newspaper (2)**
67:8,9
**next (11)**
4:22;9:14;22:16;
26:10,13,16;69:8;68:2,
16;69:4;75:20;90:15
**NICE (7)**
116:11,20;117:5,10;
118:12,14,21
**night (2)**
49:18;50:24
**ninja (1)**
133:24
**nod (1)**
108:10
**None (1)**
95:23
**Nonstop (1)**
130:15
**NOTARY (2)**
31:2;49:7
**notes (1)**
140:17
**notice (9)**
31:14,19;32:4,13;
87:10;93:18,20;94:6;
121:5
**notices (1)**
138:5
**notifying (1)**
83:7
**November (1)**
14:24
**nowhere (2)**
34:6;80:7
**nukka (4)**
133:20,24;134:1,5
**n-u-k-k-a (1)**
133:20
**numeral (1)**
90:16
**numerous (3)**
67:12;78:6;103:14
**N-word (29)**
66:23;67:3;70:14;
71:13,22;72:16;73:1,5,
25;74:15;75:1;96:21;
103:8,14,16,21;104:2,
12,17,21;106:11;107:4,
7,13;111:4,10,20;
112:8;113:24

## O

**obey (1)**
25:16
**object (4)**
32:23;33:3;36:21;
49:20
**objecting (1)**
50:13
**Objection (73)**
16:14,16;29:1,25;
30:9,22;31:16;32:8,16,
20;33:7;34:13;37:7;
38:6,23;40:5;41:11;
42:5,11;45:12,24;46:9,
12,16;47:17;49:21,22,
25;50:7;52:17,25;53:6,
11,25;54:21;55:5,14;
56:25;57:10,17,24;
58:8;60:7;62:12;63:10;
64:3;66:3,7,13;67:1;
68:20;73:3,6,18,20;
74:5;75:12;79:2;90:5;
91:8;94:23;101:15;
102:24;109:19;110:6,
19;122:4;124:19;
129:12;131:22;133:2;
136:11;138:2
**objections (7)**
32:22;33:4,9;50:2,4,
10,16
**obviously (1)**
82:9
**occasion (1)**
77:5
**occur (4)**
14:23;46:8,10;99:23
**occurred (11)**
25:11,21;26:17;
27:20,21;47:13;48:5;
58:18;67:11;68:6;
77:20
**occurring (2)**
79:5;136:1
**October (5)**
6:12;27:21;58:20;
80:17;82:1
**off (30)**
4:19;8:23;35:3;52:1;
56:15;64:5;70:20,22;
71:1,8,13,22;72:23;
73:5,8,25;74:14;81:2,
25;90:18;91:15,20;
95:9;96:22;106:15,20;
131:9,10;140:11,20
**off-duty (1)**
75:1
**offended (1)**
126:16
**offense (8)**
29:22;30:8,13;83:19,
19,24;86:9;87:4

**offenses (8)**
85:4,12,14,23;86:4,
16,19,22
**offensive (16)**
44:15,16;121:4,6;
122:1,3;123:24;
124:17;125:1,15,21;
128:7,8;129:16;
136:19;137:5
**offer (4)**
16:11;69:1;70:6;
96:17
**offered (1)**
83:1
**offering (1)**
74:9
**offhand (1)**
18:13
**officer (62)**
6:19,21;10:1;25:2,6;
48:22;49:17;51:10,15;
52:21;53:4,8,8;58:2,3;
59:11;60:18;62:14,19;
66:22;67:2,3,24;68:3;
69:7;70:11,17,19,24;
71:21;72:18,21;73:24;
74:14;75:1,25;76:6,9,
20;77:4,7;78:19;80:2,
8;83:14,84:7;85:10;
94:20;96:21;100:7;
101:18;103:7,14,15;
104:2,3;105:12;108:1;
110:2;123:5;125:17;
137:7
**officer/park (1)**
14:7
**officers (12)**
52:9;78:6,9;80:15;
107:24,25;108:5,14;
121:14;124:1;136:24;
137:16
**official (3)**
52:23;57:22;70:3
**oftentimes (1)**
103:8
**Ohio (1)**
138:24
**old (1)**
46:25
**once (2)**
37:16,16
**one (33)**
21:12;24:9;35:22;
36:2;51:20;52:2,7;
53:7;58:2;68:21;72:1;
74:3,25;80:11;86:22;
91:10;97:2;101:18;
105:11;108:9;111:5;
117:24;124:15,17,23;
128:22;130:4,11,14,19;
131:1,9;139:24
**ones (1)**
118:4

**online (11)**
6:2;11:24;12:6;13:7;
14:20,21;18:6,7;19:4;
40:13,21
**only (8)**
10:19;22:14;38:14;
77:23;105:15;121:21;
135:4,9
**open (3)**
12:9,19;13:11
**operational (1)**
22:16
**operations (2)**
22:13;131:24
**opinion (27)**
71:6,12,16,18;72:1,
2;73:10,11,15,19,21,
23;74:9,13,18,22,24;
82:4;91:4,10;92:9;
93:2,3;97:2;121:17;
136:12,15
**opinions (1)**
137:1
**opportunities (2)**
107:18;117:13
**opportunity (3)**
33:23,25;93:24
**opposition (1)**
83:1
**order (3)**
25:17;76:4;87:14
**ordered (1)**
78:24
**orders (6)**
78:23;80:21;81:4;
84:4;120:14;121:20
**ordinary (1)**
79:22
**organization (1)**
17:23
**origin (1)**
67:6
**others (2)**
52:13;96:16
**Otherwise (2)**
10:22;50:9
**ours (1)**
51:19
**ourselves (1)**
89:17
**out (17)**
6:11;10:20;12:7;
24:23;40:14;51:16;
56:24;68:14;77:14;
79:22;94:4;96:8;
118:23;130:15;132:25;
135:15,20
**outcome (2)**
92:9;96:6
**outlet (1)**
68:9
**outlets (4)**
67:5;105:13,17;

107:12
**outline (1)**
27:17
**outside (8)**
14:1;43:6;91:5;97:6;
99:4,18;100:25;128:17
**over (11)**
4:25;65:17;100:4;
103:7,25;119:13;
129:9,17;130:5,23;
140:16
**overall (1)**
117:23
**overseas (8)**
9:2;22:14;37:20;
38:1,13;39:4,13;44:9
**overt (1)**
109:10
**Overtime (8)**
117:12,14,21,22;
118:1,3,16;119:7
**Owens (4)**
19:1,15;20:1,5
**own (3)**
103:22;109:8;113:1

**P**

**packet (2)**
27:7;101:1
**Packing (1)**
51:9
**Page (11)**
21:5;22:18;24:24;
28:1;37:1;66:19;75:20;
83:13;88:2;90:15;
130:8
**pages (1)**
84:18
**paid (2)**
8:3,19
**paper (1)**
26:19
**paperwork (1)**
138:5
**Parachutist (1)**
24:21
**Paragraph (14)**
21:5;22:19;24:25;
36:25;65:15;66:19;
69:4;70:1,7,13;75:5,
20;76:3;83:12
**paraphrasing (1)**
93:15
**Pardon (1)**
102:10
**paren (1)**
83:18
**parents' (1)**
103:18
**Park (1)**
115:1
**part (7)**

24:12;28:16;64:1;
111:11;135:25;139:21,
24
**partial (2)**
107:9;132:18
**participation (1)**
24:1
**particular (6)**
24:1;85:11;96:23;
105:2;121:18;137:1
**particulars (1)**
135:21
**partner (1)**
103:8
**parts (3)**
104:22;139:13,19
**party (6)**
90:7;103:17;106:7;
128:10,18;135:13
**passed (1)**
37:17
**past (2)**
78:8;128:11
**Patrol (6)**
6:19,21;9:25;14:7;
37:24;103:9
**pay (8)**
13:3,23;86:11,24;
87:6;117:6,7;119:6
**people (45)**
23:16;39:20;40:1;
44:7,15;51:4;56:20;
57:8,11,13,14,18;58:4,
5;62:21;64:18;72:7;
79:16;88:8;103:12,15,
24;106:6;107:20,20,23,
23;108:8,16,16,21;
109:21;110:10,17;
111:9,20;123:12,13;
134:14;135:5,11,11;
136:19;138:11,13
**per (2)**
122:2,5
**perceive (1)**
137:11
**perceived (2)**
111:1,25
**perform (1)**
23:11
**performed (1)**
66:17
**perhaps (1)**
110:14
**period (3)**
10:19;15:7;128:9
**permission (1)**
118:7
**person (11)**
39:7;44:6,7;73:4;
90:9;117:24;122:24;
125:4;137:3;138:9,17
**personal (3)**
7:16;61:21;137:24

**personally (1)**
91:13
**personnel (1)**
90:20
**persons (12)**
38:5;42:22,22;62:22,
25;64:8;88:17,18,22;
91:2;137:3;138:17
**pertain (1)**
129:5
**pertaining (1)**
99:12
**PETITT (10)**
4:4;5:4,5;75:7;76:6;
104:3;112:20,21;
114:20;115:6
**phase (1)**
102:5
**Phoenix (1)**
6:3
**phone (17)**
14:16,22;15:18;16:7;
17:4,12;46:24,25;47:2,
6,18;76:20;77:7;100:4;
105:25;106:2,5
**photo (1)**
67:18
**photograph (11)**
49:11,14;66:21,21;
67:7,15;68:2,23;69:11,
15;70:10
**photographs (2)**
69:5;131:17
**photos (2)**
132:10;133:5
**phrase (11)**
58:19;73:13;92:23;
111:3,15;112:5;113:8;
114:4;124:24;137:1,23
**phraseology (1)**
101:13
**phrases (2)**
94:19;139:4
**phrasing (1)**
41:5
**physical (3)**
56:23;82:9;110:4
**physically (1)**
81:16
**picture (3)**
67:2,23;132:3
**pictures (2)**
129:6;131:8
**Pike (30)**
4:9,10;16:16;26:23;
29:4;31:3,25;32:19,25;
33:6;35:8;48:10,14;
49:3,25;50:4,8,16;
51:21;52:4;75:13;
84:13;91:25;98:3,14,
17;129:20;140:5,9,16
**place (1)**
87:15

Aaron Petitt, et al. v.
City of Cleveland

Aaron Petitt
January 17, 2019

**places (1)**
6:1
**Plaintiff (2)**
75:6;76:5
**planes (4)**
24:23;129:9,18;
130:5
**play (1)**
131:10
**Please (14)**
35:2;38:25;45:17;
48:4;51:2;54:5;55:20;
60:16;83:9;84:13,17;
95:20;113:6;125:9
**pm (1)**
140:22
**point (9)**
6:16,23;69:18;98:4;
124:13;126:19,21,23;
127:15
**Police (71)**
5:23;6:14,24;7:5;
8:11,16;9:15,24;10:12;
14:2;25:2,6;28:12,20;
35:19;52:23,24;53:4,8,
8,10;57:23,25;58:2,3,7,
14,24;59:4,16;64:12,
22,23;65:2;69:7;70:11,
24;71:21;72:18,21;
75:18;78:23;79:15;
80:21;81:4;82:5;84:4,
7;85:9;87:14;88:3;
90:20;91:2;94:19;
103:15;104:2;109:6,8;
110:2;115:11,14;
117:16,21;119:21;
123:5;125:22,24;
136:23;137:6,15,20
**policies (2)**
120:14;121:20
**policy (4)**
80:21;87:14,18;
136:23
**poor (1)**
108:25
**portion (1)**
89:17
**position (35)**
12:19;13:4,11;16:20,
23;17:1,7;18:2;19:6,
16,25;20:11;70:15;74:1,
3,19,25;75:3;100:9,11;
116:5;118:24;123:5,
14,17,25;124:3,8;
125:3,6,15,22;126:10,
13,14
**positions (8)**
11:6;12:9,10;20:10;
116:8,10,25;118:9
**possess (1)**
68:4
**possession (1)**
46:21

**possible (13)**
41:22;45:9,10;
109:15,20,22,25;110:1,
8,16,21,23;136:21
**Possibly (2)**
75:16;139:2
**posted (4)**
67:23;131:5;132:10;
133:4
**posters (8)**
129:6,8,16,25;130:1,
5;131:4,11
**potential (4)**
28:11;52:24;53:10;
58:4
**predisciplinary (5)**
27:15;30:18,21;
31:11;33:15
**prefaced (1)**
62:16
**prejudice (1)**
88:9
**presence (2)**
97:7;99:18
**present (11)**
65:22;66:9;97:12,14;
98:10,11,20,23,24;
105:12;139:6
**presented (1)**
127:14
**presently (1)**
46:21
**preserved (1)**
50:17
**presided (1)**
119:13
**president (2)**
101:3;105:18
**pretty (1)**
60:25
**prevent (2)**
136:1,9
**previously (2)**
128:4,4
**print (1)**
12:6
**prior (3)**
94:6,17;118:6
**probably (2)**
4:10;139:18
**probe (1)**
48:3
**problem (12)**
54:2,8,19;55:3,4,11;
56:23;88:16,25;110:2;
111:3,16
**procedure (1)**
95:12
**procedures (2)**
36:9;90:16
**proceed (1)**
15:18
**proceeding (2)**

58:18;78:20
**PROCEEDINGS (5)**
4:1;70:21;79:9;
99:21;102:22
**process (17)**
11:22;36:19;92:10;
93:5;95:12,16;101:25;
102:3,17,19,21;108:23;
117:2;120:3;127:2;
128:2;138:1
**processes (1)**
11:9
**professional (3)**
25:4,5;120:10
**progressed (1)**
10:11
**proper (5)**
50:2;81:12;82:6,22;
87:3
**properly (1)**
108:12
**protection (1)**
7:17
**Protective (1)**
11:7
**provide (2)**
33:23;34:4
**provided (2)**
7:16;33:18
**provides (1)**
85:9
**provision (1)**
117:20
**provisions (1)**
94:2
**public (6)**
89:19;90:21;135:15,
22;136:10;137:10
**publication (4)**
67:11;68:6,14;77:13
**publications (3)**
106:10,13,22
**published (3)**
67:4,7;68:2
**punishment (2)**
76:15;87:12
**purpose (1)**
30:20
**pursuant (3)**
78:19;80:20;101:22
**purview (1)**
35:18
**put (9)**
31:14;32:4;68:14;
77:14;93:18,19;103:6;
118:3;122:7
**putting (5)**
4:24;8:13;74:6;
92:20;93:1

**Q**

**qualification (3)**

55:17,18,23
**qualifier (1)**
97:17
**qualifying (1)**
54:15
**quality (1)**
118:25
**quantify (2)**
107:19;108:12
**quicker (1)**
44:19
**quote (5)**
53:14;62:20;63:23;
66:23;82:17

**R**

**race (2)**
107:25;108:3
**racism (2)**
104:12;112:23
**racist (12)**
103:16,21;104:2;
111:25;112:2,4,7;
113:3,14,15,20;114:16
**raises (1)**
98:3
**range (2)**
37:14;86:2
**Ranger (7)**
5:19,20;14:7;24:11,
16,19;37:18
**Rangers (1)**
24:13
**ranges (2)**
21:8,9
**ranging (1)**
37:22
**rank (2)**
6:16,17
**Rarely (2)**
117:17,19
**rate (1)**
13:3
**rationale (1)**
110:21
**read (15)**
31:25;32:2;45:18,19;
50:19;51:2;56:21;61:5;
72:13;83:20;88:7,12;
90:21;109:15;140:19
**reading (3)**
48:16;55:1;61:13
**realize (1)**
92:8
**really (5)**
32:11;40:12;132:19;
136:22;137:25
**realtor (1)**
17:23
**Realty (1)**
17:25
**reapply (1)**

9:16
**reason (15)**
13:16;16:19;18:19;
19:12;29:24;30:7;
36:20;66:15;77:16;
78:13;84:1;90:7;
109:20;132:9;133:17
**reasonably (2)**
90:19;91:1
**reasons (1)**
77:23
**recall (45)**
7:1;10:13;15:4,21,
22;16:1;20:12;21:13;
23:3,5,7;25:12,15,22;
26:4,9,10;35:16;36:1,4,
8,9,15;43:13,14,16;
47:12;49:2;52:12;65:7;
67:9;68:7;79:10;81:13;
87:17;95:9;99:14;
100:11,14;101:12,16,
19;106:15;128:25;
132:20
**receive (24)**
12:12,22;13:13,17;
16:11,20,22;17:1,3,6;
18:15;19:9,14,19;
23:11;26:1;27:14;
31:19;102:9,11;117:1,
21,25;118:6
**received (25)**
9:1;11:20;15:1,2,5,
12;19:17;25:7;27:7,12;
30:16,17;31:13,20;
32:7,13;62:6,14,16,18;
97:3;99:24;101:1;
116:7;118:16
**receiving (3)**
15:6;87:5;108:24
**recess (3)**
35:5;91:22;140:13
**recognize (5)**
20:21;27:4;49:11,13;
103:13
**recognized (1)**
22:25
**recollection (11)**
26:8,17;34:16;35:22,
23;48:4,11,18,20;86:2;
114:7
**recommendation (3)**
83:14;127:20;129:15
**recommended (1)**
23:2
**record (13)**
4:2,25;5:3;25:4;35:3,
7;51:2;61:5;91:20,24;
140:11,15,20
**records (3)**
35:17;64:22,23
**recruiting (1)**
12:10
**redaction (1)**

105:1
**redeployed (1)**
22:5
**re-enlisted (1)**
22:1
**refer (12)**
38:4;39:10,12;42:21;
63:20;64:7,11;104:20;
133:8;135:5,9,10
**referenced (1)**
62:10
**referencing (1)**
28:11
**referred (3)**
22:19;60:12;64:21
**referring (5)**
37:14;63:18;88:18;
90:3;130:2;134:14
**refers (1)**
38:21
**refreshed (1)**
86:1
**regard (16)**
12:25;26:2;28:1;
29:18;30:3;40:9;52:23;
53:9;68:13;86:2,13;
95:13;107:15;108:2;
120:10;135:17
**regarding (19)**
13:14,21;19:16;20:1;
22:20;28:21;36:6,19;
49:23;50:13;54:15;
58:21;71:17;87:10;
99:10;100:21;101:21;
102:21,22
**regards (4)**
9:10;25:5;107:16;
128:23
**Regiment (1)**
5:20
**regulations (2)**
28:21;94:7
**reiteration (1)**
29:11
**Related (3)**
65:2;100:17;120:6
**relates (4)**
28:8;100:19;121:10;
124:21
**relating (1)**
108:3
**relation (1)**
111:2
**relative (1)**
36:10
**relatives (2)**
115:13,16
**released (6)**
66:20;67:18;68:23;
69:11,14;104:23
**releasing (2)**
69:5;70:9
**relevant (1)**

137:25
**religion (1)**
63:6
**remainder (3)**
10:18;84:23,24
**remains (1)**
132:25
**remarks (1)**
28:10
**remember (4)**
34:20;101:4;129:13;
138:12
**repeat (4)**
31:23;76:2;111:5;
135:7
**repeatedly (1)**
66:22
**rephrase (5)**
38:25;45:17;63:19;
71:19;80:3
**replied (1)**
34:11
**representation (3)**
50:23;89:12;105:19
**representing (3)**
98:4,11,23
**reputation (5)**
77:21;107:17;114:3,
8,16
**reputational (1)**
76:4
**request (3)**
58:10;62:18,18
**requesting (3)**
53:9;58:3,12
**required (2)**
78:4;84:7
**reread (2)**
36:11;125:8
**research (9)**
40:10,22;43:9;59:5;
60:21;61:17;65:14,23;
66:11
**reservations (1)**
110:4
**reserved (1)**
50:5
**resigned (1)**
9:22
**respect (74)**
11:15;12:13;13:6;
14:22;15:18;19:10;
22:22;23:6,14;27:8;
29:13;30:12;32:5;
33:16;34:7,10;36:5,13,
16;39:17;40:16;41:9;
42:15;46:18;50:17;
53:14;56:4;58:17,18,
24;60:13;67:18;68:18;
71:3;73:17;75:25;79:4;
80:17;81:10,15;82:1,
11,21;83:3,5;87:24;
88:5,14,19,21;89:16,

22;92:2,3,10;94:16;
96:14,18,20;101:22;
107:3;111:21,22;
112:10;115:5;116:5;
125:7;127:1,3,5;
132:21;135:1,14;
137:22
**respectful (1)**
88:22
**respects (1)**
40:15
**respond (5)**
4:17;33:25;53:3;
75:18;93:24
**responding (1)**
75:8
**responds (2)**
51:10,15
**response (5)**
12:12;51:8,13;57:22;
133:4
**rest (1)**
104:11
**restrain (1)**
81:16
**restroom (1)**
35:1
**result (12)**
27:19;60:6;81:15;
87:12,16;94:12;
107:12;116:6;117:1;
119:10,19;120:2
**resulted (3)**
87:5;117:5;119:6
**results (7)**
60:2,8;61:10;93:12;
102:9,11;104:6
**retire (1)**
9:18
**retraction (2)**
105:1;106:24
**return (2)**
9:17;22:15
**returned (4)**
8:15;9:15;10:17;
11:2
**review (2)**
49:8;119:15
**Ribbon (1)**
24:7
**rid (2)**
47:2,18
**right (83)**
4:16;8:3,5,19;9:11;
20:20;24:24;30:15;
31:9,13;34:25;36:18,
23;39:16;42:2;43:21;
46:1,11;52:5,20;62:1;
64:7;69:15,17,20;
72:10;74:4;79:4,24;
80:23;82:19;83:5;85:9,
18;92:18,20;93:16,18,
21,23,25;94:4,7;95:3,

24;97:1;98:25;99:17;
101:4;109:24;110:7,
12,14;114:1;116:25;
118:14;123:9;124:20,
25;126:25;127:7,12,16,
25;128:2,10;130:4,19;
132:9;133:1;134:17;
136:5,15,17,22;139:2,
14,19;140:1,3,3,5,7
**River (1)**
116:1
**Road (1)**
114:24
**Robin (1)**
131:10
**Rocky (1)**
116:1
**roll (1)**
80:25
**Roman (1)**
90:16
**room (2)**
97:24;132:8
**roster (1)**
118:6
**rough (1)**
48:20
**roughly (1)**
25:3
**round (1)**
37:10
**route (1)**
51:5
**rubble (1)**
132:25
**rule (3)**
95:11;124:15,23
**rules (9)**
4:16;28:20;71:14;
94:2,6,10,25;95:4,12
**run (3)**
21:2;22:21;98:17

**S**

**same (17)**
11:11,17;13:7,23;
14:10;19:3;76:14,18,
18;78:1,2;79:5,12,24;
81:10;89:4;133:17
**Saudi (1)**
63:8
**saw (3)**
103:20;113:21;
131:13
**saying (16)**
19:17;35:21,23;36:3;
39:18;44:22;72:9;
77:15;112:3;113:5;
121:16;122:2,20;
123:9;124:10;133:12
**schedule (1)**
79:19

**scheduled (1)**
117:22
**school (13)**
5:9,12,17,18,25;6:6;
24:17,18;129:2,7;
131:5,14,23
**Scrolling (1)**
24:24
**se (2)**
122:2,5
**Sean (2)**
48:22;51:7
**search (2)**
104:6,6
**Second (9)**
10:15,16,20;21:17;
22:8;28:1;34:24;83:12;
130:11
**secondary (1)**
35:14
**security (6)**
7:6,14,16;11:7;18:3;
19:8
**seeking (1)**
136:1
**seems (1)**
132:3
**selected (5)**
19:18,24;37:18;
116:17;118:22
**send (1)**
55:6
**sending (1)**
54:23
**senior (2)**
5:15,17
**sensitivity (5)**
78:3,4,10,18,25
**sent (4)**
10:16;55:8,8;78:2
**separate (7)**
7:25;11:8;78:4,18;
80:4,14,15
**serious (1)**
85:17
**serve (1)**
23:16
**served (3)**
5:20;6:8;25:1
**service (8)**
5:22;23:6,8,9,11,15,
22;24:7
**services (2)**
23:21;118:10
**set (4)**
117:22;118:4;128:6,
8
**seven (6)**
11:14;14:9;18:5;
20:7;21:20;86:10
**several (2)**
27:23;67:5;79:8;
102:17

**severely (1)**
96:16
**severity (1)**
29:19
**Short (3)**
35:5;91:22;140:13
**Shortly (1)**
99:24
**show (4)**
20:20;31:6;132:11;
133:6
**shows (1)**
104:6
**side (5)**
33:23;92:21,22;93:3;
127:9
**sides (1)**
127:14
**sign (1)**
118:20
**Signature (1)**
140:23
**sign-off (1)**
118:5
**similar (2)**
23:14;78:5
**simply (1)**
107:25
**singular (2)**
75:6;87:11
**sister (1)**
132:15
**sit (9)**
33:9,10;69:23;70:5;
114:1;124:9;125:10,
12;138:16
**situation (1)**
124:5
**situations (1)**
74:17
**six (9)**
21:14;83:7,18;84:2;
86:10,23;87:6;104:9;
119:18
**slang (2)**
38:4;134:1
**slogans (1)**
131:9
**slur (4)**
41:15;42:21;60:5,14
**small (2)**
38:15;82:14
**SOC (9)**
11:5,13,23,25;12:2,
14,23;13:21;20:6
**society (1)**
138:21
**somebody (7)**
39:13,24;53:24;55:1,
15;77:3;133:19
**somehow (1)**
103:3
**someone (17)**

22:24;46:6;53:20;
54:8;55:4,7,10,12;
71:1;72:15;73:11;89:5;
124:6;125:23;126:11,
16;137:10
**someone's (1)**
70:22
**Sometime (1)**
15:4
**Sometimes (2)**
118:10;140:2
**somewhat (1)**
88:24
**Somewhere (1)**
47:7
**soon (3)**
51:9;130:15,17
**sophomore (2)**
131:13,23
**sorry (34)**
6:18;9:10;27:9;31:3,
21;32:11;36:14;45:20;
47:22;50:21;51:11;
55:20,22;63:18;68:21;
71:19;76:2;91:15;
92:25;93:8;95:7;
102:25;107:15;111:3,
5;115:1,3,22;117:18;
119:24;126:8,22;
129:25;135:7
**sort (4)**
120:8;124:9,10;
128:5
**sought (1)**
105:1
**source (4)**
67:13;105:23;107:1,
2
**speak (2)**
38:17;89:5
**Speaking (5)**
32:21;33:4;89:4;
133:13,18
**special (3)**
22:13;131:2,24
**specialized (1)**
116:18
**specific (5)**
15:10;105:11;
109:10;110:10;120:19
**specifically (1)**
24:4
**specification (14)**
28:8,14,19;29:18,20;
30:3,5,12;34:8,8,10;
58:21;83:3;100:17
**specifications (8)**
27:9,18;28:2,5;
29:11,15;59:1;119:20
**specify (1)**
121:13
**speculate (1)**
26:21

**speculating (1)**
121:15
**speech (3)**
72:9;90:17;129:4
**spelled (2)**
94:3;96:8
**spoke (1)**
15:23
**spoken (1)**
100:24
**spots (1)**
119:2
**stand (1)**
11:25
**standard (2)**
116:14;128:8
**standards (3)**
89:18,23;137:17
**standing (4)**
69:6,12;70:1,10
**stands (1)**
73:21
**Stark (7)**
17:21,22;18:10,16,
22,24;20:5
**start (3)**
9:11;76:20;105:24
**started (2)**
5:25;132:6
**starting (1)**
5:9
**state (8)**
5:3;6:1;7:7,8,13,25;
8:2;120:21
**stated (5)**
64:4;89:10;92:16;
96:10;125:6
**statement (19)**
34:12,17;54:3,6;
56:4;57:3,15,20;61:4;
70:11;72:24,25;74:1,7,
24;75:3;88:2;89:12;
104:24
**statements (2)**
106:14,17
**states (9)**
22:9,20,22;24:6;
60:18;61:14;86:10;
138:22;139:17
**stating (6)**
15:2;50:1;57:25;
61:22;74:19,21
**status (2)**
60:23;61:18
**stay (1)**
10:7
**stayed (3)**
10:7;22:1,11
**stemming (1)**
37:9
**step (1)**
102:17
**still (19)**

6:21;12:9,10,19;
13:11;15:14;19:21;
22:3;32:3;46:21,25;
54:4;89:14;102:3;
114:21;115:9;123:25;
125:13,16
**stop (5)**
28:17;51:3;81:13,15;
135:19
**stopped (2)**
9:8,11
**story (3)**
33:23;127:9,15
**strike (8)**
11:21;44:11;60:10;
61:3;75:22;90:14;92:1;
116:3
**strip (1)**
75:9
**structure (1)**
13:23
**study (1)**
65:14
**subduing (1)**
82:11
**subject (7)**
37:25;46:20;47:25;
70:20;71:16;100:16;
125:2
**subjects (1)**
37:15
**submit (1)**
9:17
**submitted (3)**
12:6;14:18;18:17
**substance (1)**
16:1
**successful (1)**
136:5
**sudden (1)**
108:9
**suffer (1)**
132:17
**suffered (3)**
81:17;82:13;120:4
**summer (1)**
11:18
**superman (1)**
130:20
**support (7)**
37:6;69:19;70:7;
77:19;109:11;132:11;
133:6
**supported (1)**
127:11
**supports (1)**
36:19
**suppose (1)**
13:4
**supposed (1)**
80:23
**supposedly (1)**
85:8

**sure (39)**
8:12;9:5;12:11;
15:15;19:20;23:12;
25:20;30:2,24;31:22,
24;32:3,4,12;39:1;
42:20;45:18,21;47:23;
50:22;55:15,21;56:19;
59:11;60:17;63:20;
71:21;76:3;79:7;80:4;
83:10;88:23;111:6;
124:21;132:5,22;
134:12,21;135:8
**surfaced (2)**
108:23;124:11
**surprised (1)**
94:14
**surrounding (1)**
96:23
**suspect (2)**
81:17;82:11
**suspended (4)**
26:1;85:6;129:13,14
**suspension (5)**
83:8,18;86:10,24;
87:6;104:9,10;119:19;
120:3
**sworn (1)**
4:5
**symbol (2)**
60:23;61:18

**T**

**Tab (1)**
24:11
**table (3)**
84:18;85:3;86:7
**tactics (1)**
36:7
**talk (6)**
4:25;15:16,20;25:1;
55:16;113:1
**talked (1)**
93:9
**talking (13)**
8:10;15:7;41:1,3;
48:9;76:9;89:1;92:4;
103:11;116:10;122:7;
123:10,23
**Talks (1)**
21:5
**target (1)**
132:4
**taser (1)**
35:25
**tattoos (3)**
28:22;58:22;80:20
**taught (5)**
39:9;40:6,19;41:5,25
**tear (1)**
82:14
**TECHNICIAN (8)**
4:2;35:3,6;91:20,23;

**Aaron Petitt, et al. v.**
**City of Cleveland**

**Aaron Petitt**
**January 17, 2019**

140:11,14,20
**techniques (5)**
28:15;81:13;82:7,23;
87:4
**telephone (1)**
15:6
**ten (4)**
16:5;25:3;26:5;
79:14
**tend (1)**
90:19
**term (109)**
23:25;38:9,20;39:2,
3,8,17;40:11,23;41:4,
14,16,18,23;42:2,9,18,
21;43:10,11,17,25;
44:2,14,16,25;45:3,3,4,
21;46:4;47:15;55:16,
17,23,24;56:10,13;
57:2;59:6,14,21;60:3,
13,19,20,21,24;61:8,
12,15,16,17,20,24,25;
63:20,25;64:11,17;
65:24;66:11;75:7;90:3;
92:22;93:4;109:18,24;
110:17;111:2,2,23;
112:4,11,14,22;113:2,
8,12,16,23;114:4,9,17;
125:14;133:7,16,20,21,
23;134:5,7,8,11,13,16,
19,20,22,24;135:1,5,9,
10;136:7,16;137:4;
138:7,10
**terminology (4)**
58:25,25;95:4;137:4
**terms (14)**
26:19;44:8;78:22;
86:6;87:16;90:8;94:10,
19;101:23;133:18;
135:14;138:10,19;
139:4
**terrible (1)**
72:3
**Terrorism (1)**
23:18
**testified (3)**
4:6;66:16;71:5
**testify (1)**
97:13
**testifying (1)**
4:18
**testimony (5)**
34:16;69:1;70:6;
96:17;111:6
**texted (2)**
48:22;77:4
**theoretical (1)**
126:7
**thinking (1)**
110:20
**Third (7)**
10:4,6,8,17,22;
21:19;130:14

**though (2)**
49:21;137:9
**threat (2)**
7:17;19:8
**three (14)**
21:10,14,16;22:14;
28:2,5,24;29:15;76:25;
81:25;85:14;105:20;
119:19;128:16
**times (3)**
128:13,21;133:24
**today (12)**
4:11;28:9;69:1,23;
70:5;88:15;89:14;91:1;
93:10;114:1;117:3;
140:17
**Todd (1)**
65:23
**together (7)**
4:24;69:6;76:13,19;
77:1,16;78:25
**told (8)**
35:11;39:13,24;42:8;
43:5;113:10;138:9,18
**took (2)**
81:2;82:1
**top (4)**
56:15;95:9;106:15,
20
**tour (4)**
21:7,15;22:7,8
**tours (6)**
5:21;6:8;21:6,11;
22:2,4
**Towers (1)**
132:13
**traded (1)**
47:8
**traffic (5)**
28:17;81:13,15;
118:10;128:24
**train (1)**
22:16
**trained (4)**
40:7,17,18;42:1
**training (15)**
5:16;37:9,10,17,19,
21,24;38:12;42:13,16;
78:3,10,18,25;139:21
**trainings (1)**
78:5
**transcript (7)**
31:10;33:17;34:6;
48:16;60:11;80:7;
119:15
**transcripts (1)**
59:9
**transferred (1)**
118:14
**Transferring (1)**
37:12
**treat (2)**
88:8;108:15

**treated (3)**
96:15;109:12;111:1
**treating (5)**
88:17;108:21;
109:21;110:10,11
**treatment (2)**
108:25;120:9
**tribal (1)**
38:16
**Tri-C (1)**
6:1
**tried (1)**
40:14
**Triple (10)**
8:4,7,14,20,25;9:4,9,
12,25;11:2
**trouble (1)**
48:25
**true (14)**
49:16;50:22;65:19;
66:6;68:17;69:2;70:11;
75:2;77:21;114:10,12;
120:11;121:20;130:22
**trust (1)**
89:19
**truthful (1)**
41:6
**Try (8)**
4:19,22;99:8;104:5,
13,13;119:3;138:15
**trying (1)**
39:1
**tune (8)**
51:14;53:20;56:5;
59:22;111:4,16;112:5;
113:8
**tuning (3)**
56:24;88:16,25
**turn (2)**
104:4;136:13
**TV (4)**
103:20;113:21,23;
131:13
**Twin (1)**
132:13
**two (15)**
4:15;11:8;15:8;
21:10;69:5;76:12,23;
77:15,24;79:10,23;
86:16;116:16;139:12,
13
**two-part (1)**
123:1
**type (7)**
11:11;12:22;13:7,23;
17:3;90:11;133:4
**types (6)**
48:24;51:4;53:15;
62:10,20;90:4

U

**ultimate (1)**

119:22
**unacceptable (2)**
90:12;121:14
**unambiguously (1)**
70:14
**unauthorized (1)**
35:14
**uncle (9)**
112:18,19,21;113:1,
15,19,20;115:5,10
**under (21)**
45:15;54:19;55:2,11;
56:7,17,22;71:22;
78:22;85:25;86:6,8;
88:2;90:15;94:10;
118:16;120:14;122:23;
123:6,6;130:8
**undergo (1)**
78:19
**understandable (1)**
61:2
**understood (2)**
38:12;39:3
**Unequivocally (1)**
69:13
**unfathomable (1)**
138:25
**unimaginable (1)**
138:25
**union (3)**
101:3;105:15;135:18
**union's (1)**
97:24
**unit (13)**
22:13;31:1;116:11,
18,20;117:5,11;118:11,
11,12,15,17,21
**United (4)**
22:20,22;24:6;
139:17
**units (4)**
22:12;117:22;118:8,
20
**universally (1)**
70:14
**University (1)**
6:3
**Unless (1)**
99:4
**unnamed (1)**
67:14
**unquote (2)**
63:23;66:23
**unrelated (1)**
78:10
**unsafe (1)**
36:7
**up (40)**
8:15;25:14;26:7,11,
14;32:5;35:13;36:6;
40:13;43:10,20;47:10,
14;51:9,14;53:20,22,
24;54:9;55:4,12;56:5;

59:22;88:17;89:1;
103:12;111:4,16,17;
112:5;113:9;118:20;
122:9,16,19;123:11;
124:8;125:1;131:18;
132:24
**upon (9)**
34:11;61:2,4;64:18;
73:24;78:6;85:20;
86:23;96:24
**usage (3)**
41:16;44:8;139:12
**use (50)**
28:15;35:1,25;47:14;
55:10;58:19,20;64:17;
70:13,19;71:9,21;72:4,
10;75:6;81:12;82:9,21;
87:3,10,15,20;91:17;
100:15;101:13;109:24;
110:16;111:2,3,15;
112:11,14,22;113:7,11;
114:3,8;121:14;
122:25;124:2,16;
133:8,16,17,21;134:13;
136:8;138:7,10,19
**used (70)**
28:10;37:5,11,13,25;
38:4,14;39:3;41:5,10,
14;42:20;44:14;45:22;
46:4;60:4,14,22,24;
61:11,18,19;63:25;
64:10,14,21,24;65:13;
66:22;67:2;70:16,24;
71:10;72:4,15;73:13;
75:6;90:3,8;92:22,23;
93:4;94:20;95:4;96:21;
103:16;104:20;108:6;
111:9;112:4,8;113:23;
123:22;125:15,20,21;
134:3,6,11,16,19,24;
135:1,5,9,10,22;
136:16;137:6;139:5
**uses (6)**
67:3;72:21;73:25;
74:14;75:1;104:2
**using (14)**
36:6;71:3,13;73:4;
94:9;103:8;104:16;
113:15;123:6;124:7;
126:12,15;133:7;137:9
**usually (1)**
118:5

V

**valid (1)**
81:6
**values (2)**
88:2;89:21
**various (1)**
108:2
**varying (1)**
85:7

**verbally (1)**
   4:17
**verbiage (2)**
   87:17;129:14
**Verizon (1)**
   47:7
**versus (2)**
   85:5;111:4
**vested (1)**
   137:15
**via (2)**
   62:7;92:24
**VIDEO (8)**
   4:2;35:3,6;91:20,23;
   140:11,14,20
**Viet (1)**
   131:11
**violations (1)**
   86:13
**violence (2)**
   110:5;119:2
**virtually (1)**
   37:25
**vocabulary (1)**
   122:13
**volunteered (1)**
   132:24

**W**

**wages (2)**
   103:2,3
**waiting (2)**
   102:15;115:1
**waived (3)**
   50:10,12;140:23
**Walk (3)**
   10:10;99:8;108:5
**walking (3)**
   103:11;109:7,8
**War (1)**
   23:18
**wartime (2)**
   23:9,11
**water (2)**
   20:14;91:17
**way (27)**
   12:13;35:22;36:2;
   41:9;57:9;62:4;72:1;
   74:3,13,25;89:3,4,14;
   90:2;92:18;93:5,13;
   97:2;99:6;109:3,6;
   120:18,20;127:23;
   135:13;136:16;138:25
**Wayne (1)**
   119:17
**ways (1)**
   43:19
**website (3)**
   68:9,11,13
**websites (5)**
   67:12,14,22;68:1;
   106:19

**week (1)**
   15:8
**weeks (1)**
   21:10
**weigh (1)**
   85:8
**weren't (3)**
   19:23;94:14;106:7
**what-if (1)**
   123:2;124:4
**What's (23)**
   16:16;20:3,20;26:10;
   31:6;32:6;33:19;49:25;
   53:20;66:25;69:7,7;
   75:23,23;85:2;86:6;
   95:22;114:23;116:20;
   130:8,8,11;139:24
**whatsoever (1)**
   40:22
**white (1)**
   95:1
**whole (1)**
   38:19
**wide (1)**
   37:14
**Williams (3)**
   29:12;120:1;131:10
**within (5)**
   32:15;35:17;49:14;
   116:8;138:18
**without (8)**
   65:14;86:10,24;87:6;
   88:9;89:1;97:12;99:14
**WITNESS (5)**
   51:22;52:1;99:2;
   102:25;125:8
**word (65)**
   34:20,20;37:4,11,13,
   19;45:11,15;46:14;
   52:7;55:10;56:9;65:13;
   70:16,23;71:3,10;72:3,
   10,16,21,25;73:13;
   75:6;87:11;93:15,16;
   121:1,3,5,18,21;122:3,
   7,11,12,16,20,25;
   123:4,11,15,21;124:2,
   8,10,16,25;125:19,21,
   25;126:6,9,9,16,21;
   127:7;128:6;130:16;
   134:1;137:1,6,11,23,25
**wording (1)**
   95:4
**words (13)**
   40:3;47:20,20;49:2;
   74:6;94:19;108:2;
   120:21,25;121:8,11,12,
   16
**word's (1)**
   139:11
**work (16)**
   7:6,8,9;8:1;9:25;
   11:11;22:2;81:20,20,
   25;83:18;107:21;

115:25;118:1;133:17;
   134:15
**worked (4)**
   7:12,22;39:21;
   103:24
**Workers (1)**
   39:23
**working (5)**
   8:24;9:8,12;52:9;
   53:17
**world (3)**
   139:14,19,24
**write (1)**
   115:4
**writing (1)**
   131:19
**written (7)**
   11:22;14:20;19:15;
   64:14,24;130:9,11
**wrong (5)**
   56:16;74:23;88:7;
   98:13;99:5

**Y**

**year (6)**
   5:15,17,24;7:1;8:9;
   47:3
**years (6)**
   4:15;21:10;25:3;
   79:14;108:8;116:17
**year-wise (1)**
   6:6

**Z**

**Zero (1)**
   132:24

**0**

**06 (1)**
   6:12

**1**

**1 (2)**
   29:18;34:10
**10 (1)**
   83:6
**10:31 (1)**
   35:4
**10:37 (1)**
   35:7
**10th (1)**
   85:21
**11:37 (1)**
   91:21
**11:50 (1)**
   91:24
**12:48 (1)**
   140:12
**12:55 (3)**

140:15,21,22
**13 (1)**
   8:17
**14 (1)**
   6:12
**17 (2)**
   5:14;37:11
**19656 (1)**
   114:24

**2**

**2 (4)**
   28:14;30:4;34:8;
   100:17
**2003 (1)**
   6:7
**2007 (2)**
   6:13,23
**2009 (2)**
   35:24;36:11
**2011 (1)**
   7:3
**2012 (2)**
   8:16;9:24
**2013 (5)**
   8:10;9:24;10:8,12;
   35:11
**2014 (2)**
   35:13;36:14
**2015 (3)**
   36:5,13,16
**2017 (5)**
   27:20,21;48:6;80:17;
   82:2
**2018 (6)**
   11:18;14:24;26:13,
   17;27:10;83:6
**24 (1)**
   60:19
**27 (1)**
   82:1
**27th (2)**
   48:6;58:20
**28 (1)**
   24:25

**3**

**3 (6)**
   21:5;22:18;28:19;
   30:12;34:8;88:2
**30 (1)**
   8:23
**32 (1)**
   36:25
**36 (1)**
   65:15
**37 (1)**
   66:19
**38 (2)**
   70:1,7

**4**

**40 (1)**
   70:13
**44 (1)**
   75:5
**45 (2)**
   75:20;76:3

**5**

**5 (1)**
   24:24
**50/50 (4)**
   60:20;61:16;92:17;
   93:16
**500 (1)**
   13:5

**6**

**6 (1)**
   37:1

**7**

**75th (1)**
   5:20

**9**

**9 (2)**
   21:5;22:19
**9/11 (3)**
   131:7;132:13,23
**9:54 (1)**
   4:3
**90 (4)**
   8:23;10:16,19;81:24